IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**UHLIG LLC,**

    **Plaintiff/Counter Defendant,**

v.

**CORELOGIC, INC.,**

    **Defendant/Counter Claimant.**

Case No. 21-2543-DDC-GEB

### MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR TEMPORARY RESTRAINING ORDER

Defendant CoreLogic Solutions, LLC[1] has moved for a temporary restraining order and preliminary injunction (Doc. 5). This Order decides the TRO aspect of this motion but defers decision on the preliminary injunction request. For reasons that follow, the court denies the requested restraining order.

**I.  Background**

Plaintiff Uhlig, LLC ("Uhlig") is a "national provider . . . of resale and lender processing information for common interest communities, including but not limited to homeowner associations, condominiums, co-ops, and similar communities, wherein the deed to property is encumbered by certain obligations to the common community." Doc. 1 at 1 (Compl. ¶ 1). Uhlig alleges that it "provides time-sensitive data and other information regarding Common Interest Communities and their residents . . . to retail customers under contractual terms and conditions set forth in [Uhlig's] website, registration, upload and ordering agreements and expressly

---

[1]  Defendant CoreLogic Solutions, LLC asserts that plaintiff incorrectly has sued it as "CoreLogic, Inc." Doc. 5 at 1.

accepted as a condition of doing business with Plaintiff[.]" *Id.* (Compl. ¶ 2). Uhlig "does business under the brands CondoCerts™ and WelcomeLink®[.]" *Id.* at 2 (Compl. ¶ 3).

Defendant CoreLogic Solutions, LLC ("CoreLogic") "is a global property information, analytics and data-enabled services provider." Doc. 8 at 11 (Countercl. ¶ 21). One of CoreLogic's products is CondoSafe, which "is a national service for mortgage lenders that provides condominium-project data and analytics." *Id.* In the past, CoreLogic has purchased data from Uhlig and a predecessor company who it used for CoreLogic's products. *See generally id.* at 13–15 (Countercl. ¶¶ 29–37). But, in November 2021, Uhlig terminated CoreLogic's access to its services and has barred CoreLogic from accessing its websites. *Id.* at 15 (Countercl. ¶ 38).

Uhlig filed this lawsuit against defendant, alleging (1) violations under the Lanham Act, 47 U.S.C. § 1125(a)(1) for CoreLogic's alleged unauthorized use of Uhlig's trademarks, (2) breach of contract for CoreLogic's alleged violation of Uhlig's Terms of Use agreement, (3) breach of contract for CoreLogic's alleged violation of Uhlig's Account Registration agreement, (4) breach of contract for CoreLogic's alleged violation of Uhlig's Information Upload Agreement, (5) breach of contract for CoreLogic's alleged violation of Uhlig's Order Submission Agreement, (6) fraud, (7) tortious interference with business expectancy, and (8) violation of the Delaware Deceptive Trade Practices Act, 6 Del. C § 2531–2536. Doc. 1 at 11–18 (Compl. ¶¶ 58–108).[2] CoreLogic responded to Uhlig's lawsuit by filing an Answer and Counterclaim. Doc. 8. The Counterclaim asserts breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contractual relations, and promissory

---

[2]   The court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiff brings a claim under the federal Lanham Act. The court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state law claims and defendant's Counterclaim.

estoppel claims against Uhlig. *Id.* at 16–66 (Countercl. ¶¶ 39–66). The same day that CoreLogic filed its Answer and Counterclaim, it also filed a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 5). It asks the court to issue a temporary restraining order and preliminary injunction "restraining [Uhlig] from prohibiting CoreLogic's access to its websites condocerts.com and welcomelink.com, and data contained therein, pending the final determination of this action." *Id.* at 1. The court conducted a hearing on CoreLogic's motion on December 2, 2021. Doc. 21. After considering the parties' arguments and submissions, the court denies CoreLogic's request for a temporary restraining order ("TRO") under Fed. R. Civ. P. 65. It explains why, below.

## II.     Governing Legal Standard

To secure a TRO, the moving party must establish four things: (1) the moving party is substantially likely to succeed on the merits; (2) it will suffer irreparable injury without the TRO; (3) the threatened injury outweighs the injury the opposing party will suffer if the TRO issues; and (4) the TRO, if issued, is not adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (addressing request for preliminary injunction); *see also Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan. 1995) (explaining that when "addressing a motion seeking a temporary restraining order," the court "follows the same procedure as for a preliminary injunction motion"). Preliminary relief—whether in the form of a TRO or a preliminary injunction—"is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (preliminary injunction case); *see also Heavy Petroleum Partners, LLC v. Atkins*, No. 6:09-cv-01077-EFM-KMH, 2010 WL 11565423, at *2 (D. Kan. May 25, 2010) ("A temporary restraining order is an extraordinary remedy that is an exception rather than the rule, and courts

do not grant it as a matter of right."). The decision whether to issue "a temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court." *Sac & Fox Nation*, 905 F. Supp. at 906.

### III. Analysis

The court denies the request for a TRO because, it concludes, CoreLogic fails to establish at least two of the four requirements a movant must show to secure a TRO. The court begins by explaining why CoreLogic fails the irreparable harm requirement. And then, it explains why CoreLogic hasn't shown a substantial likelihood of success on the merits.

#### A. Irreparable harm

Our Circuit consistently has explained that irreparable harm is the first touchstone of a preliminary injunction and a TRO. "[C]ourts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004) (quoting *Reuters Ltd v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)). This priority applies with equal force to a request for a TRO. *See Sac & Fox Nation*, 905 F. Supp. at 907 ("[T]he court, in addressing a motion seeking a temporary restraining order, follows the same procedure as for a preliminary injunction motion."); *see also Presidential Hos., LLC v. Wyndham Hotel Grp., LLC*, No. 17-0981 JB/JHR, 2018 WL 2604831, at *15 (D.N.M. June 2, 2018) (applying to a motion for TRO, that "a showing of probabl[e] irreparable harm is the single most important prerequisite for the issuance" of a TRO (citation and internal quotation marks omitted)).

4

Here, CoreLogic, the moving party, argues that ever since Uhlig—the nonmoving party—blocked CoreLogic from acquiring data from Uhlig, "CoreLogic has been precluded from obtaining any due diligence information from COAs and condominium projects under contract with Uhlig." *See* Doc. 6 at 13.  CoreLogic also claims it has had "no opportunity to investigate workarounds." *Id*.  CoreLogic explains that it has contacted "at least a dozen" COAs/management companies requesting the due diligence information that it typically would have acquired from Uhlig.  *Id*.  But, it says, all these efforts were "rebuffed."  *Id*.

CoreLogic conceded at the TRO hearing, however, that it has competitors and those competitors presumably acquire the same type of information from somewhere.  CoreLogic has made no effort to explain why it hasn't or couldn't establish a relationship with an alternative supplier of the information it used to acquire from Uhlig.  Instead, CoreLogic merely asserts it lacks the capacity to discern the source used by its competitors to secure the information CoreLogic needs.  Also, to the extent Uhlig exclusively has access to data for Uhlig-contracted properties, CoreLogic never quantifies how much of the market it is restricted from by not having access to the data of Uhlig-contracted properties.  Presumably Uhlig has competitors who provide data for other non-Uhlig contracted properties.  And, CoreLogic provides no reason why it can't continue its business using data provided by Uhlig's competitors who have access to data for non-Uhlig contracted properties.

The court isn't persuaded that a sophisticated operator like CoreLogic couldn't gather industry intelligence about alternative providers.  In short, CoreLogic hasn't persuaded the court that its access to information is so confined that it has no alternative.

But even if CoreLogic had made such a showing, it has not demonstrated—at least not yet—that it will suffer irreparable injury without Uhlig's information.  CoreLogic has argued that

it already has had to turn customers away and it cannot count on them to return if there is a break in their relationship.

Irreparable harm "'does not readily lend itself to definition.'" *Dominion Video*, 356 F.3d at 1262 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). And proving irreparable harm is not "'an easy burden to fulfill.'" *Id*. (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "To constitute irreparable harm, an injury must be certain, great, actual, 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Irreparable harm is not harm that is merely serious or substantial." *Id*. (citations and internal quotation marks omitted).

A party seeking interim relief establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258). A claim of "[p]urely speculative" harm does not suffice; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden. *Id*. (quoting *Greater Yellowstone*, 321 F.3d at 1258).

A party may establish irreparable harm by "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position." *Dominion Video*, 356 F.3d at 1264; *see also Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) ("[L]oss of customers, loss of goodwill, and threats to a business'[s] viability can constitute irreparable harm." (citations and internal quotation marks omitted)).

The Circuit has established a high bar for establishing irreparable harm. Often, the question is a "difficult and close" one. *Dominion Video*, 356 F.3d at 1262. Here, on the current record anyway, it is not close. The court has received no more than "wholly conclusory" statements. *Id*. at 1261. CoreLogic has asserted that it will suffer substantial losses if its customers go elsewhere. Perhaps it will. And, in time, CoreLogic may marshal information to substantiate those claims. But for now, it has offered no more than vague conclusory statements about such losses. If it can prove those losses (and the other elements of its claims), it will have the right to recover money damages. But CoreLogic hasn't convinced the court that any harm here is irreparable. This shortcoming alone dooms its TRO request.

### B.     Substantial likelihood of success on the merits

But even if CoreLogic could establish irreparable harm, the court would deny a TRO for a second, independent reason: CoreLogic hasn't shown a substantial likelihood that it will prevail on the merits. CoreLogic's Counterclaim asserts breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contractual relations, and promissory estoppel claims. Doc. 8 at 16–66 (Countercl. ¶¶ 39–66). The Counterclaim theorizes that CoreLogic entered into a largely oral contract with another company—Mutual of Omaha—and Uhlig is saddled with that contract because it acquired substantial assets from Mutual of Omaha. Even if this legal premise pans out for CoreLogic, its related contract and tort claims will face substantial challenges.

The gist of this oral contract, CoreLogic claims, is memorialized in one page summary labeled "DRAFT CONDOCERTS ORDER PROCESS." *See* Doc. 6-2 at 6. This document refers to itself as "a draft process." *Id*. This one page contains zero information about the price that CoreLogic must pay for what it acquires and never specifies any term for the purported

7

contract. That is, it contains no information indicating whether the agreement will last for one month, one year, or one decade. CoreLogic tries to meet this inadequacy with the argument that the oral contract lasted indefinitely until Uhlig terminates it with reasonable notice. *See* Doc. 6 at 19–21.

The problem with CoreLogic's theory is what happened after the oral contract supposedly was formed. Uhlig acquired some assets from Mutual of Omaha—the company who purportedly formed the oral contract with CoreLogic. And in 2018, CoreLogic began acquiring the information at issue from Uhlig. This meant that CoreLogic's agents and employees began acquiring the information at issue from the website of CondoCerts—a d/b/a utilized by Uhlig. Each such acquisition required CoreLogic's employee or agent to secure access to the website and consent to the terms and conditions displayed there. These terms and conditions rejected many of the key components of CoreLogic's oral contract theory.

For instance, Uhlig's "Information Upload Agreement" provided:

> 18.    **Entire Agreement**, *This Agreement, including any binding written agreements that have been physically signed by both you and CondoCerts, the Registration, any Order Agreement, and the Terms of Use and the Privacy Policy (and any click-wrap agreements to which User has assented on the Website), constitute the complete and exclusive agreement between you and us with respect to use of the Website and CondoCerts Services and supersedes any and all prior or contemporaneous communications, representations, statements, agreements and understandings, whether in oral, written or electronic form, between you and us concerning the use of the Website and CondoCerts Services.* There are no representations, promises, warranties, covenants, understandings, or undertakings between or among the Parties other than those expressly set forth in this Agreement, the Registration, the Terms of Use, the Privacy Policy, and Order Agreement and any agreements that have been physically signed by you and CondoCerts (and any click-wrap agreements to which User has assented on the Website). For clarity, this Agreement, the Registration, the Terms of Use, the Privacy Policy, and Order Agreement and any agreements that have been physically signed by you and CondoCerts (and any click-wrap agreements to which User has assented on the Website) may not be superseded by or interpreted by any separate agreement between the Parties, or by any Uploaded Information. No attempt by you to alter, modify, waive, supplement or append additional terms to this Agreement, the

> Registration, the Terms of Use, the Privacy Policy, any Order Agreement and/or any agreements that have been physically signed by you and CondoCerts (and/or any click-wrap agreements to which User has assented on the Website), whether through Uploaded Information, forms, documents, legends, signatures or other writing or content in any form that is added, uploaded or submitted by you or any third party (an "**Attempted Alteration**"), shall be effective or have any legal significance whatsoever, regardless of whether such Attempted Alteration is retained, allowed, accepted and/or reproduced through the Website and CondoCerts Services; provided, however, that any such attempt by you to alter, modify, waive, supplement or append additional terms to this Agreement shall automatically, without any notice or action on our part, cause the CondoCerts Services and any Documents or other materials produced for you or on your behalf to be deemed to be ineffective and void for all purposes.

Doc. 17-1 at 45 (emphasis added). Other of Uhlig's terms and conditions contain similar provisions. *See* Doc. 17-1 at 18 ("CondoCerts Website Terms of Use"); Doc. 17-1 at 55–56 ("Order Submission Agreement"). These provisions favor the conclusion that Uhlig's written terms and conditions—which CoreLogic's agents and employees reportedly accepted—negated and fully replaced any oral agreement that CoreLogic might have formed with Uhlig's predecessor. In time, perhaps, CoreLogic may manage to establish that these provisions didn't nullify the oral contract it claims. But CoreLogic hasn't done so yet, and this inference—for now, at least—negates its ability to establish that it's substantially likely to prevail on the merits. *Winter*, 555 U.S. at 20.

Also, Uhlig's written terms and conditions explicitly reject CoreLogic's theory of a continuing right to access Uhlig's data—absent reasonable notification of termination. Specifically, they provide that Uhlig "expressly reserves the right to terminate the use of, or to refuse to permit the use of, the CondoCerts Services and the Website . . . by any person or entity, at the sole and absolute discretion of CondoCerts." Doc. 17-1 at 24. And so, the current record also favors a finding that Uhlig has exercised this discretion and elected to stop providing information to CoreLogic.

9

In sum, the current record favors a finding that Uhlig established a contract explicitly providing the right to do precisely what CoreLogic claims Uhlig has done. This information casts substantial doubt on CoreLogic's contract claim and the likelihood it will prevail on the contract theory it has asserted. The court thus finds that CoreLogic has failed to shoulder its burden to show it is substantially likely to prevail on the merits.[3]

### IV.     Conclusion

The court denies the portion of CoreLogic Solutions, LLC's motion (Doc. 5) seeking a temporary restraining order. If CoreLogic elects to proceed on its motion for a preliminary injunction, the court directs counsel for both parties to contact the chambers of Magistrate Judge Gwynne E. Birzer to request a conference for scheduling that hearing and attendant proceedings.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant CoreLogic Solutions, LLC's Motion for a Temporary Restraining Order is denied. At the court's direction, the Clerk bifurcated defendant CoreLogic Solutions, LLC's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 5). Therefore, the portion of the motion seeking a preliminary injunction remains pending.

**IT IS SO ORDERED.**

**Dated this 3rd day of December, 2021, at Kansas City, Kansas.**

>                          s/ Daniel D. Crabtree
>                          **Daniel D. Crabtree**
>                          **United States District Judge**

---

[3] CoreLogic's motion only discusses its likelihood of succeeding on "its breach of contract and promissory estoppel claim." Doc. 6 at 19; *see also id.* at 18–23. CoreLogic doesn't address its breach of the covenant of good faith and fair dealing and tortious interference with contractual relations claims. Since CoreLogic doesn't address those claims, it hasn't shouldered its burden to show that it's likely to succeed on them. CoreLogic's promissory estoppel theory is even less likely to carry the burdens imposed by the TRO standard.