# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UHLIG LLC,

      **Plaintiff/Counter Defendant,**

v.                                          Case No. 21-2543-DDC-GEB

CORELOGIC, INC., et al.,

      **Defendants/Counter Claimants.**

## MEMORANDUM AND ORDER

Plaintiff Uhlig LLC ("Uhlig") has filed a Motion to Dismiss Amended Counterclaims. Doc. 35. The motion asks the court to dismiss each of the eight claims that defendant CoreLogic Solutions, LLC[1] ("CoreLogic) has asserted against Uhlig in its "Answer, Affirmative Defenses, and Counterclaims to Amended Complaint" (Doc. 67).[2] For reasons that follow, the court grants the motion. And, it dismisses all eight claims that CoreLogic has asserted in its Counterclaim against Uhlig.

---

[1] Defendant CoreLogic Solutions, LLC asserts that plaintiff incorrectly has sued it as "CoreLogic, Inc." Doc. 5 at 1; Doc. 42 at 6.

[2] Uhlig's motion (Doc. 35) is directed at CoreLogic's "Answer, Affirmative Defenses, and First Amended Counterclaims to Complaint" (Doc. 29). After Uhlig filed the motion, it sought and secured the court's leave to file an Amended Complaint. Docs. 61, 62. Uhlig filed its Amended Complaint (Doc. 63), and CoreLogic filed its "Answer, Affirmative Defenses, and Counterclaims to Amended Complaint" (Doc. 67). Shortly after that, Uhlig filed an unopposed motion to allow "the parties' prior briefing on [p]laintiff's Motion To Dismiss Amended Counterclaims (Docs. 35, 36, 42, and 50) to stand against [d]efendant's recently filed Counterclaims," asserted in its more-recently filed "Answer, Affirmative Defenses, and Counterclaims to Amended Complaint" (Doc. 67) because "the Counterclaims to the Amended Complaint (Doc. 67) are the same in nearly all material respects to the Amended Counterclaims." *See* Doc. 71 at 1, 3. The court granted the motion. Doc. 73. Thus, the court considers the briefing that the parties submitted on the Motion to Dismiss that was directed at Doc. 29, but the court applies that briefing to claims asserted by CoreLogic in its more recently-filed "Answer, Affirmative Defenses, and Counterclaims to Amended Complaint" (Doc. 67) because it supercedes the earlier-filed pleadings. *See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) ("[A]n amended complaint supercedes an original complaint and renders the original complaint without legal effect[.]" (citation and internal quotation marks omitted)).

## I.      Factual Background

The following facts come from Uhlig's Amended Complaint (Doc. 63) or CoreLogic's Counterclaim (Doc. 67).  The court accepts the facts as true and views them in the light most favorable to CoreLogic, the party opposing the motion to dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

Uhlig is a "national provider . . . of resale and lender processing information for common interest communities, including but not limited to homeowner associations, condominiums, co-ops, and similar communities, wherein the deed to property is encumbered by certain obligations to the common community[.]"  Doc. 63 at 1 (Am. Compl. ¶ 1).  Uhlig alleges that it "provides time-sensitive data and other information regarding Common Interest Communities and their residents . . . to retail customers under contractual terms and conditions set forth in [Uhlig's] website, registration, upload and ordering agreements and expressly accepted as a condition of doing business with" Uhlig.  *Id.* at 1–2 (Am. Compl. ¶ 2).  Uhlig "does business under the brands CondoCerts™ and WelcomeLink®[.]"  *Id.* at 2 (Am. Compl. ¶ 3).

CoreLogic "is a global property information, analytics and data-enabled services provider."  Doc. 67 at 12 (Countercl. ¶ 7).  "One of CoreLogic's products is CondoSafe," which "is a national service for lenders that provides condominium-project data and analytics."  *Id.*  As part of a lender's due diligence in the mortgage underwriting process, the lender typically asks the condominium owners association ("COA") for a condominium or other common-interest project "to provide due diligence information, such as a condominium questionnaire, COA governing documents, annual budget, capital reserves, litigation documents, [and] engineer's

report," among other data. *Id.* at 12–13 (Countercl. ¶ 9). CoreLogic collects this data by contacting the COA and requesting that it provide the data. *Id.* at 13 (Countercl. ¶ 11). Sometimes, however, the COA outsources the task of providing the requested data to a third party vendor, such as Uhlig. *Id.* at 14 (Countercl. ¶¶ 12–14). In this third party vendor role, Uhlig collects condominium data from COAs and then "sells it for a fee via its websites CondoCerts.com and Welcomelink.com." *Id.* (Countercl. ¶ 13). Uhlig has entered exclusivity arrangements with COAs, making Uhlig the "sole source for third parties seeking to obtain" condominium data. *Id.* (Countercl. ¶¶ 13–14).

In the past, CoreLogic has purchased data from Uhlig and a predecessor company who it used for CoreLogic's products. *See generally id.* at 15–20 (Countercl. ¶¶ 22–40). In 2015, Mutual of Omaha owned CondoCerts. *Id.* at 15 (Countercl. ¶ 22). At that time, CoreLogic was buying data from CondoCerts (and WelcomeLink) to use for CoreLogic's product for mortgage lenders and investors. *Id.* But then, CondoCerts told CoreLogic that "it had an issue with CoreLogic placing orders and using CondoCerts for CoreLogic's product." *Id.* And, for "a short period of time," CondoCerts stopped filling CoreLogic orders. *Id.*

To resolve the dispute, CoreLogic arranged a meeting with CondoCerts during a 2015 conference held in Las Vegas and attended by both CondoCerts and CoreLogic. *Id.* (Countercl. ¶ 23). A CoreLogic representative met with two CondoCerts representatives. *Id.* At the meeting, CoreLogic provided the CondoCerts representatives a one-page document labeled "Draft CondoCerts order process." *Id.* at 16 (Countercl. ¶ 24); *see also* Doc. 6-2 at 6 (2015 Agreement).[3] It "described CoreLogic's order process and use of data from the CondoCerts

---

[3]     When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). A court "'may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties

website." Doc. 67 at 16 (Countercl. ¶ 24).  The CoreLogic representative "verbally explained the process and how CoreLogic used data from CondoCerts for CoreLogic's product, and proposed to continue to follow that process going forward." *Id.*  As consideration for the CondoCert's agreement to provide the data, "CoreLogic agreed to continue placing orders with CondoCerts[.]" *Id.*  CoreLogic agreed to "place a separate order with CondoCerts for each request CoreLogic fulfilled for a customer, even where CoreLogic already had received the data from CondoCerts[.]" *Id.*  The two CondoCerts representatives agreed to this agreement, which CoreLogic calls the "2015 Agreement." *Id.*

Two years later, in 2017, Uhlig acquired CondoCerts. *Id.* at 17 (Countercl. ¶ 28).  In 2018, CoreLogic contacted Uhlig about the 2015 Agreement, and Uhlig responded that it wasn't familiar with the agreement. *Id.* (Countercl. ¶ 29).  Instead, Uhlig told CoreLogic that its terms and conditions are on its website, that Uhlig does not offer its product and services outside those terms, and that Uhlig "would 'not be able to enter into the agreement [CoreLogic] propose[d].'" *Id.*  In response, CoreLogic told Uhlig that it "had an agreement with [CondoCerts] on [their] relationship[,]" that CoreLogic has "been doing business with CondoCerts for many years[,]" and that "the way [CoreLogic does] business with [Uhlig] is not aligned with Uhlig's standard terms and conditions." *Id.* (Countercl. ¶ 31) (internal quotation marks omitted).  Uhlig asked for more detail about the agreement CoreLogic was seeking, and CoreLogic responded "by providing two different documents the parties could use to further memorialize the 2015 Agreement and noting that all [CoreLogic was] looking to do is memorialize [its] existing

---

do not dispute the documents' authenticity.'" *Id.* (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)).  Here, the court considers the one-page "Draft CondoCerts order process" document as well as other documents that the pleadings reference because they are central to the claims and the parties don't dispute their authenticity.  Thus, the court properly may consider documents referenced in the pleadings on this Rule 12(b)(6) motion.

relationship" with CondoCerts.  *Id.* (Countercl. ¶ 32) (internal quotation marks omitted).  Uhlig never responded to CoreLogic about memorializing an agreement between the parties.  *Id.* at 18 (Countercl. ¶ 33).

After that exchange, CoreLogic continued to buy data from Uhlig's website and use it in the same manner as it had since 2015.  *Id.* at 18, 19 (Countercl. ¶¶ 33, 37).  CoreLogic asserts that Uhlig "was aware" that CoreLogic was buying data from its websites and using it "without restriction" as the 2015 Agreement permitted it to do, and that Uhlig "consented to such use." *Id.* at 18 (Countercl. ¶ 34).

In June 2021, Uhlig's legal counsel sent CoreLogic a letter notifying CoreLogic that it was "violating Uhlig's terms of service because it was purchasing data from Uhlig for prohibited commercial purposes." *Id.* at 19–20 (Countercl. ¶ 39); *see also* Doc. 6-4 at 13–15 (June 29, 2021 letter).  On July 26, 2021, CoreLogic responded to Uhlig's letter, asserting that Uhlig "has known for years of both CoreLogic's purchasing of the data and the commercial purpose for which the data was purchased." *Id.* at 20 (Countercl. ¶ 40).  Uhlig didn't respond to CoreLogic's July 2021 letter for three and one-half months.  *Id.* (Countercl. ¶ 41).  Then, on November 9, 2021, Uhlig sent CoreLogic another letter notifying CoreLogic that Uhlig was terminating CoreLogic's access to its services based on CoreLogic's violation of Uhlig's consumer agreements.  *Id.* (Countercl. ¶ 42); *see also* Doc. 6-4 at 25–27 (Nov. 9, 2021 letter).  This lawsuit followed.

Uhlig sued CoreLogic, claiming (1) violations under the Lanham Act, 47 U.S.C. § 1125(a)(1) for CoreLogic's alleged unauthorized use of Uhlig's trademarks, (2) breach of contract for CoreLogic's alleged violation of Uhlig's Terms of Use Agreement, (3) breach of contract for CoreLogic's alleged violation of Uhlig's Account Registration Agreement, (4)

breach of contract for CoreLogic's alleged violation of Uhlig's Information Upload Agreement, (5) breach of contract for CoreLogic's alleged violation of Uhlig's Order Submission Agreement, (6) fraud, (7) tortious interference with business expectancy, and (8) violation of the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6, §§ 2531–2536.  Doc. 63 at 12–18 (Compl. ¶¶ 58–108).[4]  CoreLogic responded to Uhlig's lawsuit by filing an Answer and Counterclaim.  Doc. 67.

CoreLogic's Counterclaim asserts claims against Uhlig for:  (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) tortious interference with contractual relations, (4) promissory estoppel, (5) unlawful exclusivity arrangements violating Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, (6) attempted monopoly violating Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, (7) unlawful exclusivity arrangements violating Section 3 of the Clayton Act, 15 U.S.C. § 14, and (8) violation of the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2511–2528.  *Id.* at 25–38 (Countercl. ¶¶ 59–141).

Invoking Fed. R. Civ. P. 12(b)(6), Uhlig now moves the court to dismiss all eight claims that CoreLogic asserts against Uhlig in the Counterclaim.  It asserts that CoreLogic's eight claims fail to state a claim for relief.  The court grants Uhlig's motion, and explains why, below.

## II.    Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

---

[4]    The court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because Uhlig brings a claim under the federal Lanham Act.  The court has supplemental jurisdiction under 28 U.S.C. § 1367 over Uhlig's state law claims and CoreLogic's Counterclaim.

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678

(citing *Twombly*, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the

factual allegations in the complaint are true, but it is "'not bound to accept as true a legal

conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  And

while this pleading standard doesn't require "'detailed factual allegations,'" it demands more

than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of

a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting

*Twombly*, 550 U.S. at 555).

## III.    Analysis

The court first addresses Uhlig's dismissal arguments directed at CoreLogic's three

federal antitrust claims.  They claim Uhlig violated the Sherman Antitrust Act and the Clayton

Act.  Following the antitrust analysis, the court turn to Uhlig's arguments seeking dismissal of

CoreLogic's state law claims.

### A.  Federal Antitrust Claims

#### 1.   Sherman Act § 1 Claim for Unlawful Exclusivity Arrangements

CoreLogic's "Fifth Counterclaim" asserts a claim against Uhlig for unlawful exclusivity

arrangements purportedly violating Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Doc.

67 at 31–33 (Countercl. ¶¶ 98–112).  CoreLogic bases this claim on Uhlig entering exclusive

contracts with COAs or property managers, thereby making Uhlig the "sole source for third

parties seeking to obtain" condominium data from those COAs or property managers.  *Id.* at 14

(Countercl. ¶¶ 13–14).  Uhlig makes two separate and independent arguments supporting

dismissal of CoreLogic's Sherman Act § 1 claim.  The court addresses those two arguments,

separately, below.

### a.  Market Definition

*First*, Uhlig asserts that CoreLogic fails to state a plausible Sherman Act § 1 claim

because the Counterclaim fails to allege a valid market definition.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy,

in restraint of trade or commerce[.]"  15 U.S.C. § 1.  To state a § 1 claim under the Sherman Act

based on an exclusionary contract, "plaintiff must allege facts which show:  [(1)] the defendant

entered a contract, combination or conspiracy that [(2)] unreasonably restrains trade in the

relevant market."  *TV Comm'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022,

1027 (10th Cir. 1992); *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111,

1119 (10th Cir. 2008) (explaining that Sherman Act § 1 claim based on exclusive dealing

"requires [the court] to analyze the relevant market power of the defendants and therefore

requires the plaintiff to allege a valid market").  Failing to plead a "legally [ ]adequate market

definition within [the] complaint" requires the court to dismiss a Sherman Act § 1 claim.

*Campfield*, 532 F.3d at 1119.

"The relevant product market in any given case is composed of products that have

reasonable interchangeability for the purposes for which they are produced—price, use and

qualities considered."  *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments,*

*LLC*, 843 F.3d 1225, 1244–45 (10th Cir. 2016) (citation and internal quotation marks omitted).

Also, the relevant market must not be one that is "'underinclusive" but, instead, plaintiff must

plead a market definition that "'reflects the total market demand for plaintiffs' product, not just

defendants' demand.'"  *Id.* at 1245 (quoting *Campfield*, 532 F.3d at 1118).  The relevant market

definition "must take into account 'competitive substitutes.'"  *Id.* (quoting *Campfield*, 532 F.3d

at 1118).  And, when analyzing the relevant market, the court must consider the "impact on

*competition* generally"—and not merely the harm just to a "single *competitor*[.]"  *Id.*; *see also*

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws,

however, were enacted for 'the protection of competition not competitors[.]'" (quoting *Brown*

*Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))).

     Here, CoreLogic defines the relevant market for its Sherman Act § 1 claim as:

"Condominium Data from COAs/property managers that contract with third party vendors to

outsource the provision of Condominium Data (the 'Relevant Market')."  Doc. 67 at 14

(Countercl. ¶ 14).  CoreLogic alleges, "Uhlig currently controls approximately 30% of the

Relevant Market and through its conduct . . . has a dangerous probability of obtaining

monopsony power in the Relevant Market."  *Id.*

     Uhlig asserts that CoreLogic has defined the market too narrowly.  The court agrees.

CoreLogic alleges that mortgage lenders and financial institutions seek certain data from COAs

or property managers about condominium properties when making underwriting decisions.  *Id.* at

12–13 (Countercl. ¶¶ 8–10). CoreLogic concedes that some COAs and property managers

contract directly with CoreLogic to provide the relevant condominium data.  *Id.* at 13 (Countercl.

¶ 11).  But, other COAs have informed CoreLogic that their condominium data is available only

through Uhlig, with whom these COAs have entered exclusive contracts.  *Id.* at 14 (Countercl. ¶¶

12, 14–15).  CoreLogic never defines the universe of COAs who provide condominium data

either (1) directly to buyers who seek such information like CoreLogic, or (2) through a third

party vendor, like Uhlig, using an exclusive contract.  And, CoreLogic never explains the

percentages of data sold through these two different channels—*i.e.*, sold directly from the COA

vs. sold through a third party vendor like Uhlig,  But, it's that market—the one that includes both

channels for selling condominium data—that, Uhlig correctly argues, "is the relevant starting

point from which to determine any impact Uhlig possibly could have on CoreLogic's ability to

obtain and sell Condominium Data to its customers."  Doc. 50 at 5.  But here, CoreLogic's

market definition impermissibly limits the market just to one portion of the relevant market—*i.e.*,

the one that provides condominium data through third party vendors who contract with COAs

and property managers to collect and provide that data to financial institutions and lenders—and

its definition excludes the second portion of the market—*i.e.*, condominium data sold directly

from the COAs or property managers without using a third party vendor's services.

        As our Circuit has instructed, "the relevant market is one that reflects the total market

demand for plaintiffs' product, not just defendants' demand."  *Campfield*, 532 F.3d at 1118

(internal quotation marks omitted) (finding plaintiff's "market definition [was] underinclusive"

because it failed "to include competitive substitutes").  Here, the total demand for the product—

*i.e.* condominium data—includes buyers who purchase the data directly from COAs or property

managers (as CoreLogic admits it does in some instances) as well as buyers who purchase the

data through exclusive contracts (as Uhlig has entered with certain COAs).  Our Circuit has

explained that when "there are numerous sources of interchangeable demand, the plaintiff cannot

circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."

*Id.* ("'[O]ne purchaser in a market of competing purchasers cannot constitute a relevant

geographic market, absent exceptional market conditions.'" (quoting *Jayco Sys., Inc. v. Savin*

*Bus. Machs. Corp.*, 777 F.2d 306, 319 n.43 (5th Cir. 1985))).  That's what CoreLogic's market

definition does here—it impermissibly reduces the scope of the product market to increase, albeit

artificially, Uhlig's market share.  And so, CoreLogic's definition isn't a legally permissible definition of the relevant market.

The facts here are strikingly similar to the ones presented in *Campfield*.  In that case, plaintiff was an automobile glass repair shop who used a patented repair technique to repair cracks in windshields.  *Id.* at 1116.  Plaintiff sued State Farm Insurance alleging that its policy of recommending windshield replacement instead of repair for its insureds' vehicles violated the antitrust laws.  *Id.*  The *Campfield* plaintiff alleged that State Farm had engaged in a monopsony by taking "advantage of its market power to depress demand" for a product.  *Id.* at 1118 (explaining "monopsony is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices[,]" and instead, in "a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices[,]" which is conduct that is "included within the practices prohibited by the Sherman Act").  The Tenth Circuit explained that when "considering market power in a monopsony situation, 'the market is not the market of competing sellers but of competing buyers.'"  *Id.* (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001)).  That is, the relevant market "'is comprised of buyers who are seen by sellers as being reasonably good substitutes.'"  *Id.* (quoting *Todd*, 275 F.3d at 202).  And, if "the market described in the complaint fails to include 'reasonably good substitutes' then the plaintiff has not adequately alleged a relevant market."  *Id.* (quoting *Todd*, 275 F.3d at 202).

The *Campfield* plaintiff defined the relevant market as "the State Farm insured repairable windshield repair market, in the geographic area of the United States of America."  *Id.* (internal citations omitted).  The Circuit found plaintiff's market definition was "underinclusive" because

it failed "to include competitive substitutes" when "there [were] other consumers to which auto-glass repair shops may cater their services." *Id.* The Circuit explained:

> Although State Farm and its insureds may be a significant consumer of automobile-glass repair and replacement services, [plaintiff had] not alleged that State Farm insureds are the only consumers available to him. [Plaintiff] might offer his services to other automobile insurance companies or individual car owners who do not have glass coverage. Because these are reasonably interchangeable buyers, the relevant market includes all of these potential consumers of windshield repair and replacement services.

*Id.* at 1118–19. The Circuit thus held that *Campfield*'s plaintiff had failed "to allege an appropriate market," and thus "failed to state a claim" under the Sherman Act. *See id.* at 1119 (holding that plaintiff failed to plead relevant market to support Sherman Act § 2 claim); *see also id.* (holding that Sherman Act § 1 claim for exclusive dealing failed for the same reason, *i.e.*, "because of the legally inadequate market definition [used] within [plaintiff's] complaint").

As did the *Campfield* plaintiff, CoreLogic has defined the market too narrowly. Its market definition has confined the market to a subset of buyers of condominium data—*i.e.*, just those buyers who are third party vendors, like Uhlig, who contract with COAs to purchase the data. *See* Doc. 67 at 14 (Countercl. ¶ 14) (defining the relevant market as "Condominium Data from COAs/property managers that contract with third party vendors to outsource the provision of Condominium Data"). CoreLogic's definition excludes "alternative buyers seeking similar services," *Campfield*, 532 F.3d at 1119, which would include buyers—like CoreLogic—who purchase condominium data directly from COAs who don't use third party vendors to respond to requests for condominium data. CoreLogic's market definition thus fails to include these "reasonably interchangeable buyers" in the relevant market just as the *Campfield* plaintiff failed to include in his market definition "other automobile insurance companies or individual car owners who do not have glass coverage" who also were "potential consumers of windshield

12

repair and replacement services." *Id.* Thus, CoreLogic here, as did the *Campfield* plaintiff, has alleged an "underinclusive" market definition that "fail[s] to allege an appropriate market," and as a consequence, "fail[s] to state a claim" under the Sherman Act. *Id.* at 1118–19.

CoreLogic asserts that it's premature for the court to dismiss its Sherman Act § 1 claim on a motion to dismiss before the factual record is developed. For support, it cites a Supreme Court case that held the "proper market definition *in this case* can be determined only after a factual inquiry into the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (emphasis added) (citation and internal quotation marks omitted). The Supreme Court explicitly limited its holding in *Eastman Kodak* to the facts "in [that] case[.]" *Id.* And, CoreLogic's argument ignores many other cases where both the Tenth Circuit and our court have dismissed Sherman Act claims on a Rule 12(b)(6) motion because the alleged market definition has failed to allege an appropriate market. *See, e.g.*, *Campfield*, 532 F.3d at 1118–19 (affirming dismissal of Sherman Act §§ 1 and 2 claims because plaintiff "fail[ed] to allege an appropriate market" and thus "failed to state a claim" under the Sherman Act); *TV Comm'ns Network*, 964 F.2d at 1025–26 (affirming Rule 12(b)(6) dismissal of Sherman Act claims because "the relevant market as defined in [the] complaint [was] insufficient as a matter of law"); *Drake v. Cox Enters., Inc.*, No. 12-2115-EFM-JPO, 2013 WL 557024, at *3 (D. Kan. Feb. 13, 2013) (dismissing Sherman Act claims under Rule 12(b)(6) because the "market description [was] legally insufficient" because it was "overly broad"); *Ablulimir v. U-Haul Co. of Kan., Inc.*, No. 11-4014-EFM, 2011 WL 2731774, at *5 (D. Kan. July 13, 2011) (dismissing federal antitrust claims on a Rule 12(b)(6) motion to dismiss because the complaint's allegations "fail[ed] to define the relevant market in terms of interchangeability and cross-elasticity of demand"). Other district courts in our Circuit have done the same thing. *See, e.g.*,

*Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (holding on a Rule 12(b)(6) motion that plaintiffs' "failure to plead the relevant market adequately is fatal to their exclusive dealing claim").  And other Circuits have recognized the broad application of this approach.  *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) (collecting cases and explaining that where "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted").

In sum, the court concludes that CoreLogic has failed to state a plausible claim under § 1 of the Sherman Act because its Counterclaim fails to allege an adequate market definition. Instead, CoreLogic's pleaded market definition is "underinclusive" as a matter of law because it "fails to include competitive substitutes"—*i.e.*, "reasonably interchangeable buyers" of condominium data.  *Campfield*, 532 F.3d at 1118–19.  CoreLogic hasn't pleaded an adequate market definition that could support a plausible Sherman Act § 1 claim.  For this reason, the court dismisses CoreLogic's "Fifth Counterclaim" under Rule 12(b)(6) for failing to state a claim.

### b.  Antitrust Injury

*Second*, Uhlig argues that the court also should dismiss CoreLogic's "Fifth Counterclaim" under § 1 of the Sherman Act for a second and independent reason.  Uhlig asserts that CoreLogic fails to allege a plausible antitrust injury legally capable of supporting a § 1 claim.  The court agrees with Uhlig on this point as well.  It explains why, below.

14

A plaintiff asserting an antitrust claim must allege an antitrust injury, in the sense that the Sherman Act defines that term. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006)). "'The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm' or individual." *Id.* (quoting *Tal*, 453 F.3d at 1258); *see also Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990) (explaining that a challenged practice must adversely affect competition, not just the business of the plaintiff or another competitor). The antitrust laws thus require a plaintiff to allege "'an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Cohlmia*, 693 F.3d at 1280 (quoting *Tal*, 453 F.3d at 1253).

So, to state a plausible Sherman Act claim, CoreLogic must allege harm to competition, not just harm to its own business. *Id.*; *see also SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994) (requiring that an antitrust violation "must actually or potentially harm consumers"). This standard, at the motion to dismiss stage, requires an antitrust plaintiff to allege facts capable of supporting a finding or inference that the purported anticompetitive conduct increased prices, reduced output, or otherwise affected the quantity or quality of the product. *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984) (describing raised prices and reduced output as the "hallmarks of anticompetitive behavior"); *see also Cohlmia*, 693 F.3d at 1281 (explaining that an antitrust plaintiff must show that the "'challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare'") (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).

Here, CoreLogic merely asserts, in conclusory fashion, that "Uhlig's exclusivity arrangements prevent competitors from entering the marketplace, which substantially reduces the

choice for vendors to distribute Condominium Data." Doc. 67 at 23 (Countercl. ¶ 54).  But, the Counterclaim asserts zero facts capable of supporting a plausible finding or inference that Uhlig's contracts with COAs and property managers preclude *competition*—as opposed to harming CoreLogic's business.  Here, CoreLogic's allegations center on its inability to procure condominium data from COAs and property managers.  It concedes that it tries to procure that data by "first contacting the COAs/property managers and requesting that they provide CoreLogic with the Condominium Data." *Id.* at 13 (Countercl. ¶ 11).  CoreLogic asserts that it, unlike Uhlig, "does not require or encourage COAs/property managers to refuse to deal with others seeking Condominium Data, nor is the de facto effect of CoreLogic's relationships with COAs/property managers an exclusive arrangement between CoreLogic and the COA/property manager for their Condominium Data." *Id.*

The Supreme Court has explained that if an antitrust plaintiff's injury "was attributable to its lack of desire, its limited production capabilities, or to other factors independent of [defendant's] unlawful conduct," then the antitrust plaintiff fails in "its burden" to plead an antitrust injury. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 126–27 (1969). Here, CoreLogic asserts that Uhlig has harmed CoreLogic by entering exclusive contracts with COAs and property managers that CoreLogic seeks to do business with directly.  But CoreLogic never alleges that it somehow is prevented from procuring the condominium data in the same fashion as Uhlig acquires it—*i.e.*, by contracting with COAs and property managers to acquire the data through an exclusive arrangement.  In short, CoreLogic's alleged injury arises from its own business decisions and conduct—not from Uhlig's actions.

Also, CoreLogic identifies another competitor in the industry who does business just as Uhlig conducts business.  CoreLogic asserts that Uhlig charges "average prices that are

substantially higher than the second major player in the Relevant Market[,]" *id.* at 23–24

(Countercl. ¶ 55)—*i.e.,*, a third party vendor who, like Uhlig, contracts with COAs and property

managers "to outsource the provision of Condominium Data[,]" *id.* at 14 (Countercl. ¶ 14).

CoreLogic asserts that this "second major player" does business in 21 states, charging prices that

are lower than Uhlig's. *Id.* at 23–24 (Countercl. ¶ 55). These allegations don't support an

inference of harm of competition. To the contrary, they allege that another competitor in the

market is operating in almost half of the United States and charging lower prices than Uhlig.

Those facts—viewed in CoreLogic's favor—actually support a plausible finding or inference of

*increased* competition and a *benefit* to consumers who long to access the information. *See State*

*Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (explaining that "[l]ow prices . . . benefit consumers

regardless of how those prices are set, and so long as they are above predatory levels, they do not

threaten competition" and noting that "cutting prices in order to increase business often is the

very essence of competition" (citation and internal quotation marks omitted)); *cf. Perington*

*Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1374 (10th Cir. 1979) (recognizing that

exclusive dealing arrangements "may actually enhance competition," so "they are not deemed

per se illegal").

   In sum, CoreLogic's allegations don't allege a plausible antitrust injury under the

Sherman Antitrust Act. The only injuries CoreLogic asserts are ones specific to CoreLogic—not

an injury to competition in general. These kinds of allegations can't support a plausible antitrust

injury. *See Drake*, 2013 WL 557024, at *2 (holding that plaintiff's "allegations [did] not

sufficiently plead an antitrust injury" when the alleged harm accrued "only to [p]laintiff" and

asserted "no factual allegations of an actual adverse effect on competition"); *see also Bushnell*

*Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1285 (D. Kan. 1997) (granting Rule 12(c) motion for

judgment on the pleadings against plaintiff's antitrust claims because plaintiff's alleged "injury [was] not an antitrust injury . . . because it [did] not affect competition in the market generally" and plaintiff's "conclusory allegation that defendant's conduct injured competition" didn't save plaintiff's antitrust claims from dismissal).  The court thus dismisses plaintiff's Sherman Act § 1 claim for this second and independent reason:  CoreLogic fails to plead a plausible antitrust injury sufficient to support its Sherman Act § 1 claim.[5]

### 2.   Sherman Act § 2 Claim for Attempted Monopoly

CoreLogic's "Sixth Counterclaim" asserts a claim for attempted monopoly that violates Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  Doc. 67 at 33–35 (Countercl. ¶¶ 113–121).  As with its § 1 claim, CoreLogic fails to state a plausible claim under § 2 for at least two reasons.  Each reason provides a separate and independent basis to dismiss CoreLogic's Sherman Act § 2 claim under Rule 12(b)(6).

### a.   Market Definition

The *first* reason for dismissing the Sherman Act § 2 claim is that CoreLogic fails to allege a legally sufficient market definition to support a Sherman Act claim.  Like the § 1 claim, to allege plausibly "a cause of action for conduct prohibited under § 2 of the Sherman Act," CoreLogic "must define a relevant market within which the defendants allegedly engaged in anticompetitive behavior."  *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1117 (10th Cir. 2008).  "'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

---

[5]      Uhlig also moves to dismiss CoreLogic's Sherman Act § 1 claim for a third reason.  Uhlig argues that CoreLogic fails to allege facts capable of supporting a plausible exclusive dealing claim violating the Sherman Act under a Rule of Reason analysis.  Because the court's analysis already has found that CoreLogic has failed to state a plausible Sherman Act § 1 claim for two separate and independent reasons, it need not reach Uhlig's third dismissal argument.

maintenance of that power.'" *Id.* at 1117–18 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966)).  A plaintiff's failure "to allege a legally sufficient market is cause for dismissal of the" § 2 claim.  *Id.* at 1118.  For the same reasons already discussed, *see supra* Part III.A.1.a., CoreLogic has failed to allege an adequate relevant market.  Instead, CoreLogic's alleged market definition is "underinclusive" and "fails to include competitive substitutes[.]"  *Id.*  And by "failing to allege an appropriate market, [CoreLogic] has failed to state a claim under § 2 of the Sherman Act."  *Id.* at 1119.  The court thus dismisses the Sherman Act § 2 claim—CoreLogic's "Sixth Counterclaim"—for this first reason.

### b.  Anticompetitive Conduct

The *second* reason for dismissing the § 2 claim under Rule 12(b)(6) is that CoreLogic fails to allege plausibly that Uhlig has engaged in anticompetitive conduct sufficient to support a § 2 claim.  An attempted monopolization claim under § 2 requires:  "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power,' with the third element requiring 'consider[ation] [of] the relevant market and the defendant's ability to lessen or destroy competition in that market.'"  *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  And, such a claim under § 2 requires a plaintiff to "plead both power in a relevant market and anticompetitive conduct."  *Id.*

CoreLogic argues that it has alleged plausibly two kinds of anticompetitive conduct supporting its Sherman Act § 2 claim.

*First*, CoreLogic asserts that it plausibly has alleged that Uhlig unlawfully "is exercising monopsony power" by "leverag[ing] its monopsony power in the related market of providing due

diligence data and analytics to mortgage lenders through various conduct, including exclusive dealing arrangements that serve only to foreclose a necessary input to competitors, refusing to deal with competitors, supracompetitive pricing, and interfering with CoreLogic's relationships with customers."  Doc. 42 at 24–25.  But, a monopsony "is different from the usual form of monopolistic control in which suppliers utilize market power to restrict output and thereby raise prices."  *Campfield*, 532 F.3d at 1118.  Instead, an actionable monopsony occurs when "the buyers have market power to decrease market demand for a product and thereby lower prices."  *Id.*; *see also id.* (explaining that facts alleging "State Farm took advantage of its market power to depress demand for" a product, taken as true, "describe a monopsony").

CoreLogic's problem is that its Counterclaim makes no factual allegations capable of supporting a finding or inference that Uhlig is leveraging monopsony power here.  It never alleges that Uhlig is using market power to decrease demand for condominium data in an effort to lower prices from COAs and property managers.  Also, the Counterclaim asserts no facts alleging that Uhlig is driving up prices that COAs and property managers charge for that data in an effort to exclude or drive competitors out of the market.  Instead, the Counterclaim merely alleges that Uhlig is using exclusive contracts to raise *its own prices* when it sells that data to financial institutions and lenders.  *See* Doc. 67 at 34 (Countercl. ¶ 120) (alleging that Uhlig's conduct has caused "substantial economic injury to CoreLogic, and has also injured competition . . . by . . . depriving customers from obtaining Condominium Data at lower cost"); *see also id.* at 36 (Countercl. ¶ 129) ("As a direct result of the foregoing anticompetitive conduct and restrictions on competition, consumers pay substantially higher prices for Condominium Data than they would in a fully competitive and open market.").  These allegations don't assert monopsonistic practices.

20

CoreLogic has no response to this shortcoming.  Instead, its papers merely allege that Uhlig "fails to appreciate the various forms of anticompetitive conduct."  Doc. 42 at 24; *see also Altitude Sports & Ent., LLC v. Comcast Corp.*, __ F. Supp. 3d. __, 2020 WL 8255520, at *9 (D. Colo. Nov. 25, 2020) ("Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." (citation and internal quotation marks omitted)).  CoreLogic then goes on to cite various alleged anticompetitive conduct that the Counterclaim asserts against Uhlig.  *See* Doc. 42 at 24–25 (citing Doc. 67 at 11, 14, 20–21, 23–24 (Countercl. ¶¶ 1, 14–15, 41–45, 54–57)).  But, none of the cited paragraphs allege *monopsonistic* practices.  Thus, CoreLogic fails to allege facts that plausibly assert that Uhlig is exercising monopsony power.  *Cf. Campfield*, 532 F.3d at 1118 (finding that facts alleging that "State Farm took advantage of its market power to depress demand for" a product, taken as true, "describe a monopsony").

*Second*, CoreLogic asserts that it has alleged anticompetitive conduct through "Uhlig's termination of a voluntary and profitable business relationship for anticompetitive reasons."  Doc. 42 at 25.  But, "as a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) ("[A]s a general rule . . . purely unilateral conduct does not run afoul of section 2—businesses are free to choose whether or not to do business with others and free to assign what prices they hope to secure for their own products." (citation and internal quotation marks omitted)).  As our Circuit put it, "[i]n *Trinko*, the Court acknowledged that in rare circumstances a refusal to cooperate with competitors might constitute

21

a § 2 violation, but that 'such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm,' should be few." *Christy Sports*, 555 F.3d at 1194 (quoting *Trinko*, 540 U.S. at 408).

The Supreme Court recognized one such exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  In that case, "the Supreme Court upheld a jury verdict finding liability when a monopolist (Aspen Skiing Company) first voluntarily agreed to a sales and marketing joint venture with a rival (Aspen Highlands) and then later discontinued the venture even when the evidence suggested the arrangement remained a profitable one." *Novell*, 731 F.3d at 1074 (discussing *Aspen Skiing*, 472 U.S. 585).  Later, however, the Supreme Court warned that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.  And, the Court has declined to extend Sherman Act liability based on a refusal to deal beyond *Aspen*, which merely represents a "limited exception" to the general rule that a business is free to choose with whom it does business. *Id.*

Our Circuit requires a plaintiff who aspires to "invoke *Aspen*'s limited exception" to allege the following two elements:  (1) "a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival[,]" and (2) "the monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end." *Novell, Inc.*, 731 F.3d at 1074–75 (quoting *Trinko*, 540 U.S. at 409 (further citations omitted)).  Here, CoreLogic alleges neither element plausibly, so it can't bring its Counterclaim within *Aspen*'s "limited exception." *Trinko*, 540 U.S. at 409.  The next two paragraphs explain how CoreLogic misses these marks.

For the first element, CoreLogic fails to allege that it was a rival of Uhlig when they entered their purported agreement in 2015.  Indeed, CoreLogic alleges just the opposite, alleging

22

that it "has *never* viewed Uhlig as a competitor."  Doc. 67 at 20 (Countercl. ¶ 43) (emphasis

added).  And, CoreLogic alleges that Uhlig "did not view CoreLogic as a competitor until

recently[.]"  *Id.* at 24 (Countercl. ¶ 58); *see also id.* at 15 (asserting in heading that "Uhlig

Breaches Its Contract With CoreLogic *After* Deeming CoreLogic A Competitor" (emphasis

added)).  The Supreme Court requires an antitrust plaintiff to allege that the monopolist

"voluntarily engaged in a course of dealing with its rivals[.]"  *Trinko*, 540 U.S. at 409.  Because

CoreLogic never alleges that it was Uhlig's competitor when the parties entered their purported

agreement in 2015 (one that allegedly permitted CoreLogic to buy condominium data from Uhlig

and use that data in CoreLogic's product that it sells to mortgage lenders and investors),

CoreLogic fails to allege a plausible refusal to deal claim falling within *Aspen*'s "limited

exception."  *Id.* at 409.

On the second element, CoreLogic also fails to allege facts capable of supporting a

plausible finding or inference that Uhlig's termination of "the preexisting course of dealing . . .

suggest[s] a willingness to forsake short-term profits to achieve an anti-competitive end."

*Novell, Inc.*, 731 F.3d at 1074–75.  To be sure, the Counterclaim makes a conclusory assertion

that "Uhlig is knowingly sacrificing short-term profits from CoreLogic in order to harm what it

views as a competitor."  Doc. 67 at 24 (Countercl. ¶ 57).  But, CoreLogic's problem is that it

never alleges any facts to support this perfunctory assertion, and in the *Iqbal* era, pleading a

plausible claim requires more than having counsel author a legal conclusion.

Instead, the Counterclaim alleges that Uhlig terminated CoreLogic's access to its services

because CoreLogic was purchasing data from Uhlig for prohibited purposes.  *Id.* at 19–20

(Countercl. ¶¶ 39, 42); *see also* Doc. 6-4 at 13–15 (June 29, 2021 letter); Doc. 6-4 at 25–27

(Nov. 29, 2021 letter).[6]  Uhlig's counsel sent a letter to CoreLogic asserting that "CoreLogic appears to be obtaining information through Uhlig's systems for prohibited commercial purposes, in clear violation of Uhlig's terms of use and transaction agreements" and that "CoreLogic has been systematically falsifying such information and attaching Uhlig's preparer certifications to altered data without Uhlig's knowledge or authorization."  Doc. 6-4 at 13.  And later, Uhlig's counsel sent a letter informing CoreLogic that it was terminating CoreLogic's access to Uhlig's services because of CoreLogic's "systematic[ ] violati[on of] the terms and conditions of Uhlig's services."  *Id.* at 25.  The letter also referenced CoreLogic's "past violations of Uhlig's ordering terms and conditions, as well as the demonstrated falsification of Uhlig's name, data and certifications[.]"  *Id.* at 26–27.  The Counterclaim asserts on "information and belief" that "this letter and Uhlig's conduct that followed [it] . . .was part of Uhlig's anti-competitive scheme . . . and not for any legitimate business purpose."  Doc. 67 at 19–20 (Countercl. ¶ 39).

A plaintiff may plead allegations "'on information and belief so long as the complaint sets forth the factual basis of the belief.'"  *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1040 (D. Kan. 2019) (quoting *Jackson-Cobb v. Sprint United Mgmt.*, 173 F. Supp. 3d 1139, 1149 (D. Colo. 2016)); *see also Horocofsky v. City of Lawrence*, No. 20-2529-EFM, 2022 WL 1421554, at *17 (D. Kan. May 5, 2022) ("Certainly, pleading upon information and belief is acceptable *as long as the complaint contains the factual basis for the belief.*" (citation and internal quotation marks omitted)); *Jackson-Cobb*, 173 F. Supp. 3d at 1149 ("The Tenth Circuit has held in various contexts that allegations, even allegations of fraud, may be made on information and belief so

---

[6]      The court considers these letters on the motion to dismiss because they are "documents referred to in the complaint" that "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation and internal quotation marks omitted).

long as the complaint sets forth the factual basis of the belief." (citing *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992))).  But, here, the CoreLogic's Counterclaim provides no factual basis for its conclusory assertion that Uhlig's termination of CoreLogic's access to Uhlig's services was "not for any legitimate business purpose."  Doc. 67 at 19–20 (Countercl. ¶ 39).  That approach can't suffice to state a plausible claim under the Sherman Act for refusing to deal.  *See Horocofsky*, 2022 WL 1421554, at *17–18 (dismissing plaintiff's claims based on allegations made on "information and belief" because plaintiff made "no attempt at all to vouch for this allegation or offer a factual basis for the belief").

In sum, CoreLogic fails to plead facts that plausibly allege either of the two elements required to plead a refusal to deal claim that comes within the "limited exception" of *Aspen Skiing.  See Novell, Inc.*, 731 F.3d at 1074–75; *see also Trinko*, 540 U.S. at 409.  As a result, CoreLogic hasn't alleged anticompetitive conduct sufficiently to assert a plausible Sherman Act § 2 claim based on a refusal to deal.  *See H&C Animal Health, LLC v. Ceva Animal Health, LLC*, 499 F. Supp. 3d 920, 931 (D. Kan. 2020) (holding that plaintiff failed to state Sherman Act claim based on defendant's refusal to sell products to plaintiff for distribution because the "antitrust laws permit a business to sell its own products or to contract with a distributor to bring those products to the market" and an "initial decision to adopt one business model does not lock [d]efendant into that model and preclude it from later deciding to sell its own products").  The court thus dismisses CoreLogic's Sherman Act § 2 claim for this second and independent reason: The Counterclaim fails to allege plausibly that Uhlig engaged in anticompetitive conduct sufficient to support a violation of § 2 of the Sherman Act.

For the two independent reasons identified in this section, the court dismisses CoreLogic's "Sixth Counterclaim" for attempted monopoly violating Sherman Act § 2 under

Rule 12(b)(6).  The pleaded claim fails to allege either (a) an adequate market definition, or (b) anticompetitive conduct.  It thus fails to state a plausible § 2 claim for relief.

### 3.    Clayton Act § 3 Claim for Unlawful Exclusivity Arrangements

CoreLogic's "Seventh Counterclaim" asserts a claim for unlawful exclusivity arrangements violating Section 3 of the Clayton Act, 15 U.S.C. § 14.  Doc. 67 at 35–37 (Countercl. ¶¶ 122–135).  Section 3 of the Clayton Act makes it unlawful:

> for any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.  To state a claim for a § 3 violation under the Clayton Act, a plaintiff must allege:  "1) that the violator is engaged in interstate commerce and that the alleged unlawful act occurred in the course of such interstate commerce, 2) that the violation involved a contract for sale, a sale, or a lease, 3) that the agreement is for goods, wares, merchandise, machinery, supplies or other tangible commodities, 4) that the agreement was conditioned or made on the understanding that the buyer or lessee will not use or deal in the goods of a competitor of the seller or lessor, [and] 5) that the probable effect of the agreement is to substantially lessen competition or create a monopoly."  *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1227–28 (D. Kan. 2013) (citation and internal quotation marks omitted).

Uhlig asserts that CoreLogic's Clayton Act § 3 claim fails for two separate and independent reasons.  The court agrees with it on both counts.

*First*, CoreLogic fails to plead the fourth element of a Clayton Act § 3 claim, *i.e.*, "4) that the agreement was conditioned or made on the understanding that the buyer or lessee will not use

26

or deal in the goods of a competitor of the seller or lessor[.]" *Suture Express, Inc.*, 963 F. Supp. 2d at 1227–28.  The Counterclaim alleges generally that Uhlig entered exclusive contracts with COAs and property managers.  But it never alleges any facts capable of supporting a finding or inference that the agreements were *conditioned* on an understanding that the buyer of condominium data—*i.e.*, Uhlig—would not use or deal in the goods of a competitor of the seller—*i.e.*, other COAs and property managers.  CoreLogic's failure to allege any facts about this required element of a Clayton Act § 3 claim means CoreLogic fails to allege a plausible violation of the Clayton Act § 3.

*Second*, CoreLogic fails to allege a Clayton Act violation because it doesn't allege "a sale or a contract for sale of *goods*[.]"  15 U.S.C. § 14 (emphasis added).  Uhlig argues that the Counterclaim alleges claims based on the sale of condominium data.  Uhlig also argues that condominium data doesn't qualify as a "sale of goods" under the Clayton Act.  CoreLogic responds, claiming that the condominium data actually is defined as "documents" which "do not constitute either intangibles or services" to which the Clayton Act doesn't apply.  Doc. 42 at 26.  But CoreLogic cites no authority capable of supporting its position.

The court isn't persuaded by CoreLogic's unsupported allegations for both factual and legal reasons.  Factually, the Counterclaim's facts, viewed in CoreLogic's favor, explicitly allege that Uhlig provides a *service*—not a tangible good—by collecting condominium data from COAs and property managers and then providing that data to financial institutions and lenders.  *See* Doc. 67 at 11 (Countercl. ¶ 1) (alleging that "CoreLogic obtain[ed] data from Uhlig's websites"); *see also id.* at 12 (Countercl. ¶ 8) ("CoreLogic facilitates the underwriting process by providing data and analytics in an easy to use, standardized format."); *id.* at 12–13 (Countercl. ¶ 9) (asserting "the COA or property management company for the COA is asked to provide due

diligence information, such as condominium questionnaire, COA governing documents, annual budget, capital reserves, litigation documents, engineer's report, etc."); *id.* at 14 (Countercl. ¶ 15) (describing that "the COA/property manager outsources the function of providing Condominium Data to third party vendors like Uhlig").

And legally, courts uniformly reject alchemy similar to CoreLogic's.  The cases uniformly conclude that data—like the condominium data involved here—fails to qualify as a tangible "good" for sale and trade to which the Clayton Act applies.  *See Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 59 (D. Conn. 2020) (dismissing Clayton Act claims under Rule 12(b)(6) because they "revolve[d] around a contract to gather, collect, and report data from convenience stores attached to gas stations" and plaintiff had failed to allege "how the antitrust violations [plaintiff] complain[ed] of relate[d] to goods or commodities"); *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL 4988268, at *7 (S.D.N.Y. Sept. 29, 2014) (holding that "Vehicle History Reports are not primarily tangible goods for sale and trade" and dismissing Clayton Act claim where defendant dealt "in information; their sale contracts [were] for the service of providing data about a vehicle, not for the ultimate physical embodiment of that data"); *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192–93 (N.D. Cal. 2005) (holding that the sale of a patent license conditioned on the additional licensing of "digital map data" was "not the sale of a tangible good" and refusing to apply the "dominant nature test" when plaintiff never alleged that defendant "also sold a physical item" or that the patent licenses include "anything corporeal").

CoreLogic's claim under Clayton Act § 3 fails to state a plausible claim for this second and independent reason:  The Clayton Act doesn't apply to CoreLogic's claims here because they don't involve the "sale of goods," as the statute requires.  *See* 15 U.S.C. § 14; *see also*

*Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *17 (D. Colo. Apr. 7, 2010) (holding that "the Clayton Act provid[ed] no remedy" for claims based on alcohol screening services and programs for corporate employer).

In sum, the court dismisses CoreLogic's "Seventh Counterclaim" asserting a claim under Clayton Act § 3.  It fails to state a plausible claim for relief.

### B.  State Law Claims

Next, the court addresses the five state law claims that CoreLogic asserts against Uhlig in its Counterclaim.  The five state law claims include:  (1) breach of contract ("First Counterclaim"); (2) breach of the covenant of good faith and fair dealing ("Second Counterclaim"); (3) tortious interference with contractual relations ("Third Counterclaim"); (4) promissory estoppel ("Fourth Counterclaim"); and (5) violation of the Delaware Consumer Fraud Act ("Eighth Counterclaim").  Uhlig moves to dismiss each of these five state law claims. The court addresses Uhlig's arguments, below.

### 1.    Breach of Contract ("First Counterclaim") and Breach of Covenant of Good Faith and Fair Dealing Claims ("Second Counterclaim")

CoreLogic asserts a breach of contract claim ("First Counterclaim") and a breach of the covenant of good faith and fair dealing claim ("Second Counterclaim") against Uhlig based on the 2015 Agreement.  As already explained, CoreLogic alleges that, in 2015, it entered an agreement with Mutual of Omaha, the previous owner of CondoCerts.  Doc. 67 at 15–16 (Countercl. ¶¶ 22–24).  CoreLogic asserts that the 2015 Agreement governs "CoreLogic's use of CondoCerts and WelcomeLink for due diligence information that CoreLogic may use for commercial purposes."  *Id.* at 25 (Countercl. ¶ 60).  CoreLogic alleges that the "contract is in

part written, in part verbal and in part established by the approximately seven-year course of dealing between CoreLogic and Uhlig and its predecessors." *Id.*

CoreLogic asserts that Uhlig breached the contract and the covenant of good faith and fair dealing by "repudiating the agreement in November 2021 and asserting that CoreLogic breached the contract by using CondoCerts and WelcomeLink for commercial purposes." *Id.* at 27 (Countercl. ¶ 66); *see also id.* at 28 (Countercl. ¶ 74). CoreLogic also alleges that Uhlig breached the 2015 Agreement and breached the duty of good faith and fair dealing "by unilaterally terminating the contract 'effective immediately,' without providing CoreLogic any notice, much less reasonable notice, and barring CoreLogic from accessing CondoCerts and WelcomeLink." *Id.* at 27 (Countercl. ¶ 66); *see also id.* at 28 (Countercl. ¶ 74). Also, CoreLogic asserts that Uhlig breached the covenant of good faith and fair dealing by "engaging in . . . conduct as part of an anti-competitive scheme and not for any legitimate business purpose." *Id.* at 28 (Countercl. ¶ 74).

Uhlig asserts two arguments supporting dismissal of CoreLogic's breach of contract and breach of the covenant of good faith and fair dealing claims.[7] Each argument provides a separate and independent reason to dismiss the two claims. The court explains why, below.

### a. Uhlig's Terms of Use Agreement and Other Agreements Supersede the Alleged 2015 Agreement

Uhlig asserts that CoreLogic's contract claims fail as a matter of law because the parties have entered other, fully integrated, written agreements that expressly prohibit CoreLogic from using Uhlig's data for commercial purposes and that supersede the alleged 2015 Agreement.

---

[7]        Uhlig asserts a third argument supporting dismissal, contending that the 2015 Agreement lacks consideration. Because the court finds that CoreLogic's breach of contract and breach of the covenant of good faith and fair dealing claims fail as a matter of law based on Uhlig's other two arguments, the court need not reach Uhlig's third argument for dismissal.

Delaware courts[8] apply "blackletter law" requiring that "a binding and completely integrated agreement 'discharges prior agreements to the extent that they are within its scope.'" *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 822 (Del. Ch. 2020) (quoting Restatement (Second) of Contracts § 213 (1981)). "'Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded.'" *Id.* at 822–23 (quoting Restatement (Second) of Contracts § 213 (1981)).

Courts should interpret an integration clause "according to its 'plain meaning when its terms are unambiguous.'" *Id.* at 823 (quoting *Barton v. Club Ventures Invs. LLC*, No. 8864-VCN, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013)). "When a 'subsequent agreement' contains a valid integration clause, it 'supersedes the terms' of any prior agreement covering the same subject matter." *Id.* (quoting *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, No. 11053-VCL, 2015 WL 9060982, at *11 (Del. Ch. Dec. 16, 2015))

---

[8]    Uhlig asserts that Delaware law governs CoreLogic's state law claims because its Terms of Use Agreement and other customer agreements require that the contracts "and any non-contractual disputes/claims arising out of or in connection with" the contracts "are subject to the laws of the state of Delaware, United States of America, without regard to conflicts of laws principles." Doc. 24 at 29 (Terms of Use Agreement); *see also id.* at 46 (Information Upload Agreement) (same); *id.* at 56 (Order Submission Agreement) (same). The court can consider these contracts on this Rule 12(b)(6) motion to dismiss because they are "documents referred to in the complaint" that "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation and internal quotation marks omitted). Also, CoreLogic doesn't dispute that Delaware law applies to the claims asserted in its Counterclaim. Just the opposite, it appears to agree that Delaware law applies because its Opposition to Uhlig's motion cites and applies Delaware law. *See* Doc. 42 at 27–39.

Applying Delaware law here also is appropriate under Kansas choice of law rules. A federal court exercising supplemental jurisdiction over state law claims in a federal question lawsuit applies the substantive law—including choice of law rules—of the forum state. *BancOklahoma Mortg. Corp. v. Cap. Title Co., Inc.*, 194 F.3d 1089, 1104 (10th Cir. 1999) (citing *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996)). In Kansas, when the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally apply the law chosen by the parties to control their agreement. *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 375 (Kan. 2002). Thus, because the parties' contracts contain Delaware choice of law provisions, the court applies Delaware law to CoreLogic's state claims here.

(brackets omitted).  And, when "a prior agreement and a subsequent agreement cover the same

subject matter and the subsequent agreement contains an integration clause, the prior agreement

'need[s] to be memorialized in [the subsequent agreement]' to survive."  *Id.* (quoting *Hunt v.*

*Limestone Med. Props.*, No. 10428-VCL, 2018 WL 2939441, at *4 (Del. Ch. June 11, 2018)).

 Here, Uhlig's Terms of Use Agreement unambiguously prohibits CoreLogic from using

Uhlig's websites "for resale or any commercial use whatsoever[.]"  Doc. 24 at 18 (Terms of Use

Agreement); *see also* Doc. 67 at 17 (Countercl. ¶ 30) (referring to the "Terms and Conditions"

and other policies).  Also, it contains the following agreement and provisions:

> You understand and agree that in the event you engage in any commercial activity
> that includes, compiles, analyzes, reproduces, relies upon or otherwise uses
> information you obtained through the Website or the CondoCerts Services that you
> will disgorge to CondoCerts all funds received that directly or indirectly result from
> such prohibited use in addition to any and all other remedies available at law or in
> equity.
>
> If you violate any of the terms of these Terms of Use, in addition to any other
> remedies CondoCerts may have, your permission to use the Website shall
> immediately terminate without the necessity of any notice.  CondoCerts retains the
> right to deny access to anyone at its discretion for any reason.

Doc. 24 at 20–21 (Terms of Use Agreement).  And, the Terms of Use Agreement—as well as

Uhlig's other customer agreements—include integration clauses that recite, unambiguously, that

the agreements "constitute the complete and exclusive agreement" between Uhlig and CoreLogic

"with respect to the use of [CondoCerts] and supersede any and all prior" agreements "whether

in oral, written or electronic form[.]"  *Id.* at 27–28 (Terms of Use Agreement); *see also id.* at 45–

46 (Information Upload Agreement); *id.* at 55–56 (Order Submission Agreement).[9]

---

[9] CoreLogic unsuccessfully argues that Uhlig's Terms of Use and other customer agreements are
"unenforceable to impose material changes to the parties' contract."  Doc. 42 at 31.  To support this
argument, CoreLogic cites cases involving § 2-207 of the Uniform Commercial Code—a provision that
governs the effect of adding more terms to a contract in an acceptance or confirmation of an offer.  *See*
*Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1445 (9th Cir. 1986) (holding that because
manufacturer "did not indicate unequivocally that [it] intended to assent to [supplier's] terms, that

The Terms of Use Agreement and the other customer agreements "cover the same subject matter" as the alleged 2015 Agreement, they "contain" integration clauses, and they never "memorialized" the purported 2015 Agreement. *Focus Fin. Partners*, 241 A.3d at 823 (citation and internal quotation marks omitted). Thus, the "prior agreement"—*i.e.*, the 2015 Agreement—can't "survive." *Id.* (citation and internal quotation marks omitted). As a consequence, the Terms of Use Agreement and the other customer agreements supersede the alleged 2015 Agreement as a matter of law. *Id.*

CoreLogic responds to Uhlig's argument, asserting that "the parties intended for the 2015 Agreement . . . to supersede Uhlig's Terms of Use and Customer Agreement prohibiting use of Uhlig data for commercial purposes, including nullifying the integration clause contained in Uhlig's standard terms with respect to CoreLogic." Doc. 42 at 28 (citing Doc. 67 at 25, 26 (Countercl. ¶¶ 60, 64)). The Counterclaim itself makes such an allegation albeit in conclusory fashion. *See* Doc. 67 at 26 (Countercl. ¶ 64). But, the Counterclaim's factual assertions don't support a finding or inference that the parties intended the 2015 Agreement to supersede the

conduct did not amount to the assent contemplated by section 2-207(1)"); *see also Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 103 (3d Cir. 1991) (holding that additional terms in an acceptance "did not . . . constitute a conditional acceptance under UCC § 2–207(1)"); *Ariz. Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 766 (D. Ariz. 1993) (declining to "interpret section 2-207 in such a way that a package disclaimer constitutes a conditional acceptance even though the disclaimer arrives after the parties have entered into an agreement for the sale of goods"). These cases don't apply here. CoreLogic never alleges that Uhlig's Terms of Use Agreement constitutes an acceptance containing additional or different terms to an earlier agreement between the parties.

Instead, the Counterclaim recognizes that the Terms of Use Agreement and other agreements are "clickwrap" agreements. Doc. 67 at 17, 30 (Countercl. ¶¶ 30, 64). "A clickwrap agreement is an online agreement that requires a webpage user [to] manifest assent to the terms of a contract by clicking an accept button in order to proceed." *Geraci v. Uber Techs., Inc.*, No. N21C-07-151 CLS, 2021 WL 5028368, at *2 (Del. Super. Ct. Oct. 29, 2021) (citation and internal quotation marks omitted). "Clickwrap agreements are routinely recognized by courts and are enforceable under Delaware law." *Id.* (citing *Newell Rubbermaid Inc. v. Storm*, No. 9398-VCN, 2014 WL 1266827, at *1 (Del. Ch. Mar. 27, 2014)). Thus, Uhlig's Terms of Use Agreement and the other customer agreements are enforceable agreements.

parties' other, subsequent agreements.  Instead, the Counterclaim explicitly alleges that CoreLogic, in 2018, asked Uhlig about the 2015 Agreement it had entered with Uhlig's predecessor, and Uhlig responded "ostensibly unfamiliar with the 2015 Agreement."  *Id.* at 17 (Countercl. ¶ 29).  Then, CoreLogic sent Uhlig "two different documents the parties could use to further memorialize the 2015 Agreement" and noted that "all [CoreLogic was] looking to do [was] memorialize [the parties'] existing relationship."  *Id.* (Countercl. ¶ 32).  This allegation effectively concedes that the purposed 2015 Agreement *wasn't* memorialized elsewhere.  And it's certainly not memorialized in the plain language of the subsequent agreements CoreLogic entered with Uhlig.

The Counterclaim also alleges that Uhlig declined CoreLogic's initial request to enter an agreement memorializing the terms of the 2015 Agreement and directed CoreLogic to Uhlig's Terms of Use Agreement.  *Id.* (Countercl. ¶ 29).  And, it alleges that Uhlig never responded to CoreLogic's additional requests to enter another agreement with CoreLogic.  *Id.* at 18 (Countercl. ¶ 33).  Instead, in June 2021, Uhlig's counsel notified CoreLogic that CoreLogic was violating its terms of service by purchasing data from Uhlig and using the data for prohibited commercial purposes.  *Id.* at 19–20 (Countercl. ¶ 39).  And, in November 2021, Uhlig terminated CoreLogic's access to its services based on CoreLogic's violation of Uhlig's consumer agreements.  *Id.* (Countercl. ¶ 42); *see also* Doc. 6-4 at 25–27 (Nov. 9, 2021 letter).  These factual allegations simply can't support a reasonable finding or inference that the parties intended the 2015 Agreement to supersede the subsequent agreements that CoreLogic entered with Uhlig.

Also, CoreLogic contends that an "'integration clause is not irrebuttable, however, because the parties' intent always controls.'"  Doc. 42 at 27 (quoting *James v. United Med. LLC*,

No. N16C-06-209 AML, 2017 WL 1224513, at *6 (Del. Super. Ct. Mar. 31, 2017)).  This

contention ignores Delaware law's mandate that a court must give "priority to the parties'

intentions as reflected *in the four corners of the agreement*."  *James*, 2017 WL 1224513, at *6

(emphasis added).  "If the contractual language at issue is clear and unambiguous, it must be

accorded its plain meaning."  *Id.*  And, a "contract is not ambiguous merely because the parties

disagree about its proper construction."  *Id.*  The 2015 Agreement never mentions the websites'

Terms of Use or other agreements.  *See* Doc. 67 at 15–16 (Countercl. ¶¶ 22–24); *see also* Doc. 6-

2 at 6 (2015 Agreement).  Also, the 2015 Agreement doesn't include any agreement *by Uhlig* to

assent to the terms of the 2015 Agreement (or a provision binding successors, like Uhlig, to the

Agreement).  *See* Doc. 6-2 at 6 (2015 Agreement).  Just the opposite, the Terms of Use

Agreement and other agreements (that Uhlig and CoreLogic entered after the 2015 Agreement)

unambiguously and unequivocally state that they "supersede any and all prior" agreements.  Doc.

24 at 27–28 (Terms of Use Agreement); *see also id.* at 45–46 (Information Upload Agreement);

*id.* at 55–56 (Order Submission Agreement).

These factual assertions, taken as true, cannot possibly support any reasonable finding or

inference that the parties intended for the alleged 2015 Agreement to supersede the parties'

subsequent agreements.  Thus, the 2015 Agreement doesn't "survive" the parties' subsequent

agreements.  *Focus Fin. Partners*, 241 A.3d at 823 (citation internal quotation marks omitted).

Instead, the Terms of Use Agreement and the other customer agreements supersede the alleged

2015 Agreement as a matter of law.  *Id.*  For this reason, CoreLogic fails to allege a plausible

claim for breach of contract[10] or breach of the covenant of good faith and fair dealing because both claims are premised on the superseded 2015 Agreement.[11]

### b. Uhlig Terminated the Alleged 2015 Agreement

Uhlig provides a second separate and independent reason that CoreLogic's contract claims fail as a matter of law. It correctly argues that—even if the 2015 Agreement is a valid contract and not superseded by subsequent agreements—Uhlig properly terminated the 2015 Agreement and CoreLogic's access to its services. The 2015 Agreement doesn't contain any duration for the purported contract's term. *See* Doc. 6-2 at 6 (2015 Agreement). CoreLogic

---

[10]    CoreLogic's Opposition to Uhlig's motion asserts for the first time in this lawsuit that it alleges "an implied contract based on the parties' course of dealing." Doc. 42 at 29. Also, CoreLogic asserts that "Uhlig manifested its consent to, and/or adopted and ratified, the 2015 Agreement through its conduct." *Id.* at 30. The Counterclaim never asserts an implied breach of contract claim. *See generally* Doc. 67. CoreLogic can't assert an implied breach of contract claim in its opposition papers when it never has pleaded such a claim. *See Iqbal*, 556 U.S. at 677–78 (explaining that Rule 8(a)(2) requires a pleading to contain "'a short an plain statement of the claim showing that the pleader is entitled to relief'" (quoting Fed. R. Civ. P. 8(a)(2)). Also, under Delaware law, a "party may not simultaneously allege an implied-in-fact and express contract based on the same terms or embracing the same subject matter." *Chase Manhattan Bank v. Iridium Africa Corp.*, 239 F. Supp. 2d 402, 409 (D. Del. 2002) (applying Delaware law). Here, CoreLogic bases its purported implied contract claim on the same terms and subject matter purportedly contained in the express contract that CoreLogic relies on to support its breach of contract claim—*i.e.*, the 2015 Agreement. The existence of this express contract precludes "the existence of an implied contract dealing with the same subject[.]" *Id.* (citation and internal quotation marks omitted).

   Also, the Counterclaim alleges no facts capable of plausibly supporting a finding that Uhlig ratified the 2015 Agreement. To the contrary, the Counterclaim describes communications between the parties where Uhlig seemed to have no knowledge of the Agreement and then declined CoreLogic's offers to memorialize an agreement outside the Terms of Use Agreement. The Counterclaim asserts that Uhlig continued to fill CoreLogic's orders for condominium data, but it contains no factual assertions capable of supporting a plausible finding or inference that Uhlig was filling these orders with an understanding that the terms of the 2015 Agreement governed those orders as opposed to the Terms of Use Agreement. Indeed, Uhlig explicitly informed CoreLogic that the Terms of Use Agreement governed the parties' relationship and wasn't subject to deviation by any other agreement outside of those Terms. *See* Doc. 67 at 17 (Countercl. ¶ 29).

[11]    The court also dismisses CoreLogic's breach of the covenant of good faith and fair dealing claim to the extent it alleges Uhlig breached this duty by "engaging in . . . conduct as part of an anti-competitive scheme and not for any legitimate business purpose." *Id.* at 28 (Countercl. ¶ 74). For reasons already explained, the court concludes that the Counterclaim fails to allege plausibly that Uhlig engaged in any unlawful anticompetitive conduct.

asserts that the 2015 Agreement contains "an implied term that it can only be terminated, if at all, upon reasonable notice." Doc. 42 at 34; *see also* Doc. 67 at 26 (Countercl. ¶ 65). "[G]enerally, where the parties to a contract express no period for its duration and none can be implied from the nature of the contract or from the circumstances surrounding them, the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either on giving reasonable notice of his intention to the other." *Del. Fin. Mgmt. Corp. v. Vickers*, No. Civ. A. 96C-10-032, 1999 WL 458633, at *6 (Del. Super. Ct. June 9, 1999). Here, the Counterclaim's factual assertions effectively concede that Uhlig notified CoreLogic that it was terminating the 2015 Agreement. And, it asserts no factual basis from which a reasonable factfinder could find or infer that this notice was unreasonable.

Uhlig put CoreLogic on notice in 2018 that it didn't intend to adhere to the 2015 Agreement. Doc. 67 at 17 (Countercl. ¶ 29). When CoreLogic contacted Uhlig about the 2015 Agreement, Uhlig—according to CoreLogic's allegations—expressed that it was not familiar with the agreement, directed CoreLogic to the terms and conditions on Uhlig's website, and made clear to CoreLogic that it wouldn't enter an agreement as CoreLogic had proposed. *Id.* Despite CoreLogic's attempts to memorialize an agreement similar to the purported 2015 Agreement, Uhlig declined. *Id.* at 17–18 (Countercl. ¶¶ 32, 33). More than three years later, Uhlig's counsel sent CoreLogic a letter notifying it that its use of Uhlig's data for commercial purposes violated Uhlig's Terms of Use Agreement. *Id.* at 17 (Countercl. ¶ 29); *see also* Doc. 6-4 at 13–15 (June 29, 2021 letter). Then, after another four months had passed, Uhlig notified CoreLogic in November 2021, that it was terminating CoreLogic's access to Uhlig's services because of CoreLogic's "systematic[ ] violati[on of] the terms and conditions of Uhlig's services." *Id.* at 25 (Nov. 9, 2021 letter). On these facts, no reasonable jury could find or infer

that Uhlig failed to give CoreLogic reasonable notice that it was terminating the purported 2015

Agreement.  Uhlig informed CoreLogic in 2018 that it wouldn't agree to the 2015 Agreement's

terms.  Even after that notice, CoreLogic asserts that it continued to "obtain[ ] data from Uhlig's

websites consistent with the 2015 Agreement and written agreements authorizing CoreLogic to

use Uhlig's Condominium Data without restriction[.]"  Doc. 67 at 18 (Countercl. ¶ 34).

CoreLogic did so, despite Uhlig's notice in 2018, informing CoreLogic that Uhlig wouldn't

follow the 2015 Agreement.  CoreLogic thus had ample notice of Uhlig's termination of the

2015 Agreement before it Uhlig stopped doing business with CoreLogic in November 2021, the

point when it actually terminated CoreLogic's access to its services.

Also, Uhlig's termination of CoreLogic's access to its services in 2021 was a proper

termination under Uhlig's Terms of Use Agreement.  This termination had no connection to

terminating the 2015 Agreement—Uhlig already had terminated that 2015 Agreement more than

three years earlier during the parties' correspondence in 2018.  The Terms of Use Agreement

expressly permitted Uhlig to terminate CoreLogic's services in 2021 because it provides:  "If you

violate any of the terms of these Terms of Use, . . . your permission to use the Website shall

immediately terminate *without the necessity of any notice*."  Doc. 24 at 21 (Terms of Use

Agreement) (emphasis added).  Thus, the Terms of Use Agreement didn't require Uhlig to give

CoreLogic notice that it was terminating its access to Uhlig's services when it did so in

November 2021.

In sum, no reasonable factfinder could find or infer from the Counterclaim's factual

assertions, taken as true and viewed in CoreLogic's favor, that it failed to provide reasonable

notice of its termination of the 2015 Agreement.  Thus, CoreLogic's breach of contract and

breach of the covenant of good faith and fair dealing claims fail for this second and independent

reason.  The court thus dismisses plaintiff's breach of contract claim ("First Counterclaim") and breach of the covenant of good faith and fair dealing claim ("Second Counterclaim") because these claims state no plausible claims for relief.

### 2. Tortious Interference with Contractual Relations ("Third Counterclaim")

CoreLogic's "Third Counterclaim" for tortious interference with contractual relations alleges that "Uhlig intentionally, improperly, and without privilege interfered with CoreLogic's contracts by unilaterally terminating the parties' agreement without advanced notice and barring CoreLogic from accessing CondoCerts and WelcomeLink."  Doc. 67 at 29 (Countercl. ¶ 84). Under Delaware law, a tortious interference with contractual relations claim requires a plaintiff to plead facts capable of supporting the following elements:  "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."  *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).  The court dismisses CoreLogic's tortious interference claim here for two reasons.  The Counterclaim pleads no facts capable of supporting the first and fourth elements of a tortious interference claim.

*First Element*:  CoreLogic never pleads the existence of a contract that could support a tortious interference claim.  CoreLogic alleges in a conclusory fashion that it "has valid and enforceable contracts to fulfill orders from its customers who require Condominium Data from Uhlig-controlled COAs/property managers."  Doc. 67 at 29 (Countercl. ¶ 82).  Also, CoreLogic asserts, "Uhlig knew or should have known about the contracts between CoreLogic and its customers."  *Id.* (Countercl. ¶ 83).  These conclusory allegations don't suffice to allege existence of a contract capable of supporting a tortious inference with a contract claim.  *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 550 (Bankr. D. Del. 2009) (dismissing claim that failed "to state a

cause of action for tortious interference with contractual relations under either Delaware or New Jersey law" because it didn't allege "a single contract between [plaintiff] and a third party that was breached by the third party because of [defendants'] conduct"); *cf. Bushnell Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1283 (D. Kan. 1997) (applying Kansas law and granting judgment on the pleadings against tortious interference with contract claim because plaintiff hadn't "identified any third-party contract that was breached as a result of improper interference by defendant").

*Fourth Element*:  The Counterclaim also fails to assert facts capable of supporting a plausible finding or inference that Uhlig acted without justification.  Delaware courts consider seven factors when "determining if intentional interference with another's contract is improper or without justification[.]"  *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).  Those factors are:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

*Id.*  "Only if the defendant's *sole* motive was to interfere with the contract will [the actor's motive] factor support a finding of improper interference."  *Id.*

Delaware courts have had no difficulty dismissing tortious interference with contractual relations claims at the motion to dismiss stage when the pleadings fail to allege that defendant acted without justification.  *See Himawan v. Cephalon, Inc.*, No. 2018-0075-SG, 2018 WL 6822708, at *11 (Del. Ch. Dec. 28, 2018) (dismissing tortious interference with a contract claim under Delaware's Rule 12(b)(6) for failing to state a claim because it was "not reasonable to infer from those [alleged] facts alone that [defendants] acted with an improper purpose"); *see*

*also Turchi v. Salaman*, No. Civ. A. 11,268, 1990 WL 186450, at *2 (Del. Ch. Nov. 26, 1990) (dismissing tortious interference with contract claim because the complaint failed to allege "adequately . . . that defendants acted improperly" and finding "unpersuasive" the argument that "justification" is an issue that "cannot be resolved on a motion to dismiss").  As in these Delaware cases, the Counterclaim here fails to allege facts from which a reasonable factfinder reasonably could find or infer that Uhlig acted without justification.

Instead, the Counterclaim alleges that Uhlig terminated CoreLogic's access to Uhlig's services and barred its access to Uhlig's websites after it notified CoreLogic that its use of Uhlig's data for commercial purposes violated Uhlig's Terms of Use Agreement.  Doc. 67 at 17 (Countercl. ¶ 29); *see also* Doc. 6-4 at 13–15 (June 29, 2021 letter).  Then, four months later, Uhlig terminated CoreLogic's access to Uhlig's services because, Uhlig explained, CoreLogic's communications had "confirm[ed] Uhlig's suspicion that CoreLogic has been systematically violating the terms and conditions of Uhlig's services."  *Id.* at 25 (Nov. 9, 2021 letter).  No reasonable factfinder could find or infer from the facts alleged—as CoreLogic pleads them and viewed in its favor—that Uhlig acted without justification sufficient to support a tortious interference with contractual relations claim.  The court thus dismisses CoreLogic's "Third Counterclaim" under Rule 12(b)(6).

### 3.   Promissory Estoppel ("Fourth Counterclaim")

CoreLogic's "Fourth Counterclaim" asserts a promissory estoppel claim.  "'The doctrine of promissory estoppel is an equitable remedy "designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement."'"  *Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 344–45 (D. Del. 2001) (quoting *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284, at *17 (D. Del. Nov. 13, 1998)).  "In

other words, promissory estoppel is generally viewed as a consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable." *Id.* at 345 (citing *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000)). A promissory estoppel claim requires the following elements: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Lord*, 748 A.2d at 399. Here, CoreLogic's promissory estoppel claim fails to state a claim for at least two reasons.

*First*, CoreLogic cannot plead a valid promissory estoppel claim when it premises its claim on alleged promises that "contradict the terms of a valid and enforceable contract." *Weiss*, 140 F. Supp. 2d at 345 (citing *Feinberg*, 1998 WL 863284, at \*17); *see also SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013) ("Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue."). Here, Uhlig's Terms of Use Agreement and the other consumer agreements expressly contradict the alleged promises relied on by CoreLogic's promissory estoppel claim. Specifically, CoreLogic alleges that "Uhlig represented and promised that CoreLogic may obtain Condominium Data from the CondoCerts and WelcomeLink websites that CoreLogic may use for commercial purposes, provided that CoreLogic does not re-use the data." Doc. 67 at 31 (Countercl. ¶ 90). That alleged promise directly conflicts with the provisions in the Terms of Use Agreement that unambiguously prohibit CoreLogic from using Uhlig's websites "for resale or any commercial use whatsoever[.]" Doc. 24 at 18 (Terms of Use Agreement); *see also* Doc. 67 at 17 (Countercl. ¶ 30) (referring to the "Terms and Conditions" and other policies). Also, the Terms of Use

Agreement contains an express agreement that the contracting party, if it "engages" "in any commercial activity" with "information . . . obtained through" Uhlig's services, "will disgorge . . . all funds received that directly or indirectly result from such prohibited use[.]"  Doc. 24 at 20–21 (Terms of Use Agreement).  And, it includes a provision reciting that Uhlig "shall immediately terminate" a contracting party's permission to use Uhlig's services "without the necessity of any notice" if the contracting party "violate[s] any of the terms of these Terms of Use[.]"  *Id.* at 21 (Terms of Use Agreement).  CoreLogic simply can't state a plausible promissory estoppel claim based on alleged promises that expressly contradict the terms of the subsequent and superseding Terms of Use Agreement.

*Second*, CoreLogic hasn't pleaded sufficiently the fourth element of a promissory estoppel claim that "injustice can be avoided only by enforcement of the promise."  *Lord*, 748 A.2d at 399.  CoreLogic pleads this element in a conclusory fashion.  Doc. 637 at 30–31 (Countercl. ¶ 93).  But, it alleges no facts permitting a reasonable finding or inference of injustice.  The Terms of Use Agreement prohibits all parties who contract with Uhlig from using the condominium data for any commercial purpose.  Thus, the Counterclaim fails to plead any facts supporting a finding of "injustice" for CoreLogic when Uhlig requires all parties who contract with it—including CoreLogic—to follow the same terms and conditions.  Instead, the Counterclaim merely alleges that Uhlig's termination of its services makes it harder for CoreLogic to do business because it can't secure condominium data for properties that have exclusive agreements with Uhlig.  But, CoreLogic also alleges that it can procure, in some instances, condominium data directly from COAs or property managers who don't contract with third party vendors, such as Uhlig.  CoreLogic's inability to procure condominium data for a certain portion of COAs and property managers based on Uhlig's refusal to allow CoreLogic to

use that date for commercial purposes simply doesn't allege an "injustice" that enforcing the purported promise can avoid.  Thus, the court concludes, CoreLogic fails to plead the fourth element of a promissory estoppel claim.

In sum, CoreLogic's promissory estoppel claim fails for two independent reasons.  The court thus dismisses CoreLogic's "Fourth Counterclaim" under Rule 12(b)(6) because it fails to state a plausible claim for relief.

### 4.    Delaware Consumer Fraud Act ("Eighth Counterclaim")

*Last*, CoreLogic's "Eighth Counterclaim" asserts violations of the Delaware Consumer Fraud Act.  Uhlig argues that CoreLogic's Delaware Consumer Fraud Act claim fails for the same reasons that its antitrust claims fail to state plausible claims as a matter of law.

The Delaware Consumer Fraud Act prohibits that "use . . . of any . . . unfair practice . . . in connection with the sale . . . of any merchandise[.]"  Del. Code Ann. tit. 6, § 2513.  The statute defines the term "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate or services."  *Id.* § 2511(6).  And, it defines "unfair practice" to mean "any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  *Id.* § 2511(9).  The statute specifically directs that "violations of public policy as established by law, regulation, or judicial decision applicable in this State may be considered as evidence of substantial injury" when "determining whether an act or practice is unfair."  *Id.* Also, the purpose of the Delaware Consumer Fraud Act is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State."  *Id.* § 2512.

Here, CoreLogic bases its Delaware Consumer Fraud Act claim on Uhlig's alleged antitrust violations:  "(1) intentionally contracting, and/or agreeing to restrain trade in the Relevant Market through its exclusive dealing arrangements and foreclosure of CoreLogic from Condominium Data; (2) substantially diminishing competition in the relevant markets; and (3) causing customers to pay supracompetitive prices for Condominium Data."  Doc. 67 at 37–38 (Countercl. ¶ 138).  As already discussed, the court has concluded that none of CoreLogic's assertions state a plausible claim for federal antitrust violations.  For the same reasons, the court concludes, CoreLogic fails to allege facts capable of supporting a plausible finding or inference that Uhlig engaged in "unfair practices" violating the Delaware Consumer Protection Act.  *See* Del. Code Ann. tit. 6, § 2511(9) (permitting the court to consider whether the alleged conduct amounts to "violations of public policy as established by law, regulation, or judicial decision applicable in this State" when "determining whether an act or practice is unfair").  *Cf. McDuffy v. Koval*, 226 F. Supp. 2d 541, 547 (D. Del. 2002) (granting summary judgment against Delaware Consumer Law Fraud Act claim when plaintiff "failed to provide evidence that defendants have committed any fraudulent behavior" violating the statute).  Thus, the court dismisses CoreLogic's "Eighth Counterclaim" for Delaware Consumer Fraud Act violations for failing to state a plausible claim for relief under Rule 12(b)(6).

IV.     **Conclusion**

For all the reasons explained in this Order, the court grants Uhlig's Motion to Dismiss Amended Counterclaims (Doc. 35).  The court dismisses all eight counterclaims that CoreLogic asserts in its Counterclaim (Doc. 67).

Also, the court addresses another motion pending in this case.  On December 3, 2021, the court entered an Order denying the portion of a motion that CoreLogic had filed seeking a

temporary restraining order.  *See* Doc. 22 (denying motion for temporary restraining order (Doc. 5)).  CoreLogic's motion (Doc. 5) had moved for both a TRO and a preliminary injunction.  The court bifurcated the motion, denied the portion of the motion seeking a TRO, and left pending the portion of the motion seeking a preliminary injunction.  Doc. 22 at 10.  The court also directed the parties, if "CoreLogic elect[ed] to proceed on its motion for a preliminary injunction," to contact Magistrate Judge Gwynne E. Birzer's chambers "to request a conference for scheduling that hearing and attendant proceedings." *Id.*  In the more than nine months that have elapsed since the court ruled the motion seeking a TRO, neither party has asked the court to proceed with deciding the portion of CoreLogic's motion seeking a preliminary injunction.  Also, the court now has dismissed all eight claims that CoreLogic asserted in its Counterclaim.  So, CoreLogic can't secure a preliminary injunction because none of its claims is substantially likely to succeed on the merit.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits . . . .").  The court now denies the portion of CoreLogic's earlier motion seeking a preliminary injunction (Doc. 5).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Uhlig LLC's Motion to Dismiss Amended Counterclaims (Doc. 35) is granted.

**IT IS FURTHER ORDERED THAT** the portion of defendant CoreLogic Solutions, LLC's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 5) that seeks a preliminary injunction is denied.  The court directs the Clerk of the Court to terminate this motion (Doc. 5).

**IT IS SO ORDERED.**

**Dated this 30th day of September, 2022, at Kansas City, Kansas.**

> s/ Daniel D. Crabtree
> **Daniel D. Crabtree**
> **United States District Judge**