# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UHLIG LLC, d/b/a Condocerts and d/b/a Welcomelink,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CORELOGIC, INC. and CORELOGIC SOLUTIONS, LLC,<br><br>　　　　Defendants. | Case No. 21-2543-DDC-GEB |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants CoreLogic, Inc. and CoreLogic Solutions, LLC's Motion to Amend Scheduling Order and for Leave to File Second Amended Counterclaims, ("Motion.") **(ECF No. 89.)** Plaintiff filed its response to Defendants' Motion **(ECF No. 91),** and, on January 9, 2023, Defendants filed their reply. **(ECF No. 97**.)  This matter is fully briefed, and the Court is now prepared to rule. For the reasons set forth below, the Court **GRANTS** Defendants' Motion.

**I.    Background[1]**

Plaintiff is a national provider of community information to registered end users who seek such information for purposes such as the purchase, sale, financing, refinancing and transfer of residential real estate located in common interest communities, such as

---

[1] Unless otherwise indicated, the information recited in this section is taken from the Complaint and Answer. This background information should not be construed as judicial findings or factual determinations.

homeowner associations, condominiums, co-ops, and similar communities, wherein the deed to property is encumbered by certain obligations to the common community. Plaintiff alleges its products and services are governed by its customer agreements, ("user agreements") and are not offered outside those terms. Plaintiff does business under the brands CondoCerts™ and WelcomeLink®.

Defendants CoreLogic Solutions, LLC and Corelogic, Inc. are global property information, analytics, and data-enabled services providers. One of Defendants' products is CondoSafe, a national service for lenders that provides condominium-project data and analytics and helps lenders determine whether individual condominium units meet underwriting guidelines. In the past, Defendants purchased data regarding condominium units from Plaintiff and, in turn, provided that data to its clients.

In November 2021, Plaintiff terminated Defendants' access to its services by barring them from accessing its websites, and, in what seems to be a race to the courthouse, filed this lawsuit alleging: (1) violations under the Lanham Act, 47 U.S.C. § 1125(a)(1) for Defendants' unauthorized use of Plaintiff's trademarks, (2) breach of contract for Defendants' violation of Plaintiff's Terms of Use agreement, (3) breach of contract for Defendants' violation of Plaintiff's Account Registration agreement, (4) breach of contract for Defendants' violation of Plaintiff's Information Upload Agreement, (5) breach of contract for Defendants' violation of Plaintiff's Order Submission Agreement, (6) fraud, (7) tortious interference with business expectancy, and (8) violation of the Delaware Deceptive Trade Practices Act, 6 Del. C § 2531–2536.

Fully anticipated, Defendants responded to Plaintiff's lawsuit by filing an Answer and Counterclaims.[2] The counterclaims included breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contractual relations, and estoppel claims against Plaintiff. They also filed a Motion for Temporary Restraining Order and Preliminary Injunction.[3] The court conducted a hearing on Defendants' motion on December 2, 2021, and denied their request for a temporary restraining order, while leaving the request for preliminary injunction pending.[4] As a result, on January 10, 2022, Defendants filed an answer with amended counterclaims.[5] The amended counterclaims added the allegation Plaintiff violated anti-trust laws through its various business activities.

Plaintiff filed a motion to dismiss Defendants' amended counterclaims on January 31, 2022.[6] The motion to dismiss became ripe with the filing of Plaintiff's reply to Defendants' response, on March 8, 2022.[7] However, prior to a ruling on the motion to dismiss, Plaintiff filed an unopposed motion to add CoreLogic Solutions, LLC, as a Defendant, (the case was initially filed solely against CoreLogic, Inc.)[8] The unopposed motion was granted, and Plaintiff filed its Amended Complaint on June 7, 2022.[9] It was during this timeframe the Court's May 27, 2022, deadline for filing any motions for leave to amend passed.[10]

---

[2] ECF No. 8.
[3] ECF No. 5.
[4] ECF No. 22.
[5] ECF No. 29.
[6] ECF No. 35.
[7] ECF No. 50.
[8] ECF No. 61.
[9] ECF Nos. 62, 63.
[10] ECF No. 39.

3

On September 30, 2022, the District Judge entered his memorandum and order granting Plaintiff's motion and dismissing all eight of Defendants' amended counterclaims. The District Judge also denied Defendants' motion for a preliminary injunction.[11] Consequently, Defendants are now before the Court on their motion to modify the scheduling order and for leave to file an answer with second amended counterclaims to allege contract claims based upon Plaintiff's terms of use, as modified by the parties' course of conduct during the time period from 2018-2021.[12]

## II.  Parties' Respective Positions

### 1. <u>Plaintiff's Position</u>

Plaintiff asserts Defendants do not show good cause for an extension of the scheduling order deadline to file a Fed. R. Civ. P. Rule 15(a)(2) motion for leave to amend, as required by Fed. R. Civ. P 16(b)(4).[13]  Plaintiffs further argue Defendants' proposed second amended counterclaims are futile and subject to dismissal under Fed. R. Civ. P. 12(b)(6).[14]

### 2. <u>Defendants' Position</u>

Defendants allege good cause to amend the scheduling order, as they could not have met the Court's May 27, 2022, deadline for motions seeking leave to amend pleadings because the Plaintiff's motion to dismiss was pending past the deadline.[15]

---

[11] ECF No. 81.
[12] ECF No. 89.
[13] ECF No. 91.
[14] *Id.*
[15] ECF No. 89.

4

Defendants also assert leave should be freely given as justice so requires to amend pleadings prior to trial, and that its proposed second amended counterclaims are neither prejudicial nor futile.[16]

## III. Discussion

Because the deadline set by the Court for filing motions seeking leave to amend has passed, the Court conducts a two-step analysis of Defendants' Motion.[17] First, the Court looks to Fed. R. Civ. P. 16(b)(4), which provides, "[a] schedule may be modified only for good cause and with the judge's consent." If the Court finds there is good cause to amend the scheduling order, it must then determine whether to grant Defendants' motion for leave to file their amended pleading.[18] If Defendants fail to satisfy either Rule 16(b)(4) or Rule 15(a), the district court does "not abuse its discretion in denying" a motion for leave to amend.[19]

The Court first examines the good cause requirement of Fed. R. Civ. P. 16(b)(4).

### 1. Fed. R. Civ. P. 16(b)(4)

To demonstrate good cause to amend the scheduling order, Defendants must show the "scheduling deadlines cannot be met despite the movant's diligent efforts."[20] Courts

---

[16] ECF No. 89.
[17] ECF No. 39; *See Tesone v. Empire Marketing Strategies,* 942 F.3d 979, 989 (10th Cir. 2019).
[18] *Tesone* at 989-90.
[19] *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d, 1230, 1241 (10th Cir. 2014).
[20] *Birch v. Polaris Indus., Inc.,* 812 F.3d 1238, 1247 (10th Cir. 2015) (quotations and alterations omitted).

5

have held the good cause requirement could be satisfied if, for example, the moving party learns of new information through discovery, or the underlying law has changed.[21]

The court, in finding the existence of good cause to amend the scheduling order in *Orchestrate HR, Inc. v. Blue Cross and Blue Shield of Kansas,* noted that, when examining good cause, it was relevant that plaintiffs wanted to "rectify the shortcomings of their Second Amended Complaint rather than seeking to assert new claims."[22] Similar to the case at bar, the court in *Orchestrate HR* dismissed certain claims in plaintiff's second amended complaint, and plaintiff sought to file a third amended complaint after the passage of the deadline to amend pleadings. Also, as in *Orchestrate HR,* here, the Defendants seek to rectify the shortcomings of three amended counterclaims which were dismissed by the District Judge, including:  1) Breach of contract; 2) Breach of the covenant of good faith and fair dealing; and, 3) Tortious interference with contractual relations.[23]

In this case, the deadline for seeking leave to amend pleadings passed while Plaintiff's motion to dismiss was pending. Defendants now want to rectify the shortcomings in three of their amended counterclaims dismissed by the District Judge.[24] Further, Defendants argue Plaintiff, during discovery, produced thousands of documents signed by Plaintiff which expressly authorized Defendants to distribute data they obtained from Plaintiff to third parties, which is relevant to Defendants' proposed breach of contract

---

[21] *Birch*, 812 F.3d at 1247 (quoting *Gorsuch,* 771 F.3d at 1240).
[22] No. 19-cv-4007-HLT-TJJ, 2021 WL 2515025, at *3, (D. Kan. 2021).
[23] ECF No. 89.
[24] ECF No. 35, 39, 50, 81.

counterclaim.[25] This newly discovered information, as claimed by Defendants, was not readily available because they could not extract the documents from their database without expending hundreds of man hours.[26]

The Court finds Defendants have established good cause to modify the scheduling order and extend the deadline for seeking leave to amend pleadings.

### 2. Fed. R. Civ. P. 15(a)

Having established Defendants demonstrate good cause to modify the scheduling order, the Court now considers whether Defendants meet the standards of Rule 15(a)(2), which states, in part, "The court should freely give leave [to amend pleadings] when justice so requires."[27] Despite the direction to freely grant leave to amend, "a court may deny leave to amend upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, or futility of amendment."[28] Plaintiff does not argue undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed or undue prejudice; only that Defendants' proposed second amended counterclaims are futile.[29] As the party arguing futility of amendment, Plaintiff has the burden to show the proposed amendments would be futile.[30] Futility is determined based upon the same analysis that governs a Fed.

---

[25] ECF No. 98.
[26] ECF No. 98.
[27] Fed. R. Civ. P. 15(a)(2).
[28] *Orr v. Riederer*, No. 10-1303-CM, 2011 WL 13234391, at *3 (D. Kan. 2011) (citing *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993)) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotation marks omitted)).
[29] ECF No. 91.
[30] *Rural Water Dist. No. 4, Douglas County, Kan. v. City of Eudora, Kan.*, No. 07-2463-JAR, 2008 WL 1867984, at *5 (D. Kan. Apr. 24, 2008).

R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim.[31] For the court to find futility, it must determine the proposed counterclaims "do not contain enough facts to state a claim for relief that are plausible on their face or [they] otherwise fail as a matter of law."[32] A proposed amendment is futile if the court determines the plaintiff can prove no set of facts in support of its claims that would entitle it to relief.[33] When applying this standard, "the court must accept as true all well-pleaded factual allegations and view them in the light most favorable to the pleading party."[34]

The following facts are taken from Defendants' Motion, Reply, and proposed answer, affirmative defenses and second amended counterclaims, and, for purposes of determining futility, the allegations are taken as true and viewed in the light most favorable to Defendants, (proposed Counter-Plaintiffs.)[35] Some condominium ownership associations, ("COA") and property managers outsource data regarding their property to third-party vendors such as Plaintiff, and in such cases, Defendants are unable to obtain that data directly from the COA or property manager. Plaintiff provides the data to Defendants through a condominium questionnaire offered for sale on its website.

Defendants purchased data from Plaintiff through its websites since 2018. Plaintiff sold and provided the data to Defendants by completing, signing and returning the

---

[31] *Pedro v. Armour Swift-Eckrich*, 118 F. Supp.2d 1155, 1158 (D. Kan. 2000).
[32] *Eagle v. USA Dent Company, LLC, et al.,* No. 20-cv-01146-JWB-TJJ, 2022 WL 17903796, at *5 (D. Kan. 2022) (citing *Bank Midwest v. R.F. Fisher Elec. Co., LLC*, No. 19-2560-JAR-GEB, 2021 WL 38008, at *6 (D. Kan. 2021).
[33] *Orr* at *3 (citing *Pedro* at 1158).
[34] *Eagle* at *5 (D. Kan. 2022) (citing *Bank Midwest v. R.F. Fisher Elec. Co., LLC*, No. 19-2560-JAR-GEB, 2021 WL 38008, at *6 (D. Kan. 2021).
[35] ECF Nos. 89, 90, 97. *Eagle* at *5.

questionnaires to them. When accessing and purchasing the data from Plaintiff, Defendants agreed to its terms of use which prohibit the reselling of the data by Defendants. However, the completed questionnaires also contained the following, agreed-upon, statement, "The undersigned certifies that to the best of their knowledge and belief, the information contained herein and in any addendum or attachments is true and correct and authorizes [Defendants] to utilize the information and provide it to mortgage lenders and other third parties without restriction."[36] This addition to the questionnaires was presented to Plaintiff's management-level employees for approval and signed by Plaintiff's representative when the completed questionnaires were sent to Defendants.

Defendants allege the parties entered into an agreement of an indefinite term pursuant to Plaintiff's terms of use, as modified by the authority granted in the signed questionnaires and the parties' course of conduct. The agreement was unilaterally terminated by Plaintiff without any notice to Defendants when Plaintiff barred Defendants from accessing its websites in November 2021.

Defendants' proposed second amended counterclaims allege Plaintiff breached this agreement by barring them from accessing the website to obtain condominium data on the feigned allegation Defendants breached the terms of use, further allege Plaintiff breached the covenant of good faith and fair dealing, and, lastly, allege tortious interference with contractual relations.

---

[36] ECF No. 91.

### A. <u>Breach of Contract</u>

Defendants' second proposed amended counterclaims include the allegation Plaintiff breached an agreement which allowed Defendants access to its website.[37] Plaintiff argues access was terminated in November 2021, based upon Defendants violating Plaintiff's terms of use.[38] Defendants assert the agreement allowing it access to the website was governed by Plaintiff's terms of use *and* subsequent modification by Plaintiff's authorization allowing Defendants to "utilize the information [purchased from Plaintiff] and provide it to mortgage lenders and other third parties without restriction."[39] Plaintiff specifically states, "The reason [Plaintiff] terminated [Defendants'] access to [Plaintiff's] websites was that [Defendants were] reselling [Plaintiff's] information for commercial purposes, and even altering the information in the process."[40] Plaintiff argues Defendants' breach of contract counterclaim is futile for five reasons: 1) Defendants' "course of conduct" theory was previously rejected by the court; 2) The terms of use prohibit any alteration to those terms of use; 3) The modifying language in the questionnaires did not apply to future orders; 4) The terms of use superseded the modifying language in the questionnaires; and, 5) There are no facts showing Plaintiff terminated any contract with unreasonable notice.[41] The Court will address each of Plaintiff's five arguments in turn.

---

[37] ECF No. 90, Exh. 2.
[38] ECF No. 91.
[39] *Id.*
[40] *Id.*
[41] ECF No. 91.

In its memorandum and order granting Plaintiff's motion to dismiss, the District Judge discussed a 2015 agreement between Defendants and Plaintiff's predecessor, and the impact the Plaintiff's terms of use, including an applicable integration clause, had on that prior agreement.[42] The questionnaires and the additional language contained in those questionnaires were neither known to, nor considered by, the court in its analysis. The District Judge's order was clear, stating, in part, Defendants "…can't assert an implied breach of contract claim in its opposition papers when it never has pleaded such a claim."[43] The court further noted Delaware's prohibition on simultaneously alleging an implied contract and express contract, "based on the same terms or embracing the same subject matter."[44] In their proposed second amended counterclaims, Defendants argue the agreement between the parties was governed by the terms of use, as modified by the parties' course of conduct and evidenced by Plaintiff's grant of authority to Defendants to provide the purchased information to third parties "without restriction."[45] The Court does not agree this proposed second amended counterclaim is Defendants' attempt to re-argue claims previously considered by the District Judge.

---

[42] ECF No. 81.
[43] ECF No. 81, fn 10.
[44] The parties agree the choice of law provisions in the terms of use designate Delaware law applies to the contract claims herein. Based both on the choice of law provision in the parties' user agreements and based upon the holding that Kansas courts generally apply the law chosen by the parties to control their agreements, the Court applies Delaware law. *Brenner v. Oppenheimer & Co. Inc.,* 44 P.3d 364, 375 (Kan. 2002). *See* ECF Nos. 24, 42. *Also see, Chase Manhattan Bank v. Iridium Africa Corp.*, 239 F. Supp. 2d 402, 409 (D. Del. 2002) (applying Delaware law). *Also see,* ECF Nos. 89, 91.
[45] ECF Nos. 90, Exh. 2, 91.

11

Plaintiff next argues Defendants' proposed second amended counterclaims are futile because the terms of use prohibit any alteration to those terms of use. Again, the Court looks to Delaware law regarding the ability of parties to modify a contract despite contractual language that prohibits modification and concludes any such modification is "void," which is the express language in the Plaintiff's terms of use.[46] Viewing the Defendants' facts as true and in a light most favorable to them, the parties agreed to additional language in the questionnaires which was approved by Plaintiff's management-level employees, and signed by a representative of Plaintiff every time it sold a completed questionnaire to Defendants. This Court believes it plausible that the language granted Defendants the authority to provide the information in the completed questionnaires to third parties without restriction. The parties' course of conduct from 2018 until November 2021 appears to include the questionnaires completed and sold by Plaintiff to Defendants with the grant of authority allowing Defendants to provide the information to third parties, and Defendants then providing those questionnaires to its clients. Delaware law does not permit a party to reference "contractually noncompliant actions as being void" to lock in a contractual outcome.[47] The court in *XRI Investments Holdings* also noted, "These authorities suggest that parties should not be able to use the word "void" to lock in a contractual arrangement and insulate it from the implications of their subsequent

---

[46] In their Reply (ECF 97), Defendants assert this language prohibiting modification was not added to Plaintiff's terms of use until May 2021, purportedly three years after the grant of authority to release information to third parties was included in the questionnaire and six months prior to Plaintiff terminating Defendants' access to its website.
[47] *XRI Investments Holdings, LLC v. Holifield and GH Blue Holdings, LLC*, 283 A.3d 581, 660 (2022).

actions."[48] Delaware law also directs, "[N]otwithstanding a contractual provision stating that a contract cannot be modified except in writing, a court may find that the parties modified their obligations orally, by conduct, or through waiver."[49] Defendants seek to alter their amended counterclaims to include a breach of the contract which was modified by the parties based upon their course of conduct (authorizing Defendants to provide the information to its clients and Defendants doing just that) over the course of approximately three years. As such, this Court declines to conclude this proposed second amended counterclaim as futile based on the course of conduct by these parties.

Plaintiff's third argument to demonstrate futility is the modifying language in the questionnaires did not apply to future orders. In construing the facts in a light most favorable to Defendants and taking their factual allegations as true, again, the modifying language in the questionnaires was applicable to each order placed by Defendants and that language was included in each order.[50] Defendants also argue the parties' course of conduct, as dictated by Delaware law, served to modify the terms of future use.[51] There is no argument Plaintiff issued completed questionnaires without the grant of authority allowing Defendants to use the information without restriction. As such, the Court also declines to conclude the proposed second amended counterclaim is futile on the basis the modifying language did not apply to future orders.

---

[48] *Id*.
[49] *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc*., 297 A.2d 28, 33 (Del. 1972)
[50] ECF No. 90, Exh. 2.
[51] *Pepsi-Cola Bottling Co*. at 33. (Holding a contract containing a paragraph that no future changes in the terms would be valid except when reduced to writing and executed by both sides, would not prohibit the modification or making of a new agreement by the conduct of the parties.)

13

According to Plaintiff, the terms of use superseded the modifying language in the questionnaires. The Court disagrees. Plaintiff issued the questionnaires with the grant of authority to Defendants after Defendants assented to the terms of use and placed its order. This separate and distinct inclusion of authority to Defendants to distribute the questionnaires modified the terms of use, and it became part of the parties' agreement. The Court cannot find futility in this argument. As alleged by Defendants, the issuance of the questionnaire with the grant of authority would supersede the terms of use, because it was assented to and issued by Plaintiff *after* Defendants agreed to the terms of use. Coupled with Defendants providing the information to its clients, (establishing the course of conduct of the parties) Defendants allege the terms of use were modified by subsequent conduct as allowed by Delaware law.[52]

Finally, as to the breach of contract claim, Plaintiff alleges futility by arguing there has already been a finding by the District Judge that there are no facts that could demonstrate Plaintiff terminated any contract with unreasonable notice. The factual allegation in Defendants' proposed second amended counterclaims is Plaintiff terminated their access to the websites with *no* notice in November 2021.[53] There is a difference between "unreasonable" notice and "no" notice at all. The proposed second amended counterclaim stems from the allegation Plaintiff terminated a contract the parties operated under from 2018 until November 2021 without any notice. But this is not the claim

---

[52] *See Pepsi-Cola Bottling Co.,* 297 A.2d at 33.
[53] ECF No. 90, Exh. 2, (Alleging, "In November 2021, Uhlig repudiated the parties' agreement and blocked CoreLogic's access to Uhlig's websites "effective immediately…").

analyzed by the District Judge in his Memorandum and Order granting dismissal.[54] The Court does not find Plaintiff establishes futility of amendment with this argument.

The Court does not find Plaintiff sustained its burden to prove futility with regard to Defendants' proposed second amended counterclaim for breach of contract.

### B. Breach of the covenant of good faith and fair dealing[55]

Defendants' proposed second amended counterclaim alleges:

> Uhlig breached the implied covenant of good faith and fair dealing by, without limitation, (a) repudiating the Agreement and asserting disingenuously that CoreLogic breached the Terms of Use by using Uhlig's data for commercial purposes without Uhlig's knowledge or consent, and (b) unilaterally terminating the Agreement without reasonable notice and barring CoreLogic from accessing data exclusively controlled by Uhlig.

Plaintiff alleges Defendants' proposed second amended counterclaim is futile because "there is no contract allowing [Defendants] to resell information for commercial purposes."[56] The undersigned analyzed Defendants' proposed second amended breach of contract counterclaim herein and determined the breach of contract claim does not appear to be futile according to the law. Considering Defendants' proposed factual allegations as true and in a light most favorable to them, the questionnaires included an authorization allowing Defendants to provide the information obtained in the questionnaires to third

---

[54] ECF No. 81.

[55] The Court again looks to Delaware law regarding the covenant of good faith and fair dealing, based both on the choice of law provision in the parties' user agreements and based upon the holding that Kansas courts generally apply the law chosen by the parties to control their agreements. *Brenner,* 44 P.3d 364, 375.

[56] ECF No. 91.

parties expressly "without restriction."[57] The Court will not deny Defendants' ability to modify their amended counterclaim of breach of the covenant of good faith and fair dealing on the basis that "there is no contract allowing [them] to resell information for commercial purposes."[58]

Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract.[59] In its most general terms, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[60] Upon consideration of Defendants' allegations in its proposed second amended counterclaim, Plaintiff terminated their agreement and barred Defendants from accessing the data on its website without notice.[61] Plausibly, these allegations set forth a claim for breach of good faith and fair dealing at the pleading stage, and Plaintiff has not met its burden of establishing futility.

### C. Tortious Interference with Contractual Relations[62]

Regarding the proposed second amended counterclaim alleging tortious interference with contractual relations, Defendants allege they had enforceable contracts with third parties to provide data they could only obtain from Plaintiff.[63] They further allege Plaintiff

---

[57] ECF Nos. 90, Exh. 2, 91.
[58] ECF No. 91.
[59] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).
[60] *Id.* at 442 (citing *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 Del.Ch.1985), *construing Restatement § 205*.
[61] ECF No. 90, Exh. 2.
[62] As previously set forth, the Court applies the law of Delaware to this state law claim. *Brenner* at 375.
[63] ECF No. 89, Exh. 2.

16

knew or should have known Defendants were providing this information to third parties, and Plaintiff knowingly and intentionally interfered in those contracts by terminating its agreement with Defendants to supply said data.[64] Finally, Defendants assert they have suffered damages as a result of Plaintiff's actions.[65] In order to plead tortious interference with contractual relations, Defendants must plead facts capable of establishing the following elements: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[66]

    Considering the facts plead, and viewed in a light most favorable to Defendants, they have adequately alleged a tortious interference with contractual relations counterclaim. There is no dispute Defendants provide condominium data to its clients, with whom they allege a contractual relationship.[67] According to Defendants, Plaintiffs knew of the contract, either due to the authorization to distribute the data contained in the questionnaires or through its business practices.[68] Defendants also allege Plaintiffs intentionally and without justification barred accessibility to its website, leaving Defendants with no way to provide data to its clients.[69] Finally, Defendants claim substantial financial injury as a result of Plaintiff's actions.[70]

---

[64] *Id.*
[65] *Id.*
[66] Bhole, Inc. v. Shore Invs., Inc., 67 A.3d 444, 453 (Del. 2013).
[67] ECF No. 90, Exh. 2.
[68] ECF No. 90, Exh. 2.
[69] *Id.*
[70] *Id.*

Plaintiff asserts futility, arguing Defendants cannot allege facts to support that Plaintiff acted "without justification" in terminating Defendants' access to its website.[71] The pleadings viewed in the light most favorable to Defendants indicates Plaintiff has failed to sustain its burden of establishing futility regarding this proposed second amended counterclaim.

## IV.   Conclusion

Because the Court finds Defendants established good cause as required by Fed. R. Civ. P. 16(b)(4), it will amend the scheduling order. Further, the Court finds leave to amend should be freely granted if justice so requires. Plaintiff has not met its burden to establish futility.[72]

**IT IS THEREFORE ORDERED** Defendants' motion to amend the scheduling order is **GRANTED** and for leave to file their second amended counterclaims is **GRANTED**. **(ECF No. 89).** Defendants shall file their second amended answer, affirmative defenses, and counterclaims on or before February 16, 2023.

**IT IS SO ORDERED.**

Dated February 6, 2023, at Wichita, Kansas.

s/ Gwynne E. Birzer
GWYNNE E. BIRZER
United States Magistrate Judge

---

[71] ECF. No. 91.

[72] Plaintiff did not argue undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed or undue prejudice, and the Court does not find evidence of these factors.