IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UHLIG LLC,

       Plaintiff/Counter Defendant,

v.

CORELOGIC, INC., et al.,

       Defendants/Counter Claimants.

Case No. 21-2543-DDC

## MEMORANDUM AND ORDER

Plaintiff Uhlig[1] operates websites, where it sells information about "common interest communities." Purchasers use Uhlig's information in real estate transactions. Uhlig alleges defendant CoreLogic[2] purchased data from Uhlig's websites, then resold that data and stored the data to enrich CoreLogic's own products and services. Uhlig asserts that CoreLogic's use of the data is illegal and violates a variety of contractual obligations. Uhlig sues CoreLogic for: violating the Lanham Act, breach of contract, fraud, tortious interference with business expectancy, violating the Delaware Deceptive Trade Practices Act, misappropriation of trade

---

[1] Plaintiff/Counter Defendant Uhlig LLC does business as CondoCerts and WelcomeLink. *See* Doc. 279 at 1 (Pretrial Order). The court uses "Uhlig" throughout this Memorandum and Order to refer to this entity. The court also uses CondoCerts and WelcomeLink to refer to Uhlig's products and services, with the understanding that both refer to Uhlig.

[2] Uhlig sued defendants CoreLogic, Inc. and CoreLogic Solutions, LLC. *See* Doc. 279 (Pretrial Order). In their Motion for Summary Judgment, both CoreLogic defendants ask the court to enter summary judgment in CoreLogic, Inc.'s favor because there "is no evidence that CoreLogic, Inc. is responsible in any manner for any of the alleged wrongdoing." Doc. 289 at 66–67. Uhlig doesn't respond to this argument in its opposition brief. *See generally* Doc. 309. So, the court considers this argument undisputed, and grants summary judgment in CoreLogic, Inc.'s favor. This Order thus uses "CoreLogic" to refer only to CoreLogic Solutions, LLC.

secrets, and unjust enrichment.  CoreLogic moves for summary judgment against all of Uhlig's claims except for its Lanham Act claim.

CoreLogic's Motion for Summary Judgment (Doc. 288) argues Uhlig's claims are untimely.  And it argues also that Uhlig knew about CoreLogic's use of Uhlig's data.  So, CoreLogic contends, the parties modified their agreements through their course of conduct or, alternatively, Uhlig acquiesced to CoreLogic's practices.  The court, as explained below, grants CoreLogic's Motion for Summary Judgment (Doc. 288) against Uhlig's fraud, tortious interference, Delaware Deceptive Trade Practices Act, misappropriation of trade secrets, and unjust enrichment claims.  But the court concludes that a fact issue precludes granting summary judgment against Uhlig's breach of contract claims.  The court thus grants CoreLogic's Motion for Summary Judgment in part and denies it in part.

Uhlig has filed its own Motion for Summary Judgment (Doc. 283).  It seeks summary judgment in Uhlig's favor on Uhlig's breach of contract claims—a request the court denies, given the fact issue that inheres in the parties' course of dealing.  Uhlig also seeks summary judgment against many of CoreLogic's affirmative defenses.  This part of Uhlig's motion is granted in part and denied in part, as explained in full below.

CoreLogic asserts three counterclaims against Uhlig:  breach of contract, breach of good faith and fair dealing, and tortious interference with contractual relations.  CoreLogic bases its claims on its view that Uhlig breached the parties' implied agreement by improperly—and pretextually—terminating CoreLogic's access to Uhlig's websites.  Uhlig has filed a Motion for Summary Judgment (Doc. 283) against these counterclaims.  The court grants this counterclaims part of Uhlig's motion because CoreLogic's counterclaims are barred by the contractually selected statute of limitations.

CoreLogic also has filed a Motion to Review (Doc. 302) that objects to the case's Pretrial Order (Doc. 279).  The court overrules CoreLogic's Pretrial Order objections in part and sustains them in part.

The court explains these decisions, below.

# TABLE OF CONTENTS

I.       Background...................................................................................................... 5

II.     Legal Standard............................................................................................... 14

III.    Analysis ........................................................................................................ 16

  A.  Uhlig's Fraud Claim ............................................................................... 17

    1.  CoreLogic's objection to the Pretrial Order's statement of Uhlig's fraud claim is sustained. .................................................................................................... 17

    2.  The statute of limitations bars Uhlig's fraud claim................................... 23

      a. Equitable Estoppel....................................................................... 23

      b. Fraud Statute of Limitations Analysis ......................................... 27

    3.  Uhlig's fraud claim fails to create triable issues of reliance and intent. ....... 29

  B.  Uhlig's Misappropriation of Trade Secrets Claim ............................................ 31

    1.  In July 2016, CoreLogic's request to Uhlig raised a red flag. ....................... 32

    2.  Uhlig investigated this red flag—sort of. ................................................. 33

    3.  Uhlig's misappropriation of trade secrets claim is untimely........................... 36

  C.  Uhlig's Unjust Enrichment Claim .................................................................. 40

  D.  Uhlig's Tortious Interference Claim ................................................................ 44

  E.  Uhlig's Delaware Deceptive Trade Practices Act Claim........................................ 46

  F.  Uhlig's Claim for Contractual Attorneys' Fees .................................................. 47

  G.  Uhlig's Breach of Contract Claims ................................................................. 49

    1.  Uhlig's breach of contract claims for contracts formed after November 21, 2016, are timely.................................................................................................... 50

    2.  CoreLogic hasn't shouldered its burden to show that the parties modified their agreements via their course of conduct. ...................................................... 51

      a. CoreLogic and Uhlig's Relationship ............................................. 53

      b. License Agreement ..................................................................... 56

      c. GOAUA ................................................................................... 59

      d. Uhlig's Knowledge ................................................................... 63

    3.  CoreLogic hasn't shouldered its burden to show that Uhlig acquiesced. ..... 68

    4.  Uhlig has adduced sufficient evidence for a reasonable factfinder to conclude that CoreLogic executed thousands of contracts.................................................. 70

    5.  Uhlig isn't entitled to summary judgment on its breach of contract claims. ............... 75

  H.  CoreLogic's Affirmative Defenses ................................................................. 80

  I.   CoreLogic's Counterclaims .......................................................................... 84

IV.    Conclusion ................................................................................................... 91

## I.        Background

Uhlig is a national provider of information about common interest communities—*i.e.*, homeowner associations, condominiums, co-ops, and the like.  Doc. 279 at 3 (Pretrial Order ¶ 2.a.iii.).  A common interest community includes obligations that encumber property deeds within the community.  *Id.*  Uhlig sells information about common interest communities and their residents through WelcomeLink.com and CondoCerts.com.  *Id.* at 4 (Pretrial Order ¶ 2.a.iv.).  Uhlig always has owned WelcomeLink.  *Id.* (Pretrial Order ¶ 2.a.v.).  In contrast, Uhlig acquired CondoCerts in 2017 from Mutual of Omaha.  *Id.* (Pretrial Order ¶ 2.a.vi.).

Uhlig provides the information as a representative of its clients.  *Id.* (Pretrial Order ¶ 2.a.vii.).  Uhlig's clients include common interest communities and property management companies, who serve as managing agents for common interest communities.  *Id.*  The information Uhlig provides on behalf of its clients includes "estoppels, account histories, questionnaires, association documents, total association units and units sold, types of units and restrictions, commercial and residential mix, development phase information, association rental policies, association liens and lawsuits, budgets, and ownership information."  Doc. 284-2 at 2 (Uhlig Decl. ¶ 3).  Uhlig refers to this information as "Community Information."  *Id.*  Uhlig sells Community Information to retail purchasers, who use it for various purposes with a specific real estate transaction—*i.e.*, selling, financing, refinancing, and transferring homes and condominium units.[3]  *Id.* at 3 (Uhlig Decl. ¶ 4).

---

[3]      CoreLogic attempts to controvert this fact.  Doc. 311 at 11 (CoreLogic Resp. Statement of Fact ¶ 3).  But, to controvert this fact, CoreLogic cites its summary judgment *argument*.  *Id.*  Fed. R. Civ. P. 56(c)(1) requires a "party asserting that a fact . . . is genuinely disputed" to "support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  CoreLogic can't controvert Uhlig's evidence with argument, so the court rejects CoreLogic's attempt to controvert this fact.

CoreLogic operates a variety of businesses.  *See, e.g.*, Doc. 309-32 (Uhlig Ex. 144).  One of those businesses was called CondoSafe.  CoreLogic created CondoSafe to "provide lenders with the information they needed to underwrite condominium projects for mortgages that they were originating."  Doc. 290-9 at 4 (Doty Dep. 51:5–11).  CoreLogic launched CondoSafe in 2014.  Doc. 290-4 at 1 (Jensen Decl. ¶ 2).  CoreLogic began placing orders on WelcomeLink in 2014.  Doc. 279 at 4 (Pretrial Order ¶ 2.a.ix.).  From 2014 through November 9, 2021, CoreLogic placed over 11,000 orders for Community Information from WelcomeLink and/or CondoCerts.  *Id.* (Pretrial Order ¶ 2.a.x.).

Here's the crux of the parties' dispute:  Uhlig asserts that CoreLogic, when it placed thousands of orders, repackaged Uhlig's Community Information into CoreLogic's CondoSafe product and sold it.  Uhlig contends this re-use violated the parties' Customer Agreements.  CoreLogic also represented Uhlig as the "Preparer" on the CondoSafe report, a tactic Uhlig calls fraud.  And CoreLogic used Uhlig's data to enrich CoreLogic's databases—another misuse of Uhlig's data.

CoreLogic, for its part, maintains that Uhlig knew it was using Community Information in CondoSafe reports.  And, according to CoreLogic, the parties modified their contract through their course of dealing because they allowed CoreLogic to use Community Information for commercial purposes.  With this central dispute in mind, the court recites details about how, exactly, the parties' relationship worked.

### *Uhlig's Contracts*

To purchase Community Information from Uhlig, a purchaser must execute specific actions on an Uhlig "Ordering Site"—either CondoCerts.com or WelcomeLink.com.  Doc. 284-2

at 3 (Uhlig Decl. ¶ 7).[4]  To purchase Community Information from one of Uhlig's Ordering

Sites, a purchaser must review and agree to four contracts:

(1) **Terms of Use**:  a purchaser must review and accept the Terms of Use every time the

purchaser enters an Ordering Site;

(2) **Account Registration Agreement**:  to gain access to an Ordering Site and place an

order there, a purchaser must register as a user and review and accept the Account

Registration Agreement;

---

[4]      CoreLogic objects to this part of the Uhlig Declaration, asserting that the declarant, Mark Uhlig, has testified that he doesn't have personal knowledge about the various agreements on Uhlig's websites. Doc. 311 at 12 (CoreLogic Resp. Statement of Fact ¶ 7).  But Mr. Uhlig's testimony doesn't reflect a lack of personal knowledge about the four agreement themselves—far from it.  In Mr. Uhlig's deposition, he demonstrated knowledge about the agreements on both the CondoCerts and Welcome Link websites. Doc. 312-20 at 17–18 (Uhlig 30(b)(6) Dep. 339:10–340:18).  And Mr. Uhlig testified about all four of the contracts at issue here:  Terms of Use, Order Submission Agreement, Information Upload Agreement, and Account Registration Agreement.  *Id.* at 19 (Uhlig 30(b)(6) Dep. 341:20–25).  So, the court overrules CoreLogic's objection to this statement of fact—and others—arguing that Mr. Uhlig lacks sufficient personal knowledge about the four agreements on Uhlig's Ordering Sites.

CoreLogic also objects that Mr. Uhlig has no personal knowledge of how Uhlig's customers encountered these contracts on websites.  Doc. 311 at 12 (CoreLogic Resp. Statement of Fact ¶ 7).  To support this objection, CoreLogic cites a long string of Mr. Uhlig's deposition, wherein Mr. Uhlig testifies as Uhlig's 30(b)(6) witness about the various agreements.  *Id.* (citing Doc. 312-20 at 9–26 (Uhlig 30(b)(6) Dep. 331:11–348:2)).  But nowhere in this long string of cited pages does CoreLogic ask Mr. Uhlig about how these contracts appear on the websites.  And, as explained above, Mr. Uhlig demonstrated plenty of knowledge about the Customer Agreements.  This leaves CoreLogic's personal knowledge objection unsupported, and the court thus overrules it.

Finally, CoreLogic asserts a best evidence objection to Mr. Uhlig's statements about the various contracts at issue here.  The best evidence rule, codified at Fed. R. Evid. 1002, "requires a party seeking to prove the contents of any writing, recording, or photograph to produce the originals."  *United States v. Chavez*, 976 F.3d 1178, 1193–94 (10th Cir. 2020).  CoreLogic claims, in essence that the contracts at issue are the best evidence of the contracts.  The court overrules that objection because Uhlig submitted all relevant versions of the contracts.  *See* Doc. 284-4 (Uhlig Ex. 3); Doc. 284-5 (Uhlig Ex. 4); Doc. 284-6 (Uhlig Ex. 5); Doc. 284-7 (Uhlig Ex. 6); Doc. 284-8 (Uhlig Ex. 7); Doc. 284-9 (Uhlig Ex. 8); Doc. 284-10 (Uhlig Ex. 9); Doc. 284-11 (Uhlig Ex. 10); Doc. 284-12 (Uhlig Ex. 11); Doc. 284-13 (Uhlig Ex. 12); Doc. 284-14 (Uhlig Ex. 13).

    (3) **Order Submission Agreement**:  every time a purchaser places a Community

        Information order, the purchaser must review and accept Uhlig's Order Submission

        Agreement;

    (4) **Information Upload Agreement**:  to upload a custom form, a purchaser must review

        and accept Uhlig's Information Upload Agreement.

*Id.* (Uhlig Decl. ¶¶ 8–9).  Uhlig refers to these four agreements collectively as the "Customer

Agreements."  Uhlig has updated the Customer Agreements over the years, but the material[5]

provisions have remained substantially the same—including the prohibition against commercial

use of Community Information.  *Id.* at 4 (Uhlig Decl. ¶ 10).[6]  The Customer Agreements are the

only agreements CoreLogic and Uhlig signed during the relevant statute of limitations period.

Doc. 284-2 at 7 (Uhlig Decl. ¶ 27); Doc. 284-19 at 8 (CoreLogic 30(b)(6) Dep. 112:10–17).

    Uhlig has used different versions of these Customer Agreements over the years.  For

example, when CoreLogic began placing orders with Uhlig in 2014, Uhlig's Terms of Use in

effect were the Uhlig LLC Terms of Use dated December 1, 2007.  Doc. 293-7 at 7 (CoreLogic

---

[5]     Mr. Uhlig's Declaration provides that "the material provisions" of the Customer Agreements
have remained substantially the same over time.  Doc. 284-2 at 4 (Uhlig Decl. ¶ 10).  CoreLogic objects
to Mr. Uhlig's use of the phrase "material provision," calling it improper opinion testimony.  Doc. 311 at
13 (CoreLogic Resp. Statement of Fact ¶ 9).  Indeed, "material" can have a specialized legal meaning.
*See, e.g.*, *United States v. Medeiros*, No. 1:18-cr-01966, 2021 WL 2711379, at *9 (D.N.M. July 1, 2021)
(warning parties not to elicit legal conclusions about materiality at trial where statute had "a materiality
element for the jury to determine").  But that's not the case here, for CoreLogic has cited no authority
suggesting that the term "material" has a special meaning here.  Nonetheless, to the extent Mr. Uhlig's
statement about "material provisions" constitutes a legal conclusion, the court disregards it.

[6]     CoreLogic objects to this paragraph of Mr. Uhlig's Declaration, arguing it again violates the best
evidence rule.  Doc. 311 at 13 (CoreLogic Resp. Statement of Fact ¶ 9).  The court overrules this
objection.  "This does not violate the best evidence rule because 'at the summary judgment stage,
evidence need not be submitted in a form that would be admissible at trial.'"  *Banks v. St. Francis Health
Ctr., Inc.*, No. 15-CV-2602, 2016 WL 6905581, at *7 n.33 (D. Kan. Nov. 21, 2016) (quoting *Francouer
v. U.S. Bank Nat'l Ass'n*, 643 F. App'x 701, 704 (10th Cir. 2016)).  Mr. Uhlig has personal knowledge of
these facts, so the court properly can consider this paragraph of his Declaration.  And, as just explained,
Uhlig has submitted all relevant versions of the contracts.

Ex. 97); Doc. 312-20 at 20–21 (Uhlig 30(b)(6) Dep. 342:21–343:10).  These 2007 Terms of Use

required a user like CoreLogic to "represent[], warrant[], and covenant[] that its use of the

Services and the Website will not:  . . . reproduce, copy, modify, sell, distribute, or otherwise

exploit for any commercial purposes the Services or the Website, or any component of content

thereof."  Doc. 292-9 at 3–4 (CoreLogic Ex. 69).  As soon as Uhlig acquired CondoCerts in

2017, the Terms of Use applied to CondoCerts, too.  Doc. 312-20 at 20–21 (Uhlig 30(b)(6) Dep.

342:21–343:10).

Uhlig hasn't always used each of these four agreements.  Uhlig began using the current

versions of its Account Registration Agreement and Order Submission Agreement in 2021.  Doc.

293-7 at 7 (CoreLogic Ex. 97).  And Uhlig began using the Information Upload Agreement on

the CondoCerts website in May 2021 and WelcomeLink in August 2021.  Doc. 284-2 at 5 (Uhlig

Decl. ¶ 17); Doc. 312-20 at 25 (Uhlig 30(b)(6) Dep. 347:10–25).

### Uhlig Purchases CondoCerts in July 2017

Uhlig purchased CondoCerts from Mutual of Omaha in July 2017.  Doc. 284-18 (Uhlig

Ex. 17).  Back in 2015, CoreLogic had formed an agreement with Mutual of Omaha that

CoreLogic could purchase CondoCerts data and resell that data.  Doc. 312-10 at 6–9 (Doty Dep.

62:17–65:8).  Continuing that arrangement would violate the plain language of Uhlig's Customer

Agreements.  After Uhlig's purchase of CondoCerts, CoreLogic tried to get Uhlig to agree to a

similar arrangement in the form of a License Agreement.  Thus began the License Agreement

discussion—one that's critically important for summary judgment purposes.

### The License Agreement

In September 2017, CoreLogic sent Sean Madigan, of Mutual of Omaha, a proposed

License Agreement, and Mr. Madigan forwarded the License Agreement to Uhlig.  Doc. 284-23

9

at 6–7 (Uhlig Ex. 22).  The important part of the License Agreement, for summary judgment

purposes, is § 2.2, titled "Permitted Use."  *Id.* at 9.  It provided, "During the Term of this

Agreement and at all times thereafter, CoreLogic may use the HOA Information for any lawful

business purpose, including, without limitation, for incorporation into instances of CoreLogic's

real estate analytics products and services sold to CoreLogic customers."  *Id.*

Uhlig asked Mr. Madigan for context and asked, "Has CondoCerts signed a similar

agreement before?"  *Id.* at 6.  Mr. Madigan responded, "This is new, the bank has not signed this

in the past."  *Id.*  An Uhlig employee forwarded the License Agreement to Uhlig's CEO.  *Id.* at 2.

Uhlig's CEO testified he had "no memory of seeing this agreement."  Doc. 284-25 at 3 (Uhlig

Dep. 95:21–25).  And he testified that he "remember[ed] that CoreLogic asked to have . . . some

sort of special terms, and our answer was just, categorically, no.  Because we don't do that and

never have."  *Id.* at 3–4 (Uhlig Dep. 95:21–96:3).

In January 2018 and February 2018, CoreLogic followed up with Uhlig about the License

Agreement.  Doc. 284-24 at 3–4 (Uhlig Ex. 23).  Uhlig responded in February, writing, "The

terms and conditions for our products and for users of our sites appear on our ordering sites.  We

do not offer these products and services outside those terms, so we are not able to enter into the

agreement you propose."  *Id.* at 2–3.  CoreLogic wrote back to Uhlig in March 2018, explaining,

"we have been doing business with CondoCerts for many years, and had an agreement with them

on our relationship."  *Id.* at 2.  And CoreLogic explicitly noted that Uhlig's terms didn't align

with the way CoreLogic usually did business with CondoCerts.  *Id.*  Uhlig responded and invited

CoreLogic to provide "more detail about the specific items [CoreLogic was] requesting, or

identify the provisions that [CoreLogic felt] were part of a previous arrangement that [were] not

reflected in [Uhlig's] current terms and conditions." *Id.*  CoreLogic never responded to this invitation.[7]

Instead, CoreLogic responded with its view "that CoreLogic and CondoCerts have an ongoing data purchase relationship which for whatever reason has not been comprehensively set out on paper."  Doc. 284-22 at 2 (Uhlig Ex. 21).  CoreLogic told Uhlig that, if the parties wanted to memorialize their relationship, they had "two very different sets of terms and conditions" to consider:  (1) the License Agreement or (2) Uhlig's terms and conditions from its CondoCerts website.  *Id.*  CoreLogic felt that Uhlig's terms and conditions "seem to be further away from the parties' course of dealing."  *Id.*  CoreLogic's employee told Uhlig, "don't hesitate to reach out if you have questions or concerns I can address."  *Id.*  Uhlig didn't respond to this email.  Doc. 285-1 at 3 (Aberle Dep. 104:7–20).

### *Custom Forms*

WelcomeLink and CondoCerts give their customers the option to upload a custom form. Doc. 279 at 4 (Pretrial Order ¶ 2.a.viii.).  The custom form may include the customer's brand, colors, etc.  *Id.*  For example, if an order required a custom CoreLogic questionnaire, Uhlig[8] first would retrieve a standard questionnaire.  Doc. 290-6 at 5 (Brune Dep. 30:18–25).  Then, Uhlig would retrieve a blank CoreLogic custom questionnaire.  *Id.* at 6 (Brune Dep. 31:1–3).  And

---

[7]     CoreLogic attempts to controvert this fact, arguing Uhlig has mischaracterized emails.  Doc. 311 at 17 (CoreLogic. Resp. Statement of Fact ¶ 27).  But, in support of its efforts, CoreLogic cites its summary judgment opposition brief.  Again, CoreLogic can't controvert evidence with argument.  As previous explained, *see* note 3, Rule 56(c)(1) requires a "party asserting that a fact . . . is genuinely disputed" to "support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  CoreLogic has failed to cite competent summary judgment evidence, so its effort to controvert Uhlig's evidence falls flat.

[8]     This process was the same for CondoCerts and WelcomeLink.  Doc. 290-6 at 22 (Brune Dep. 95:17–24).

Uhlig would take the answers from the standard questionnaire and use it to complete the answers on CoreLogic's custom questionnaire. *Id.* (Brune Dep. 31:4–9). If Uhlig couldn't complete a customer form based on the standard questionnaire, it would send the form to the customer support team to get additional information. *Id.* at 16–17 (Brune Dep. 70:7–71:13).

CoreLogic used a custom questionnaire when utilizing Uhlig's services. And that custom questionnaire is the subject of much debate in the parties' summary judgment argument, explored in more detail, below.

### *The Grant of Authority/Unilateral Alteration (GOAUA)*

CoreLogic's custom questionnaire contained language that has caused much debate among the parties. As early as January 2015—before Uhlig owned CondoCerts—CoreLogic used a custom questionnaire on CondoCerts. *See* Doc. 293-22 (CoreLogic Ex. 112). CoreLogic's custom form included the following language under "Preparer Information." "The undersigned certifies that to the best of their knowledge and belief, the information contained herein and in any addendum or attachments is true and correct and authorizes CoreLogic to utilize the information and provide it to mortgage lenders and other third parties without restriction." Doc. 285-2 at 6 (Uhlig Ex. 27). CoreLogic calls this language the "Grant of Authority." *See, e.g.*, Doc. 289 at 37 (CoreLogic Statement of Fact ¶ 258). Uhlig refers to it instead as the "Unilateral Alteration." *See, e.g.*, Doc. 284 at 19 (Uhlig Statement of Fact ¶ 40). The court elects to use a smash-up of these two descriptions, calling the competing terminology in CoreLogic's custom form "the GOAUA." The court imagines this phrase is pronounced go-ow-uh.

In 2021, in response to the GOAUA, Uhlig created a stamp to affix to its questionnaires that explicitly made the CondoCerts signature subject to the provisions of the CondoCerts Order

Submission Agreement.  Doc. 285-3 at 10 (Ross Dep. 111:3–12); Doc. 285-2 at 6 (Uhlig Ex. 27).

With the stamp and the GOAUA, the CoreLogic custom questionnaire looked like this:



Doc. 285-2 at 6 (Uhlig Ex. 27).

CondoCerts had a custom questionnaire team that reviewed draft custom questionnaires. Doc. 290-7 at 17–19 (Button Dep. 73:18–75:3).[9]  In 2018, CondoCerts agreed to review a draft of CoreLogic's custom questionnaire—including the GOAUA.[10]  Doc. 292-3 (CoreLogic Ex. 63).  It is unclear whether the scope of these reviews unearthed the GOAUA's existence.

_____

[9]    CoreLogic proffers the following statement of fact:  "CondoCerts never complained about the language in CoreLogic's custom questionnaires with the Grant of Authority."  Doc. 289 at 37 (CoreLogic Statement of Fact ¶ 261).  CoreLogic cites as support deposition testimony from Uhlig Customer Support Manager Christopher Button.  *Id.*  Uhlig objects, arguing the deposition testimony doesn't support CoreLogic's proffered Statement of Fact.  Doc. 309 at 20 (Uhlig Resp. Statement of Fact ¶ 261).  The court agrees with Uhlig.  In the cited deposition testimony, Mr. Button testifies that no one ever told him a problem existed "with some of the language on this form at CondoCerts[.]"  Doc. 290-7 at 26 (Button Dep. 103:1–4).  That's it.  CoreLogic has stretched this testimony too far by asserting that CondoCerts never complained about the Grant of Authority.  The court can't even tell from the cited testimony which form Mr. Button refers to in his testimony.  The court thus sustains Uhlig's objection.

[10]    CoreLogic proffers the following statement of fact:  "In July 2018, Amie Ruward of CoreLogic spoke with Chris Button or Jennifer Michelson asking CondoCerts to review CoreLogic's draft Version 4 of the custom questionnaire containing the Grant of Authority, and Uhlig agreed to do so."  Doc. 289 at 37 (CoreLogic Statement of Fact ¶ 259).  In support, CoreLogic cites an email.  Doc. 292-3 (CoreLogic

*Uhlig Terminates CoreLogic's Access*

Uhlig maintains that its Executive Management Team first became aware of CoreLogic's alleged misuse when a former client complained in November 2020.  Doc. 286-2 at 7–8 (Uhlig Ex. 43).  That is, though CoreLogic used Community Information in CondoSafe reports for years, Uhlig steadfastly asserts that it didn't know about its use until November 2020.  In November 2020, Uhlig engaged counsel to investigate whether CoreLogic was violating Uhlig's Terms of Use.  *Id.* at 8.  Uhlig then sent CoreLogic a cease and desist letter on June 29, 2021.  *Id.* In November 2021, Uhlig terminated CoreLogic's access to the CondoCerts and WelcomeLink Ordering Sites.  Doc. 279 at 4 (Pretrial Order ¶ 2.a.xi.).  Uhlig filed this lawsuit on November 22, 2021.  Doc. 1.

## II.     Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625

---

Ex. 63).  In the email, CoreLogic's employee, Ms. Ruward, wrote, "I already spoke to CondoCerts and they are on board to review as well."  *Id.* at 2.  Uhlig objects to this email as double hearsay.  Doc. 309 at 20 (Uhlig Resp. Statement of Fact ¶ 259).  The court agrees that the email is hearsay because it's an out-of-court statement offered for the truth of the matter asserted.  *See McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1142 (10th Cir. 2006) (concluding district court properly "refused to admit the emails on the ground that they were inadmissible hearsay").

But the court "also recognizes that it can rely on evidence submitted in a form that would be inadmissible at trial as long as the Court determines that the evidence will be presented in an admissible form" at trial. *Bell v. City of Tulsa*, No. CIV 21-0061, 2024 WL 1018528, at *11 n.57 (N.D. Okla. Mar. 8, 2024) (collecting authorities).  This email is double hearsay.  The first statement is Ms. Ruward's email itself, stating she spoke with CondoCerts.  The second statement is CondoCerts's statement that it would review the document.  The second statement is admissible as a party-opponent statement.  *See id.* (concluding email statements were "not hearsay where they [were] offered against an opposing party"). And the court can imagine a scenario where CoreLogic could present the first statement in an admissible form:  CoreLogic calls Ms. Ruward to testify in court that she spoke with CondoCerts.  So, the court can consider this fact at summary judgment.

F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  When deciding whether the parties have shouldered their summary judgment burdens, "the

judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  To the contrary, it's an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

While a court can treat cross motions for summary judgment separately, and "the denial of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979), it also may address the legal arguments together, *Berges v. Standard Ins.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).  Here, the two motions, and their legal arguments, overlap—and substantially so.  Indeed, both parties—when briefing defendants' motion—invoke and incorporate briefing filed to support and oppose plaintiff's motion.  The court thus exercises its discretion and addresses together the legal arguments made by the dueling motions.

## III.        Analysis

The court's analysis develops in this fashion:  it first briefly addresses a small part of CoreLogic's Motion to Review (Doc. 302).  Then, it considers CoreLogic's Motion for Summary Judgment (Doc. 288) against Uhlig's claims in this sequence:  fraud, misappropriation of trade secrets, unjust enrichment, tortious interference, Delaware Deceptive Trade Practices Act, contractual attorneys' fees, and breach of contract.  With CoreLogic's Motion for Summary Judgment resolved, the court then turns its attention to Uhlig's Motion for Summary Judgment (Doc. 283).

The court starts, as promised, with a small slice of CoreLogic's Motion to Review (Doc. 302) this case's Pretrial Order (Doc. 279).  In the motion, CoreLogic argues the Magistrate Judge made six errors when she crafted the Pretrial Order.  In the first of those arguments, CoreLogic objects that the Magistrate Judge allowed Uhlig to state claims that are "too conclusory and too

indefinite to put CoreLogic on notice of the basis of each of Uhlig's claims." Doc. 302 at 2. The

court overrules this objection. It has no trouble discerning the basis of Uhlig's claims. And,

despite its alleged lack of fair notice, CoreLogic nonetheless managed to file a robust Motion for

Summary Judgment against these very same claims. The court thus overrules this piece of

CoreLogic's Motion to Review (Doc. 302).

The other five aspects of CoreLogic's motion address specific claims: breach of contract,

fraud, misappropriation of trade secrets, unjust enrichment, and attorneys' fees. *See id.* at 2–3.

The court addresses each objection as part of its corresponding analysis for each of those claims,

below.

### A.    Uhlig's Fraud Claim

The court begins its summary judgment analysis with Uhlig's fraud claim. CoreLogic

first objects to the Pretrial Order's statement of Uhlig's fraud claim, then argues that the claim is

time barred, and, finally, argues that the claim fails on its merits. The court addresses each

argument in turn, starting with CoreLogic's objection to the Pretrial Order.

#### 1.    CoreLogic's objection to the Pretrial Order's statement of Uhlig's fraud claim is sustained.

CoreLogic objects to the Pretrial Order's statement of Uhlig's fraud claim. The

Magistrate Judge entered the Pretrial Order, so CoreLogic moves for this court's review under

Fed. R. Civ. P. 72.[11]  Doc. 303 at 8. When reviewing a magistrate judge's order deciding

---

[11]    Uhlig asserts that "Rule 16(e) is the appropriate rule and standard"—not Rule 72. Doc. 317 at 6. The court disagrees. Rule 16(e) governs pretrial orders, providing that the court may modify a pretrial order "only to prevent manifest injustice." Uhlig asserts that CoreLogic seeks to modify the Pretrial Order, so CoreLogic must meet the manifest injustice standard. But the court doesn't interpret CoreLogic's request as one to modify the Pretrial Order. Instead, this is a garden variety objection to an order issued by a magistrate judge. Our court applies Rule 72 to review objections to pretrial orders. *Laber v. Austin*, No. 18-1351, 2022 WL 17351753, at *2 (D. Kan. Dec. 1, 2022) (applying Rule 72 to party's pretrial order objection). To be sure, if the court sustains CoreLogic's objection, then it might have to modify the Pretrial Order. But that's a symptom of the objection, not its main purpose. So, the court applies Rule 72.

nondispositive pretrial matters, the district court applies a "'clearly erroneous or contrary to

law'" standard of review. *See First Union Mortg. Corp. v. Smith*, 229 F.3d 992, 995 (10th Cir.

2000) (quoting *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1461–62 (10th Cir. 1988));

*see also* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).   Under this clearly erroneous standard,

a district court does not review factual findings de novo; instead, it must affirm a magistrate

judge's findings unless a review of the entire evidence leaves the district judge "with the definite

and firm conviction that a mistake has been committed." *Ocelot Oil Corp.*, 847 F.2d at 1464

(citation and internal quotation marks omitted).   In contrast, "the contrary to law" standard

permits a district judge to conduct an independent review of purely legal determinations made by

the magistrate judge. *Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d

1290, 1346 (D. Kan. 2007) (citations omitted).   A magistrate judge's order is contrary to law if it

"fails to apply or misapplies relevant statutes, case law or rules of procedure." *Walker v. Bd. of

Cnty. Comm'rs of Sedgwick Cnty.*, No. 09-1316-MLB, 2011 WL 2790203, at *2 (D. Kan. July

14, 2011) (citation omitted).   With this two-part standard of review in mind, the court returns to

the substance of CoreLogic's objection.

According to CoreLogic, Uhlig fundamentally changed the basis for its fraud claim

between the Second Amended Complaint (Doc. 193) and the Pretrial Order (Doc. 279).   Here's

how the Second Amended Complaint articulates Uhlig's fraud claim:

> On each occasion that Defendant has sold a CondoSafe Report form to its customer,
> where Defendant represents that the originator of the information is CondoCerts™
> or WelcomeLink®, Defendant made a fraudulent representation that it was selling
> the information with the permission and authorization of Plaintiff and that Plaintiff
> was ensuring the accuracy of the information.

Doc. 193 at 17 (2nd Am. Compl. ¶ 100).   But here's how the Pretrial Order describes Uhlig's

fraud claim:

Fraud (Count VI) for falsely representing that Uhlig is the preparer and certifier of CondoSafe Reports, which it was not. *Uhlig further asserts* fraud based on the further allegations in its Second Amended Complaint, which it incorporated into Count VI, that CoreLogic would abide by the Customer Agreements and that it was purchasing the Community Information as a mortgage broker/lender, appraiser, escrow/title/closing agent, real estate agent/broker, seller, or buyer for use solely in connection with a specific real estate transaction. Those allegations are set forth in Uhlig's Second Amended Complaint.

Doc. 279 at 28 (Pretrial Order ¶ 4.a.iii.) (emphasis added). So, the Second Amended Complaint states one theory of fraud, and the Pretrial Order states two.

Courts "do not normally expect to see claims . . . not contained in the pleadings appearing for the first time in the pretrial order[.]" *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). "Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice." *Id.* at 1215–16. When a party adds a new claim to "the pretrial order, it is incumbent upon opposing counsel to meticulously examine the order, taking exception, if necessary, to the additions, and recording their objection in the pretrial order." *Id.* at 1216. And the party adding the claim to a pretrial order "should do so with specificity and clarity so as to minimize the ill effects of that practice." *Id.* Courts require specificity and clarity to "provide the trial court with a fair opportunity to consider whether to approve or deny what is obviously an attempt to amend the pleadings at a rather late date." *Id.* (citing Fed. R. Civ. P. 15(a)).

CoreLogic asserts that the Pretrial Order's language "seeks to amend and fundamentally change the basis for that claim relative to the claim Uhlig pleaded." Doc. 303 at 13. Uhlig rejects the premise, arguing the Magistrate Judge found Uhlig's fraud claim wasn't new. But Uhlig's argument mischaracterizes the Magistrate Judge's statements. The Magistrate Judge explicitly told Uhlig to make its fraud claim "conform to the second amended complaint." Doc. 304 at 65–66 (Nov. 21 Pretrial Conference Tr. 13:25–14:6). The Magistrate Judge

acknowledged that the Second Amended Complaint included the facts supporting CoreLogic's new fraud theory—*i.e.*, CoreLogic falsely represented in the Customer Agreements that it would abide by them—but the Second Amended Complaint didn't call this conduct a fraud. *Id.* at 65 (Nov. 21 Pretrial Conference Tr. 13:4–11). Instead, it called the conduct breach of contract. As the Magistrate Judge put it, "I struggle to see where it was part of the fraud count and instead it formed the basis of the breach of contract claims." *Id.* At another conference, the Magistrate Judge didn't take issue with Uhlig's statement of its fraud claim, but she also said, "I think you know you got problems with this count." Doc. 297 at 49–50 (Nov. 29 Pretrial Conference Tr. 49:6–50:11).

Uhlig also argues that this new fraud theory isn't new because the fraud claim in the Second Amended Complaint incorporated all the preceding allegations. *See* Doc. 193 at 17 (2nd Am. Compl. ¶ 99). That is, the new fraud theory relies on the parties' agreements, and the Second Amended Complaint alleges facts about those agreements throughout. CoreLogic calls this "Uhlig's attempt to repurpose components of its breach of contract claim into a new fraud claim[.]" Doc. 331 at 4. Indeed, the Magistrate Judge shared CoreLogic's impression that Uhlig had used the Customer Agreements as the basis of its breach of contract claims—not its fraud claim. Doc. 304 at 65 (Nov. 21 Pretrial Conference Tr. 13:4–11). The court agrees. The Second Amended Complaint doesn't allege sufficiently this second theory of fraud, *i.e.*, that CoreLogic committed fraud by promising falsely to abide by the parties' agreements. This is especially true given Fed. R. Civ. P. 9(b)'s heightened pleading requirements for fraud. So, the court concludes that Uhlig tried to amend its fraud claim when stating it in the Pretrial Order. Given Uhlig's attempt to amend its fraud claim, three things needed to happen.

*First*, CoreLogic needed "to meticulously examine the order, taking exception, if necessary, to the additions, and recording their objection in the pretrial order." *Wilson*, 303 F.3d at 1216. CoreLogic did just that. *See* Doc. 279 at 28 (Pretrial Order n.3) ("CoreLogic objects that Uhlig's description of the fraud claim was not the common law fraud claim alleged in Uhlig's Second Amended Complaint[.]"); *see also* Doc. 304 at 140 (CoreLogic Obj. Ex. 4) (objecting to early draft of Pretrial Order and noting "CoreLogic objected to the first version of the pretrial order submitted to [the Magistrate Judge] on November 10, 2023 that Uhlig's description of the fraud claim was not the common law fraud claim alleged in Uhlig's Second Amended Complaint").

*Second*, Uhlig needed to add the claim "with specificity and clarity so as to minimize the ill effects of that practice." *Wilson*, 303 F.3d at 1216. Uhlig's statement of its fraud claim fails to fulfill this duty. The Pretrial Order's statement of the fraud claim refers to the Second Amended Complaint, but those allegations don't meet the particularity requirements of Fed. R. Civ. P. 9. So, Uhlig failed to minimize the ill effects of its late addition. According to CoreLogic, it "was surprised and prejudiced" because had "CoreLogic received fair notice of Uhlig's new fraud theory, it could and would have pursued discovery[.]" Doc. 331 at 4. And Uhlig never explains why this new theory of fraud entered the picture at such a late hour. By adding a new fraud theory, Uhlig deprived CoreLogic "of fair notice, possibly discovery, and the opportunity for motion practice[.]" *Wilson*, 303 F.3d at 1215–16. The court thus finds prejudice to CoreLogic.

*Third*, the court needed "to consider whether to approve or deny what [was] obviously an attempt to amend the pleadings at a rather late date." *Id.* at 1216 (citing Fed. R. Civ. P. 15(a)). Note that our Circuit, in *Wilson*, cited Fed. R. Civ. P. 15(a)—the rule providing the standard for

amending a pleading.  The Magistrate Judge neglected to engage the Rule 15 analysis once CoreLogic objected to Uhlig's sleight-of-hand aiming to amend its fraud claim.[12]  As a result, the court concludes, the Pretrial Order is contrary to law because it "fail[ed] to apply . . . rules of procedure."  *Walker*, 2011 WL 2790203, at *2 (citation omitted).  And the court thus sustains CoreLogic's objection to the Pretrial Order's statement of Uhlig's fraud claim.  The court next considers CoreLogic's requested relief.

CoreLogic asks the court "to amend the Pretrial Order to conform it to the claim Uhlig pleaded in the" Second Amended Complaint.  Doc. 303 at 13–14.  The court grants this request.  CoreLogic's requested relief heeds our Circuit's warning "that the pretrial order is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality."  *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979) (citation and internal quotation marks omitted).  Uhlig's original theory of fraud remains for the court to consider on its merits, untouched by CoreLogic's objection.  So, the rest of this Order will consider the following to express Uhlig's fraud claim:

> On each occasion that Defendant has sold a CondoSafe Report form to its customer, where Defendant represents that the originator of the information is CondoCerts™ or WelcomeLink®, Defendant made a fraudulent representation that it was selling the information with the permission and authorization of Plaintiff and that Plaintiff was ensuring the accuracy of the information.

Doc. 193 at 17 (2nd Am. Compl. ¶ 100).

With the objection decided, the court next addresses CoreLogic's argument that this fraud claim is untimely.

---

[12]    Uhlig asserts that the Magistrate Judge's Pretrial Order can't qualify as one contrary to law because no statute, rule, or law requires the Pretrial Order to mirror the parties' pleadings.  That's true.  Nothing requires the Pretrial Order to mirror the parties' pleadings.  So, Uhlig argues, the court here can't conclude that the Pretrial Order is contrary to law.  That's where Uhlig misses the mark.  *Wilson* holds plainly that Rule 15 governs attempts to amend pleadings and that's precisely what Uhlig strived to do when it turned its one fraud claim into two claims.  303 F.3d at 1216 (citing Fed. R. Civ. P. 15(a)).

## 2.     The statute of limitations bars Uhlig's fraud claim.

### a.     Equitable Estoppel

CoreLogic argues that Uhlig's claim for common law fraud is barred by the statute of limitations. But there's another threshold issue. That is, the court must address Uhlig's argument that CoreLogic is equitably estopped from asserting a statute of limitations defense.

"Equitable estoppel can be applied to bar a party from relying on the defense of the statute of limitations." *Rockers v. Kan. Turnpike Auth.*, 991 P.2d 889, 894 (Kan. 1999).[13] The burden to show equitable estoppel "is on the party claiming application of the doctrine." *In re Bell*, 529 P.3d 153, 157 (Kan. 2023).

> "A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."

*Rockers*, 991 P.2d at 894 (quoting *United Am. State Bank & Tr. Co. v. Wild W. Chrysler Plymouth, Inc.*, 561 P.2d 792, 795 (Kan. 1977)). To invoke equitable estoppel, Uhlig need not show "'actual fraud in the technical sense, bad faith, or an attempt to mislead or deceive[.]'" *Levi Strauss & Co. v. Sheaffer*, 650 P.2d 738, 743 (Kan. Ct. App. 1982) (quoting *Rex v. Warner*, 332 P.2d 572, 579 (Kan. 1958)). Instead, CoreLogic "'must have done something that amounted to an affirmative inducement to [Uhlig] to delay bringing the action.'" *Id.* (quoting *Rex*, 332 P.2d at 579).

Uhlig argues that it has shouldered its burden to create a fact issue on each element of equitable estoppel. Uhlig's equitable estoppel theory goes something like this: every time CoreLogic placed an order on Uhlig's website, "CoreLogic executed agreements falsely

---

[13]     The parties agree that Kansas's statute of limitations supplies the pertinent limitation period governing this claim. Doc. 279 at 3 (Pretrial Order ¶ 1.d.vii.).

representing that it was *not* utilizing the Community Information for commercial purposes."
Doc. 309 at 33.  Uhlig asserts it "relied on these representations in filling CoreLogic's orders and
in not filing suit."  *Id.* (citing Doc. 309-3 at 4 (Uhlig Decl. ¶ 15)).  But no Kansas court ever has
applied equitable estoppel based solely on a party's representation in a contract.  Under that
approach, every breach of contract plaintiff would get to assert equitable estoppel.  Kansas
authority, including the four cases Uhlig cites, don't support this proposition.

      In *Bowen v. Westerhaus*, the defendant insurance company agreed that it owed the
plaintiff insurance company.  578 P.2d 1102, 1103–04 (Kan. 1978).  But the defendant insurance
company asked plaintiff to wait for payment until defendant had resolved a declaratory judgment
action against a third party.  *Id.*  Then, things went south with the third party, and defendant
didn't receive its money.  When plaintiff asked defendant for an update, defendant responded
that the statute of limitations governing plaintiff's claim that defendant owed plaintiff money had
expired.  The Kansas Supreme Court held defendant couldn't do that.  The facts here, viewed in
the light most favorable to plaintiff, showed that it had relied on defendant's promise to pay the
claim, which "was an affirmative inducement to delay filing[.]"  *Id.* at 1107.  In contrast, here,
Uhlig has adduced no evidence of a promise by CoreLogic that affirmatively induced Uhlig to
delay filing suit.

      Next, in *Sheaffer*, a store owner alleged that a jeans company had promised him an
exclusive dealership, so he remodeled his store.  650 P.2d at 740–42.  But the jeans company
later started selling its products to competitors, denying an exclusive dealership agreement
existed.  *Id.*  The Kansas Court of Appeals concluded the jeans company had breached the

agreement[14] and credited the trial court's factual findings that the store owner reasonably had believed that the jeans company would remedy the breach. *Id.* at 745–46. Here, in contrast, Uhlig hasn't adduced any evidence that it reasonably believed CoreLogic would remedy the breach and relied to its detriment on that promise.

Third, in *Robinson v. Shah*, the Kansas Court of Appeals allowed a medical malpractice plaintiff to utilize equitable estoppel where the defendant doctor had concealed from plaintiff that surgical sponges were left inside plaintiff's body during a surgery. 936 P.2d 784, 789–91. The facts of *Robinson* don't resemble this case's facts at all. And Uhlig doesn't allege any kind of fraudulent concealment by CoreLogic, much less adduce any evidence of fraudulent concealment.

Last, in *Sunflower Electrical Power Corp. v. Clyde Bergemann, Inc.*, defendant had sold plaintiff two water cannons for use in plaintiff's coal power plant, but those two water cannons didn't accomplish plaintiff's goals. No. 04-1003, 2005 WL 1842754, at *2–4 (D. Kan. Aug. 3, 2005). When plaintiff complained to defendant, defendant suggested two more water cannons could achieve the desired result and, based on this representation, plaintiff bought two more water cannons. *Id.* at *9. The court, applying Kansas law, held plaintiff's claims began to

---

[14]    Uhlig mischaracterizes this case. Uhlig asserts that the store owner "was 'led to believe' by the [jeans company] that it was not breaching the contract." Doc. 309 at 33 (quoting *Sheaffer*, 650 P.2d at 744). That's not quite right. Here's the pertinent passage, in full, from the opinion:

> The trial court found that [plaintiff, the store owner,] was led to believe by the inaction of the [defendant jeans company's] administration and by the statements of the [jeans company's] salespersons that his complaint as to the competition would be addressed by [the jeans company], and therefore [the store owner] was justified in not asserting his claim within the period of the statute of limitations.

*Sheaffer*, 650 P.2d at 744. Contrary to Uhlig's view, the jeans company didn't lead the store owner to believe that it wasn't *breaching the contract*. Instead, the jeans company led the store owner to believe that it would *remedy the breach*. Uhlig's reliance on this case—citing it to establish that a court can apply equitable estoppel simply if a party doesn't follow through on its contractual obligations—is misplaced.

accrue when plaintiff first purchased the water cannons, but the court equitably estopped defendant from asserting the statute of limitations as a defense. *Id.* at *8–9. Plaintiff had shown it relied on defendant's promise to remedy the issue with two additional water cannons by purchasing two additional water cannons. *Id.* at *9. Here, in contrast, Uhlig hasn't adduced any evidence that it relied on a promise by CoreLogic to remedy a known issue.

In sum, in each case—*Robinson* and its inapplicable fraudulent concealment aside—in each case, one party identified a problem to the other—*i.e.*, you owe me money on this claim, you breached our exclusive dealing agreement, or your water cannons don't work. In response, the other party represented that it would fix the problem—*i.e.*, we'll pay you the money eventually, we'll resolve your exclusive dealing complaint, or we'll fix it with two more water cannons. And, so, plaintiff waited to file suit, the statute of limitations ran, and the court applied equitable estoppel. That's just not what happened here.

Uhlig has adduced no evidence that it ever identified a problem to CoreLogic and CoreLogic promised to fix it, and, relying on that promise, Uhlig didn't file suit. Putting it another way, Uhlig has adduced no facts that CoreLogic did "something that amounted to an affirmative inducement to plaintiff to delay bringing the action." *Sheaffer*, 650 P.2d at 743 (citations and internal quotation marks omitted). To be sure, CoreLogic signed contracts. And perhaps Uhlig thought that meant CoreLogic wasn't selling Community Information for commercial purposes. But that doesn't qualify as CoreLogic doing something that affirmatively induced Uhlig to delay filing suit. The court thus concludes that Uhlig has failed to create a

triable issue of equitable estoppel.  And so the court now returns to CoreLogic's argument that

Uhlig's fraud claim is time barred.[15]

### b.      Fraud Statute of Limitations Analysis

Kansas law prescribes a two-year statute of limitations for fraud claims.  Kan. Stat. Ann.

§ 60-513(a)(3).  And, under Kansas law, a fraud "cause of action shall not be deemed to have

accrued until the fraud is discovered."  *Id.*  "'Discovered' means that the action accrues when

[plaintiff] 'possesses actual or constructive notice of the fraud or when, with reasonable

diligence, the fraud could have been discovered.'"  *Textron Aviation, Inc. v. Superior Air*

*Charter, LLC*, 420 F. Supp. 3d 1186, 1194 (D. Kan. 2019) (quoting *Bonura v. Sifers*, 181 P.3d

1277, 1286 (Kan. Ct. App. 2008)).

CoreLogic asserts that Uhlig has admitted that, in September 2019, Uhlig discovered

CoreLogic had used Uhlig's trademarks on CondoSafe reports.  To support this assertion,

CoreLogic's summary judgment brief cites Uhlig's factual contentions from the Pretrial Order.

Doc. 289 at 33, 36–37 (CoreLogic Statement of Fact ¶¶ 227, 245).  The relevant part of the

Pretrial Order provides:

> On September 5, 2019, a CoreLogic customer (Nevada State Bank) sent a
> CondoSafe Report to Uhlig inquiring about the length of time that had transpired
> between the "questionnaire effective date" and the date of the CondoSafe Report.
> The customer expressed confusion about the origin of the report, stating to Uhlig:
> "You prepared this CondoSafe Report for us."  The confusion appears to have
> occurred because CoreLogic affixed to the CondoSafe Report a certification using
> Uhlig's CondoCerts™ Mark and identifying a Uhlig employee as the "preparer" of
> the CondoSafe Report, when Uhlig had not prepared the CondoSafe Report.
> CoreLogic intervened and stated it would address its client's concerns but provided
> no information to Uhlig.  This was the first time anyone from Uhlig had seen a
> CondoSafe Report incorporating data obtained from Uhlig.  Uhlig's customer
> service personnel then investigated the CondoSafe Report and concluded that
> CoreLogic had reused data it previously had obtained from Uhlig and represented

---

[15]      Though the court reaches this conclusion as part of its fraud analysis, this conclusion applies
equally to all of CoreLogic's statute of limitations arguments.  The court thus declines to equitably estop
CoreLogic from making any of its statute of limitations arguments.  They're all fair game.

that Uhlig certified the CondoSafe Report. That information was not conveyed to Uhlig's Executive Management Team, who had the authority to address the situation.

Doc. 279 at 8 (Pretrial Order ¶ 3.a.).

In response, Uhlig controverts CoreLogic's use of Uhlig's own factual contentions with quibbles about wording. Doc. 309 at 17 (Uhlig Resp. Statement of Fact ¶ 227). Uhlig also controverts its own statement of facts "to the extent it suggests there was any duplicity or change in Uhlig's testimony and to the extent it suggests there was an official investigation." *Id.* at 19 (Uhlig Resp. Statement of Fact ¶ 245). These responses don't controvert the important part of CoreLogic's statement of fact: Uhlig knew in September 2019 that CoreLogic had used Uhlig's trademark on CondoSafe reports.[16]

Of course, Uhlig's factual contentions in the Pretrial Order don't qualify as evidence. To provide evidentiary support for its position that Uhlig knew about the fraud in September 2019, CoreLogic also submits an email from WelcomeLink Vice President Andrew Gross. Doc. 289 at 34 (CoreLogic Statement of Fact ¶ 228) (citing Doc. 291-26 (CoreLogic Ex. 56)). In this 2019 email, Gross responds to the Nevada State Bank issue, writing, "This is *another* instance where CoreLogic is looking like they are stealing our information. . . . I think the last I understood, this was being somewhat left alone on the WelcomeLink side?"[17] Doc. 291-26 at 2 (CoreLogic Ex.

---

[16]     Our local rules require that a party opposing summary judgment specifically controvert each fact it disputes. D. Kan. Rule 56.1(a) provides: "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." Uhlig doesn't specifically controvert that it knew about CoreLogic using its trademark in September 2019, so the court can accept that fact as true—but only if the summary judgment record properly supports that fact. *See Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) (explaining that when a party opposing summary judgment waives its right to respond or controvert the facts asserted in the moving party's summary judgment motion, the court "should accept as true all material facts asserted and properly supported in the summary judgment motion").

[17]     Uhlig objects to this email as inadmissible hearsay. Doc. 309 at 17 (Uhlig Resp. Statement of Fact ¶ 228). But it's not hearsay because CoreLogic doesn't offer the email to prove the truth of the matter asserted: that CoreLogic was stealing its information. Instead, CoreLogic cites the email only to

56) (emphasis added).  CoreLogic thus has submitted admissible evidence to support Uhlig's concession that it knew CoreLogic was using its trademarks on CondoSafe reports no later than September 2019—more than two years before Uhlig filed suit in November 2021.  Uhlig has failed to controvert this evidence to create a triable issue of timeliness.[18]  So, Uhlig's fraud claim is time-barred, and CoreLogic is entitled to summary judgment.

The court next considers whether Uhlig's fraud claim fails for a second, independent reason.

### 3.    Uhlig's fraud claim fails to create triable issues of reliance and intent.

Even if Uhlig timely had asserted its fraud claim, it still would fail on its merits.  The parties disagree which state's law applies to Uhlig's fraud claim.  Uhlig asserts Kansas law applies; CoreLogic asserts that Delaware law applies.  Doc. 279 at 2 (Pretrial Order ¶ 1.d.v.).  Under Kansas law, the "elements of fraud are:  (1) an untrue statement of fact, (2) known to be untrue by the party making it, (3) made with the intent to deceive or with reckless disregard for the truth, (4) upon which another party justifiably relies and (5) acts to his detriment."  *Ellibee v. Posey*, No. 02-3233, 2006 WL 1133210, at *7 (D. Kan. Aug. 26, 2006) (citing *Bomhoff v. Nelnet*

---

show Uhlig's notice of the facts forming its fraud claim.  *See Brock v. Jackie Fine Arts, Inc.*, No. 83-2116, 1986 U.S. Dist. LEXIS 16265, at *1–2 (D. Kan. Dec. 18, 1985) (overruling hearsay objection to Wall Street Journal article because "the article was offered to show plaintiff's becoming aware of facts that led him to discover the fraud upon which his causes of action were based.  This was relevant to when the statute of limitations began to run.  Therefore, the article was not offered for the truth of the matter").

[18]      In its summary judgment opposition brief, Uhlig asserts that its fraud claim is timely but its argument relies on its amended fraud theory.  That is, Uhlig relies on its theory "that CoreLogic committed fraud when CoreLogic representatives completed the Account Registration Agreement over 100 times, each time representing it was a lender, mortgagor, real estate agent, closing agent, buyer, or other participating in a real estate transaction."  Doc. 309 at 36.  As already addressed, this is Uhlig's new fraud theory that it improperly added to the Pretrial Order.  The court already has sustained CoreLogic's objection to this late amendment and doesn't consider this fraud theory at summary judgment.  So, this alternative fraud theory can't save Uhlig's fraud claim from the statute of limitations.

*Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)).  Under Delaware law, common law fraud

also has five elements:

> 1) a false representation, usually one of fact, made by the defendant;
>
> 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
>
> 3) an intent to induce the plaintiff to act or to refrain from acting;
>
> 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
>
> 5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  These two standards don't

conflict in any fashion.  And they plainly don't conflict in a way that matters.  So, there's no

conflict of laws for the court to resolve to decide this summary judgment issue.  Whether Kansas

or Delaware law applies, the fraud claim analysis remains the same.

 CoreLogic argues that Uhlig's fraud claim fails as a matter of law because "the

misrepresentations supporting Uhlig's claim for common law fraud were directed at CoreLogic's

own customers (not Uhlig), with an alleged intent by CoreLogic to deceive its own customers,

and reliance by and damages to CoreLogic's customers."  Doc. 289 at 58–59.  The court agrees.

Uhlig adduces no evidence that it ever relied on CoreLogic's allegedly false representations in

the CondoCerts reports.  Nor does it adduce any evidence that CoreLogic used Uhlig's

trademarks on CondoCerts reports with intent to deceive Uhlig or induce Uhlig to act or refrain

from acting.  Uhlig seems to have realized its problems with this fraud theory.  So, to oppose

summary judgment, Uhlig merely relies on the version of its fraud theory that it added too late:

CoreLogic committed fraud when it registered its accounts with Uhlig and represented that it was

a lender, mortgage company, or similar entity.  Doc. 309 at 48–49.  The court has sustained

CoreLogic's objection to this late-added fraud claim and declines to consider it at summary

judgment.  Uhlig thus is left without any means to oppose summary judgment on its fraud claim. In sum, the court grants CoreLogic summary judgment against Uhlig's fraud claim for a second, independent reason:  Uhlig has failed to create a triable issue on multiple elements—reliance and intent to deceive—to establish a triable claim for common law fraud.

With Uhlig's fraud claim addressed, the court next considers CoreLogic's Motion for Summary Judgment against Uhlig's misappropriation of trade secrets claim.

### B.    Uhlig's Misappropriation of Trade Secrets Claim

Uhlig next claims that CoreLogic misappropriated Uhlig's trade secrets by disclosing or using "Uhlig's trade secret compilations of Community Information in CoreLogic's services, analytics, models, platforms, products and applications."  Doc. 279 at 28 (Pretrial Order ¶ 4.a.vi.).[19]  CoreLogic argues this claim is time barred as well.

Kansas's Uniform Trade Secrets Act (KUTSA)[20] provides a three-year statute of limitations for misappropriation actions.  Kan. Stat. Ann. § 60-3325.  This three-year clock begins to run when "the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  *Id.*  And "a continuing misappropriation constitutes a single

---

[19]    CoreLogic objects to the Pretrial Order's statement of Uhlig's misappropriation of trade secrets claim because—according to CoreLogic—the Pretrial Order expands the basis of Uhlig's misappropriation of trade secrets claim beyond Uhlig's claim in the Second Amended Complaint.  Doc. 302 at 2.  The court ultimately concludes that Uhlig's claim, as described in the Pretrial Order, is time-barred.  Given this conclusion, the court need not consider CoreLogic's objection, so the court overrules it as moot.

[20]    The parties disagree which state's law applies to Uhlig's misappropriation claim.  Uhlig asserts that the Kansas Uniform Trade Secrets Act applies.  Doc. 279 at 2 (Pretrial Order ¶ 1.d.iv.).  CoreLogic asserts in turn that the Delaware Uniform Trade Secrets Act applies.  *Id.*  The court need not resolve this dispute because both laws have a three-year statute of limitations.  Kan. Stat. Ann. § 60-3325; Del. Code Ann. tit. 6, § 2006.  And both start the accrual clock for the limitations period when "the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Kan. Stat. Ann. § 60-3325; Del. Code Ann. tit. 6, § 2006.  Both laws also provide that "a continuing misappropriation constitutes a single claim."  Kan. Stat. Ann. § 60-3325; Del. Code Ann. tit. 6, § 2006.  The parties briefed the statute of limitations using Kansas law, so the court follows suit and applies Kansas law to the timeliness issue.  *See* Doc. 289 at 43; Doc. 309 at 38.

claim." *Id.* Uhlig filed this suit on November 22, 2021. If Uhlig knew or should have

discovered before November 22, 2018, that CoreLogic misappropriated its trade secrets, then

Uhlig filed its trade secrets misappropriation claim too late.

Kansas courts apply the discovery rule to determine when a misappropriation cause of

action accrues. The statute of limitations on a misappropriation claim begins to run "when the

claimant discovers, or in the exercise of reasonable diligence should have discovered, the

existence of the acts constituting the cause of action." *McCaffree Fin. Corp. v. Nunnink*, 847

P.2d 1321, 1330 (Kan. Ct. App. 1993) (citation and internal quotation marks omitted). A

claimant "need not have discovered all the facts necessary to prove its claim. All that is required

is that plaintiff have sufficient facts to plead its cause of action." *Id.* (citation, internal quotation

marks, and internal citation omitted). Kansas law also imposes a duty to investigate; an "injured

party has a positive duty to use diligence in discovering his cause of action within the limitations

period. Any fact that should excite his suspicion is the same as actual knowledge of his entire

claim." *Id.* (citation and internal quotation marks omitted).

CoreLogic asserts that Uhlig had developed actual or, at minimum, inquiry notice in

2016, based on Uhlig's 2016 email traffic. This is a fact-based inquiry, so the court recounts the

relevant events in some detail, below.

### 1.     In July 2016, CoreLogic's request to Uhlig raised a red flag.

CoreLogic asserts that Uhlig possessed actual knowledge of the basis for its

misappropriation claim in July 2016. Doc. 289 at 43. In July 2016, CoreLogic contacted Uhlig,

complaining of issues with password protected PDFs that CoreLogic had received from

WelcomeLink. Doc. 291-16 at 7–9 (CoreLogic Ex. 46). CoreLogic explained that it had

received its orders in one PDF, and it wanted to split the PDF into single pages. *Id.* But

password protection stopped it from doing so.  *Id.*  Uhlig Senior Vice President K.C. Ross responded to CoreLogic:

> I am happy to assist, but I need to first understand why you are ordering and saving documents . . . ?  Our products are intended for the resell of the property and are available to owners, prospective purchasers, and their agents.  Are you ordering these packages on behalf of an owner or purchaser?

*Id.* at 3.  CoreLogic responded, explaining:  "CoreLogic is ordering these documents on behalf of lenders that are underwriting active condo loans, purchases and refinances.  Lenders contract [with] us to gather the condo documents that they need to underwrite the project."  *Id.*

After CoreLogic's response, Ms. Ross forwarded the email exchange to an executive at Uhlig's customer, FirstService.  *Id.* at 2.  Ms. Ross wrote,

> I will research this more, but from the surface, it appears that this company is providing Condo Questionnaires along with [other documents] to lenders.  This raises a red flag for me, so I will have my team run a query to determine how many orders they've placed, amount spent, and if there [are] any concerning trends.

*Id.*  In the email, Ms. Ross added a link to "CoreLogic's CondoSafe product line."  *Id.*

When asked to explain this "red flag" comment, Ms. Ross testified, "Generally speaking, any time a purchaser would ask for unprotected, unlocked documents that would raise a red flag."  Doc. 290-13 at 11 (Ross Dep. 48:2–6).  Ms. Ross explained that the "documents are meant for a specific transaction, and our clients relied on us to archive what they approved at that one time for their legal records.  If someone wanted them unlocked, then I can't protect that record for my client."  *Id.* (Ross Dep. 48:7–12).

### 2.    Uhlig investigated this red flag—sort of.

Uhlig investigated.  On July 29, 2016, Travis Stuewe, another Uhlig employee, emailed Ms. Ross the results of a query he had run.  Doc. 291-17 at 3–79 (CoreLogic Ex. 47).  Mr. Stuewe wrote, "Based on the query . . . I believe that CoreLogic has been able to collect

approximately $97,580.28 in additional fees by reselling our product."[21]  *Id.* at 2.  Mr. Stuewe

also attached a document to his email to Ms. Ross:  WelcomeLink's Terms of Use.  *Id.* at 81–84.

And Mr. Stuewe highlighted the following provision:  "User Conduct.  User represents, warrants,

and covenants that its use of the Services and the Website will not . . . reproduce, copy, modify,

sell, distribute, or otherwise exploit for any commercial purposes the Services or the Website, or

any component or content thereof."  *Id.* at 81–82.

In August 2016, Ms. Ross sent an email to its customer, FirstService, summarizing the

above events:  the July 2016 email from CoreLogic about the password issue, a link to

CoreLogic's description of their services, and a summary of CoreLogic's orders.  Doc. 292-18 at

2 (CoreLogic Ex. 78).  Ms. Ross also included the relevant part of the Terms of Use agreement—

those barring a user from reproducing, copying, modifying, selling, distributing, or otherwise

exploiting Uhlig's services and website for any commercial purposes.  *Id.*  Ms. Ross ended her

email to FirstService this way:  "I will leave this in your hands to decide how to proceed with

CoreLogics.  If you need additional information or would like us to [take] action, please do not

hesitate to ask."  *Id.*

So, it's uncontroverted that Uhlig knew something wasn't right with CoreLogic in 2016.

And likewise, it's undisputed that Ms. Ross turned the issue over to FirstService.  The question,

then, is what happened next.  When asked what happened in July of 2016 with FirstService,

Uhlig testified Ms. Ross's "red flag" email to FirstService explained CoreLogic's request to split

---

[21]      Uhlig objects to this email as hearsay.  Doc. 309 at 4 (Uhlig Resp. Statement of Fact 52).  But
CoreLogic doesn't cite this email for its truth in its statute of limitations argument.  That is, CoreLogic
doesn't use this email to show that CoreLogic did indeed collect money reselling Uhlig's product.
Instead, CoreLogic cites this fact to support its argument about Uhlig's discovery of the alleged
misappropriation.  So, this doesn't qualify as hearsay.  But even if offered for its truth, the email would
qualify as a statement by a party opponent, *i.e.*, it's a statement written by CoreLogic's party opponent,
Uhlig, and now is offered against that party.  *See* Fed. R. Evid. 801(d)(2)(A), (D).

documents raised a red flag because "we don't see why they would be doing this."  Doc. 290-15

at 10–11 (Uhlig 30(b)(6) 72:15–73:23).  Uhlig also testified it was "not clear . . . if there was a

follow-up to this."  *Id.* at 11 (Uhlig 30(b)(6) Dep. 73:15–23).  Uhlig explained,

> the other thing that happened at this time is that there was . . . an event in August
> of 2016 where we changed our relationship on other issues, . . . not related to this,
> where there was a dispute with the west region of FirstService regarding . . . a
> different contract that we had with them. . . .  So my guess is that both sides kind
> of lost track of this[.]

*Id.* at 11–12 (Uhlig 30(b)(6) Dep. 72:24–74:10).  Uhlig's CEO didn't recall speaking to Ms. Ross

about the email, explaining, "We had a lot of other things going on right then . . . in August 2016

there were some . . . really important just hills that we had to climb.  And . . . so this kind of fell

to the background.  We were distracted."  *Id.* at 15 (Uhlig 30(b)(6) Dep. 87:12–21).

When asked whether Uhlig conducted any further investigation about the July 29, 2016

email from Mr. Stuewe to Ms. Ross, Uhlig testified it was "not aware of any."  *Id.* at 16–17

(Uhlig 30(b)(6) Dep. 100:24–101:8).  Also, Uhlig explained, "we had other things to do.  We

were in the middle of a lot of different things.  And this, as important as it was or may have been,

didn't rise to that level yet.  We . . . were dealing [with] as many things as we could deal with."

*Id.*[22]  Uhlig also testified that it "gradually got hints that something was going wrong" and "the

---

[22]     Uhlig attempts to controvert CoreLogic's evidence—from Uhlig's own Rule 30(b)(6) witness—that Uhlig didn't investigate in 2016 because Uhlig had other things to deal with.  Doc. 309 at 5 (Uhlig Resp. Statement of Fact ¶ 62).  To soften the blow of these emails, Uhlig argues its Rule 30(b)(6) witness "Mark Uhlig did not even see Exs. 46 (Depo. Ex. 216) or 47 (Dep. Ex. 217) until the investigation related to this lawsuit."  *Id.* at 25 (Uhlig Add. Statement of Fact ¶ 321).  Indeed, Mr. Uhlig testified that he didn't see two emails—the July 28, 2016, email from FirstService to Ms. Ross and Mr. Stuewe's July 29, 2016, email to Ms. Ross— until this lawsuit.  Doc. 309-9 at 6–7 (Uhlig 30(b)(6) Dep. 71:24–72:14); *id.* at 8–10 (Uhlig 30(b)(6) Dep. 90:24–92:4).  Though Mr. Uhlig didn't see these emails, he nonetheless explained why Uhlig wouldn't have investigated the matter in 2016.  Uhlig's point about Mr. Uhlig himself is taken, but its effort to controvert Mr. Uhlig's own statement about Uhlig's investigation falls flat.

minute [Uhlig] had proof [Uhlig] investigated it."  *Id.* at 13–14 (Uhlig 30(b)(6) Dep. 84:20–85:13).[23]

    With these summary judgment facts in mind, the court now can determine whether the statute of limitations bars Uhlig's misappropriation of trade secrets claim.

### 3.    Uhlig's misappropriation of trade secrets claim is untimely.

    Based on this evidence, CoreLogic argues that Uhlig had actual notice in 2016 or, had Uhlig exercised reasonable diligence in 2016, it could have learned about misappropriation of its trade secrets.  Uhlig responds, arguing its misappropriation claim is timely because all this evidence about CondoSafe's reports, according to Uhlig, doesn't matter.  Doc. 309 at 39.  Uhlig argues that CoreLogic misappropriated its trade secrets by using Uhlig's data to enrich CoreLogic's data.  *Id.*  And Uhlig asserts that reselling data from an individual questionnaire in a

---

[23]    CoreLogic cites this deposition testimony to support the following statement of fact:  "Uhlig did not take further action in 2016 because, at least in part, the issue was 'pushed to the back' by more urgent issues."  Doc. 289 at 15 (CoreLogic Statement of Fact ¶ 60).  Uhlig controverts this fact, citing lines 85:9–11 of the deposition.  Doc. 309 at 5 (Uhlig Resp. Statement of Fact ¶ 60).  According to Uhlig, these lines of the deposition provide, "[T]he minute we had proof we . . . investigated it.  We contacted you.  And then you proved to us in your responses that you knew exactly what you were doing and that it was . . . deliberate misconduct and . . . deliberate misappropriation."  *Id.*  But those depositions passages simply don't say what Uhlig labors, in vain, to attribute to them.  *See* Doc. 290-15 at 14 (Uhlig 30(b)(6) Dep. 85:9–11).  Instead, those passages say, "you know, it took . . . time in a very busy office with thousands of documents moving every day.  We . . . gradually got hints that something was going wrong[.]"  *Id.* (Uhlig 30(b)(6) Dep. 85:9–12).

    So, the court disregards Uhlig's attempt to controvert CoreLogic's statement of fact.  Where "a report or other material is made part of the record but the party fails to cite to the particular parts of the record that support a particular argument, the district court is under no obligation to parse through the record to find the uncited materials."  *Doe v. Univ. of Denver*, 952 F.3d 1182, 1191 (10th Cir. 2020) (internal quotations marks, brackets, and citation omitted).  The court need not search exhibits for evidence that might support Uhlig's argument without a specific reference.  *See Chavez v. New Mexico*, 397 F.3d 826, 839 (10th Cir. 2005) (holding in summary judgment context that "[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence" which might support an argument); *accord United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

CondoSafe report didn't constitute trade misappropriation. *Id.* So, Uhlig argues, notice about CondoSafe doesn't equate to notice about actual trade misappropriation. *Id.*

Unfortunately for Uhlig, this is a distinction that makes little to no difference. Under both the KUTSA and Delaware Uniform Trade Secrets Act (DUTSA), "a continuing misappropriation constitutes a single claim." Kan. Stat. Ann. § 60-3325; Del. Code Ann. tit. 6, § 2006. So, even if Uhlig complains of enrichment instead of reselling, knowledge of one kind of misappropriation qualifies as knowledge of the entire misappropriation claim.

An example helps. In *Chasteen v. UNISIA JECS Corp.*, plaintiff sued defendant Arctic Cat for using plaintiff's trade secret: an electronic fuel injection system used in snowmobile engines. 216 F.3d 1212, 1214, 1216 (10th Cir. 2000). Arctic Cat argued plaintiff's claim was time barred by Colorado's trade misappropriation statute of limitations—a statute which, luckily, is virtually identical to the KUTSA and DUTSA. *Id.* at 1216. Our Circuit agreed with the trial court's summary judgment ruling that plaintiff's claim was untimely because, eight years before plaintiff filed suit, a magazine had featured Arctic Cat's fuel injection technology. *Id.* at 1216–17. Critically, "in the article, a manager at Arctic Cat disclosed trade secrets belonging to [plaintiff] in violation of Arctic Cat's confidentiality agreement." *Id.* at 1216–17. A copy of this article made its way to plaintiff. *Id.* And the "statutory definition of 'misappropriation' include[d] both disclosure and use of a trade secret in contravention of a duty to maintain its secrecy." *Id.* at 1216 (citing Colo. Rev. Stat. § 7-74-102(2)(b)(II)). So, even "though in the instant suit [plaintiff] more directly complained of Arctic Cat's *use* of its trade secrets, rather than *disclosure* of them," the Circuit held that the article's disclosure of plaintiff's trade secrets triggered the statute of limitations against Arctic Cat. *Id.* at 1217 (emphases in original). And the Tenth Circuit cited the single-claim portion from Colorado's misappropriation statute of

limitations: "'For purposes of this section, a continuing misappropriation constitutes a single claim.'" *Id.* (quoting Colo. Rev. Stat. § 7-74-107). In sum, Uhlig's notice of some misappropriation counts as notice about *all* misappropriation.

Here, it's undisputed that Ms. Ross raised a red flag about CoreLogic in 2016. Specifically, Ms. Ross expressed concerns that CoreLogic was "providing Condo Questionnaires along with [other documents] to lenders." Doc. 291-16 at 2 (CoreLogic Ex. 46). In response, Uhlig argues that this act—reselling data from an individual Uhlig questionnaire— doesn't qualify as trade secret misappropriation. But Uhlig's own description of its misappropriation claim accuses CoreLogic of "disclosure or use of Uhlig's trade secret compilations of Community Information in CoreLogic's services[.]" Doc. 279 at 28 (Pretrial Order ¶ 4.a.vi.). And both the KUTSA and DUTSA define misappropriation to include disclosure or use despite a duty to maintain secrecy. Kan. Stat. Ann. § 60-3320(2)(ii); Del. Code Ann. tit. 6, § 2001(2)(b). In 2016, Uhlig had identified the exact provision of its Terms of Use that it believed CoreLogic had violated reportedly by selling Uhlig's data to lenders for commercial purposes. Doc. 291-17 at 81–82 (CoreLogic Ex. 47). So, the uncontroverted summary judgment evidence shows Uhlig had notice of CoreLogic's improper disclosure or use of its data in 2016. This notice triggered the three-year statute of limitations on Uhlig's trade secret misappropriation claim.

Uhlig argues that there's a fact issue and it prevents the court from entering summary judgment. Uhlig avers that the fact issue remains "whether the emails reflected knowledge by Uhlig of CoreLogic's activities[.]" Doc. 309 at 40. The court rejects this premise because uncontroverted facts show Ms. Ross raising a red flag about CoreLogic's use and disclosure of Uhlig's trade secrets in 2016. Uhlig tries to downplay Ms. Ross's role in the company by

38

arguing that its Executive Management Team didn't find out about all of these actions until much later. *Id.* at 25. That might work if Kansas law didn't apply an objective standard. But it does. *McCaffree*, 847 P.2d at 1330 (explaining the limitations period begins to run when plaintiff "discovers, or in the exercise of reasonable diligence should have discovered, the existence of the acts constituting the cause of action" (quotation cleaned up)). Even if the court accepts Uhlig's premise that it lacked actual knowledge, Kansas law nevertheless imposes a duty for a plaintiff to exercise reasonable diligence to discover its action. *Id.*

To be sure, Uhlig testified that it "gradually got hints that something was going wrong" and "the minute [Uhlig] had proof [Uhlig] investigated it." Doc. 290-15 at 13–14 (Uhlig 30(b)(6) Dep. 84:20–85:13). But Kansas law doesn't require "proof" to start the clock on the statute of limitations. "Any fact that should excite [plaintiff's] suspicion is the same as actual knowledge of [plaintiff's] entire claim." *McCaffree*, 847 P.2d at 1330 (citation and internal quotation marks omitted).

The uncontroverted summary judgment facts show that CoreLogic's actions excited Uhlig's suspicion; indeed, Uhlig actually investigated beginning in 2016. Uhlig also testified that this investigation or concern "kind of fell to the background. We were distracted." Doc. 290-15 at 15 (Uhlig 30(b)(6) Dep. 87:12–21). Uhlig simply failed to follow through after its investigation. *See Murray v. Miracorp., Inc.*, 522 P.3d 805, 2023 WL 176652, at *10 (Kan. Ct. App. 2023) (finding shareholders' claim time barred where shareholders were suspicious that defendants were mismanaging corporation and shareholders demanded inspection "but failed to follow through").

The court thus concludes that CoreLogic is entitled to summary judgment against Uhlig's misappropriation of trade secrets claims.[24]  It's untimely.  The court now turns to Uhlig's unjust enrichment claim.

### C.     Uhlig's Unjust Enrichment Claim

Uhlig brings a claim against CoreLogic for unjust enrichment based on "CoreLogic's use of the Community Information in the CondoSafe Reports and in its various services, analytics, models, platforms, products, applications and databases, without payment for its value."  Doc. 279 at 28 (Pretrial Order ¶ 4.a.vii.).[25]  CoreLogic argues that it's entitled to summary judgment on Uhlig's unjust enrichment claim because the statute of limitations also bars this claim.  Doc. 289 at 46.  The court agrees with CoreLogic.  As it explains below, the uncontroverted summary judgment facts show the statute of limitations clock began to tick in 2015.

---

[24]     Uhlig's 2018 receipt of CondoSafe reports serves an alternative form of inquiry notice and, similarly, indicates these claims are time-barred.  In February 2018, Uhlig's customer service received a question about data in a CoreLogic CondoSafe Report.  Doc. 292-13 at 2–6 (CoreLogic Ex. 73).  The CondoSafe Report listed "Condocerts Customer Service" as its Preparer.  *Id.* at 19.  Uhlig received two similar questions about similar CondoSafe Reports in March 2018, Doc. 292-12 (CoreLogic Ex. 72); Doc. 292-15 (CoreLogic Ex. 75), and received another similar question in April 2018, Doc. 292-14 (CoreLogic Ex. 74); Doc. 292-12 (CoreLogic Ex. 72).

The court notes that Uhlig objects to CoreLogic Exhibit 73 as hearsay.  Doc. 309 at 5 (Uhlig Resp. Statement of Fact ¶ 70).  But, as already mentioned elsewhere, not every statement made outside a courtroom is inadmissible hearsay.  That's the case here.  CoreLogic doesn't cite this exhibit for its truth when CoreLogic uses it to support its limitations defense.  Instead, CoreLogic cites this exhibit to show Uhlig's receipt of facts furnishing notice of its claim.  Putting it another way, CoreLogic offers the statement to prove that someone acted in a certain fashion, *i.e.*, spoke those words, and that act provided Uhlig notice of its claim.  CoreLogic doesn't offer the statement to prove the truth of the words that were spoken at the point.  *See* Fed. R. Evid. 801 advisory committee's note to subdivision (c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").  The court thus overrules Uhlig's hearsay objection.

[25]     CoreLogic objects to the way the Pretrial Order phrases this claim, asserting this formulation "can be read to disavow the claim Uhlig pleaded in the" Second Amended Complaint.  Doc. 302 at 3.  The court need not consider this objection because it concludes that Uhlig's unjust enrichment claim is time barred.  So, the court overrules CoreLogic's objection as moot.

Kansas[26] has a three-year statute of limitations for unjust enrichment claims.  Kan. Stat.

Ann. § 60-512; *see also Doll v. Chi. Title Ins. Co.*, 517 F. Supp. 2d 1273, 1281 (D. Kan. 2007).

Unlike Uhlig's misappropriation of trade secrets claim, the unjust enrichment statute of

limitations doesn't contain a discovery rule.  *Doll*, 517 F. Supp. 2d at 1281–82.  So, the court

applies Kansas's general accrual rule:  "In general, a cause of action accrues, so as to start the

running of the statute of limitations, as soon as the right to maintain a legal action arises."

*Pancake House, Inc. v. Redmond ex rel. Redmond*, 716 P.2d 575, 579 (Kan. 1986).  Under

Kansas[27] law, "unjust enrichment arises when (1) a benefit has been conferred upon the

defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's

retention of the benefit is unjust."  *Est. of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 706 (Kan.

2009) (citing *In re Est. of Sauder*, 156 P.3d 1204, 1220 (Kan. 2007)).  "The statute of limitations

begins to run when all of these elements are present.  Often, this means that the action accrues

when there is a request for the return of the property or when payment is made to or property is

received by the defendant."  *Id.* at 715 (citations omitted).

CoreLogic asserts that all three elements of Uhlig's unjust enrichment claim had emerged

by November 2015, when CoreLogic ordered Community Information data from Uhlig and used

---

[26]        According to the Pretrial Order, the parties disagree about which state's statute of limitations applies to this unjust enrichment claim.  Uhlig says it's Kansas law; CoreLogic says Delaware.  Doc. 279 at 3 (Pretrial Order ¶ 1.d.viii.).  But CoreLogic's motion only cites Kansas's statute of limitations.  Doc. 289 at 46.  The court thus assumes CoreLogic has abandoned its argument about the Delaware statute of limitations for this claim.  And the court follows CoreLogic's lead, applying only the Kansas statute of limitations.

[27]        The Pretrial Order records the parties' disagreement about the substantive law governing Uhlig's unjust enrichment claim.  Doc. 279 at 2 (Pretrial Order ¶ 1.d.v.).  Again, Uhlig believes Kansas law applies, and CoreLogic believes Delaware law applies.  But, in its Motion for Summary judgment brief, CoreLogic recites the elements of unjust enrichment under Kansas law.  Doc. 289 at 46.  The court again follows suit and considers abandoned CoreLogic's argument about Delaware substantive law applying to Uhlig's unjust enrichment claim.

that data in CondoSafe reports.  Doc. 289 at 47.  Uhlig fulfilled an order—placed by

CoreLogic—for a lender form on November 5, 2015.  Doc. 291-29 (CoreLogic Ex. 59).[28]

CoreLogic paid Uhlig for the order.  *Id.*; *see also* Doc. 293-20 at 6 (Battaglia Dep. 15:6–25).

CoreLogic ultimately passed this charge on to the buyer of the real estate transaction; that is,

CoreLogic facilitated the payment for the buyer.  Doc. 309-8 at 11–12 (Uhlig Dep. 62:4–63:11).

And CoreLogic's internal documents provide that it billed its customer for this order.[29]  Doc.

292-1 (CoreLogic Ex. 61).[30]  So, in November 2015, CoreLogic had received Uhlig's data and

used that data in CondoSafe reports, and Uhlig's statute of limitations began running in 2015.

Aiming to avoid this result, Uhlig makes two arguments.

     *First*, Uhlig argues "the limitations period does not begin until the defendant acquires the

knowledge that its actions were wrongful, which knowledge makes the enrichment unjust."  Doc.

---

[28]    This exhibit is a conventionally filed Excel spreadsheet, and the relevant transaction appears at row 14231.  Doc. 289 at 11 (CoreLogic Statement of Fact ¶ 25).

[29]    Uhlig labors to drum-up controversy about this fact.  *See* Doc. 309 at 2 (Uhlig Resp. Statement of Fact ¶ 28).  Uhlig doesn't controvert that the relevant spreadsheet "indicates $375 was charged for the order."  *Id.*  Indeed, the billed entry has the same date—November 5, 2015—as the order.  *Compare* Doc. 291-29 at row 14231, *with* Doc. 292-1 at row 100.  And the two entries link the same property:  175 15th St. NE 309, Atlanta, Georgia.  *Compare* Doc. 291-29 at row 14231, *with* Doc. 292-1 at row 100.  So, the two spreadsheets explicitly show an order CoreLogic placed with Uhlig, for which Uhlig charged CoreLogic $235, and CoreLogic billed its customer $375.

Uhlig nonetheless asserts that this spreadsheet, showing $375 charged, "is inconsistent with the amount CoreLogic's subledger detail shows Corelogic received from its customer."  Doc. 309 at 24 (Uhlig Add. Statement of Fact ¶ 309).  Uhlig cites CoreLogic's 30(b)(6) deposition, where Uhlig's counsel asked CoreLogic's representative about a discrepancy between CoreLogic's internal subledger and the spreadsheet CoreLogic produced to Uhlig, representing CoreLogic's revenue on orders from Uhlig.  Doc. 309-20 at 3–6 (Battaglia Dep. 31:10–34:4).  Some specific numbers help illuminate this showing:  one spreadsheet provides CoreLogic charged $301.60, but the internal accounting shows CoreLogic charged and received $399.58.  *Id.* at 4 (Battaglia Dep. 32:5–13).  But, ultimately, the discrepancy Uhlig has identified doesn't matter.  The deposition testimony doesn't say anything about the November 2015 transaction CoreLogic cites.  And Uhlig doesn't dispute that CoreLogic began utilizing Uhlig data in 2015.  *See* Doc. 309 at 40.  The spreadsheets speak for themselves:  CoreLogic placed an order with Uhlig, paid Uhlig, and then billed its customer.  That much is uncontroverted.

[30]    This is another Excel spreadsheet.  The parties directed the court to row 100 within it.

309 at 41.  Uhlig grounds this element in the third element of unjust enrichment:  "under the circumstances, the defendant's retention of the benefit is unjust."  *Est. of Draper*, 205 P.3d at 706 (citing *In re Est. of Sauder*, 156 P.3d at 1220).  But, as CoreLogic points out, unjust enrichment doesn't contain a knowledge element.  *See id.*  And, under Kansas law, a cause of action begins to accrue when all elements of a cause of action present themselves.  *See id.*  So, to sustain a claim for unjust enrichment, Uhlig didn't have to wait for CoreLogic to recognize that CoreLogic's use of Uhlig's data was wrongful.  Under Uhlig's approach, the statute of limitations would never begin to run—what defendant would admit to *knowing* its actions were wrongful? [31]

Here, Uhlig brings an unjust enrichment claim based on "CoreLogic's use of the Community Information in the CondoSafe Reports and in its various services, analytics, models, platforms, products, applications and databases, without payment for its value."  Doc. 279 at 28 (Pretrial Order ¶ 4.a.vii.).  And the Kansas Supreme Court has instructed that often an unjust enrichment cause of "action accrues when . . . property is received by the defendant."  *Est. of Draper*, 205 P.3d at 715.  Here, it's undisputed CoreLogic received data from Uhlig in 2015, and CoreLogic used that data in a CondoSafe Report in 2015.  So, Uhlig's unjust enrichment claim is untimely.

*Second*, Uhlig asserts, even if the statute of limitations began to run, it "would only be precluded from recovery for CoreLogic's unjust enrichment outside the limitations period (*i.e.* before November 22, 2018)."  Doc. 309 at 41.  Saying it another way, Uhlig argues it can pursue its unjust enrichment claim for CoreLogic's conduct within the limitations period because each

---

[31]     Uhlig cites a case from our court, *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, 405 F. Supp. 3d 981 (D. Kan. 2019) to support its position.  In the court's view, *Northern* dealt with an unusual set of facts and, in light of this unusual setting, the court declines to apply *Northern* here.

of CoreLogic's orders from Uhlig and subsequent use in a CondoSafe report is a discrete act. *Id.* Unfortunately for Uhlig, our Circuit already has rejected this theory.

Uhlig's argument invokes the "continuing tort"[32] theory. Under this theory, Uhlig's claims aren't time barred because CoreLogic's acts "constitute a continuing tort entitling [Uhlig] to recover damages for each act occurring during the . . . three-year period immediately preceding this lawsuit." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 630 (10th Cir. 2008) (applying Kansas law). In *Nash*, our Circuit, applying Kansas law, rejected this doctrine based on its view that "the Kansas Supreme Court would not recognize the continuing-tort exception to the statute of limitations for these [conversion and unjust enrichment] claims." *Id.* The court thus follows binding Circuit precedent and concludes "that Kansas would not apply the continuing-tort doctrine to claims for . . . unjust enrichment." *Id.* at 631. So, Uhlig's unjust enrichment claim is time barred. CoreLogic thus deserves summary judgment on Uhlig's unjust enrichment claim.

With that claim decided, the court turns to CoreLogic's request for summary judgment against Uhlig's tortious interference claim.

### D.    Uhlig's Tortious Interference Claim

Uhlig brings a claim for tortious interference with business expectancy based on CoreLogic's "reselling [of] Community Information to customers in the industry who otherwise

---

[32]    The court recognizes the difference between the "continuing tort" (sometimes called the "continuing violations" doctrine) the "repeated violations" doctrine. As our Circuit has explained, the continuing tort doctrine "tethers conduct from both inside and outside the limitations period into one single violation that, taken as a whole, satisfies the applicable statute of limitations." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1100 (10th Cir. 2019) (citation omitted). In contrast, the "repeated violations doctrine divides what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues with the time period prior to suit." *Id.* While the "repeated violations" doctrine better describes the theory Uhlig invokes here, the court follows the parties' lead and uses the "continuing tort" terminology.

would place orders with Uhlig." Doc. 279 at 28 (Pretrial Order ¶ 4.a.iv.). CoreLogic argues that this claim, too, is time barred.

The parties agree. The Kansas statute of limitations applies to Uhlig's tortious interference claim. Doc. 279 at 3 (Pretrial Order ¶ 1.d.vii.). Kansas law prescribes a two-year statute of limitations for tortious interference with prospective business advantage claims. Kan. Stat. Ann. § 60-513(a)(4); *see also Taylor v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, 968 P.2d 685, 688 (Kan. Ct. App. 1998) (applying Kan. Stat. Ann. § 60-513(a)(4)'s two-year limit to tortious interference with business expectancy claim). A tortious interference claim

> shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of the injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable[.]

Kan. Stat. Ann. § 60-513(b).

The parties' dispute over the timeliness of Uhlig's tortious interference claim boils down to one issue: the continuing tort doctrine. It's undisputed that CoreLogic began reselling Community Information to its customers in 2015, and Uhlig received notice of this reselling in 2016. Nonetheless, Uhlig argues it "is entitled to pursue claims in the two years prior to Uhlig's November 22, 2021 lawsuit." Doc. 309 at 37. As already mentioned, our Circuit addressed the continuing tort exception to the statute of limitations in *Nash*. 526 F.3d at 630–31.

*Nash* involved claims for conversion and unjust enrichment, not tortious interference with business expectancy. *Id.* at 629. But its reasoning applies with equal force to tortious interference claims. *Nash* examined Kansas law and concluded that Kansas has applied the continuing tort theory in nuisance cases and shareholder derivative actions, but "Kansas has consistently refused to apply the theory in other contexts." *Id.* at 630–31. And, our Circuit

noted, "Kansas courts have repeatedly emphasized that it is the role of the state legislature, rather than the state courts, to create exceptions to the statute of limitations." *Id.* at 631.  Given this reluctance from our Circuit and Kansas courts to expand the continuing tort theory to apply outside the nuisance and shareholder derivative action contexts, the court declines to apply the continuing tort theory to Uhlig's tortious interference claim.  The court thus concludes CoreLogic is entitled to summary judgment on Uhlig's tortious interference with business expectancy claim because it's time barred.

> ### E.    Uhlig's Delaware Deceptive Trade Practices Act Claim

Uhlig asserts that CoreLogic has violated Delaware's Deceptive Trade Practices Act (DDTPA) "by passing off Uhlig's data as its own, by causing confusion in the marketplace, by representing Uhlig prepared the CondoSafe Reports, and by using deceptive representations via the misuse of Uhlig's Marks."  Doc. 279 at 28 (Pretrial Order ¶ 4.a.v.).  CoreLogic argues this claim is untimely.  Doc. 289 at 47–48.  The parties agree that the Kansas statute of limitations applies to this claim.  Doc. 279 at 3 (Pretrial Order ¶ 1.d.vii.).  And Kansas law prescribes a three-year statute of limitations for an "action [based] upon a liability created by a statute[.]" Kan. Stat. Ann. § 60-512.  This statute of limitations "starts running with the occurrence of the alleged conduct constituting the violation, not the discovery of the violations."  *Louisburg Bldg. & Dev. Co. v. Albright*, 252 P.3d 597, 607 (Kan. Ct. App. 2011).

CoreLogic argues Uhlig's DDTPA claim here is untimely because CoreLogic included the CondoCerts mark under the Preparer Information section in CondoSafe reports as early as February 2018.  Indeed, in February 2018, Uhlig's customer service received an inquiry about

data in a CoreLogic CondoSafe Report.[33]  Doc. 292-13 at 2–6 (CoreLogic Ex. 73).  The

CondoSafe Report listed "Condocerts Customer Service" as the Preparer.  *Id.* at 19.  So, the

three-year statute of limitations has run on Uhlig's DDTPA claim.

To avoid this result, Uhlig again invokes the continuing tort doctrine.  Doc. 309 at 38.

But as the court just explained, it declines to extend the continuing tort doctrine to claims outside

the nuisance and shareholder derivative action contexts.  *See above* § III.D.  CoreLogic thus

deserves summary judgment against this claim.

### F.      Uhlig's Claim for Contractual Attorneys' Fees

CoreLogic next argues for summary judgment against Uhlig's damages claim for

contract-based attorneys' fees.  In the Second Amended Complaint, Uhlig demanded a general

"award of costs and attorney fees as allowed by applicable law[.]"  Doc. 193 at 24 (2nd Am.

Compl. Prayer ¶ 8).  In the Pretrial Order, however, Uhlig got more specific, including a demand

for attorneys' fees with its breach of contract damages.  Doc. 279 at 41 (Pretrial Order ¶ 5.a.ii.).

The Pretrial Order asserts the "Customer Agreements . . . entitle Uhlig to its costs and fees."  *Id.*

CoreLogic refers to this claim as Uhlig's "attempt[] to improperly assert a non-pleaded claim for

contractual attorneys' fees through the Pretrial Order."  Doc. 289 at 65.

This dispute turns on pleading requirements.  A plaintiff's complaint must include "a

demand for the relief sought, which may include relief in the alternative or different types of

relief."  Fed. R. Civ. P. 8(a)(3).  A complaint also must comply with Fed. R. Civ. P. 9(g), which

provides:  "If an item of special damage is claimed, it must be specifically stated."  "Attorneys'

fees are considered special damages in a breach-of-contract action, and thus must be pleaded as

---

[33]      Uhlig objects to this exhibit as inadmissible hearsay.  Doc. 309 at 5 (Uhlig Resp. Statement of Fact ¶ 70).  As already explained the first time it cited this exhibit, the court overrules this objection.  *See above* n.24.

such under Federal Rule of Civil Procedure 9(g)." *Levin v. Five Corners Strategies, LLC*, 541 F. Supp. 3d 1262, 1273 (D. Colo. 2021).

Here, Uhlig included its demand for attorneys' fees in its Second Amended Complaint. Doc. 193 at 24 (2nd Am. Compl. Prayer ¶ 8). So, Uhlig complied with Fed. R. Civ. P. 9(g). CoreLogic complains that Uhlig failed to identify "the indemnity provisions under which Uhlig claims this right, or even to identify the particular form agreements that it contends applies to its right to indemnity." Doc. 289 at 66. But there's no "controlling case law requiring that the complaint specify that the attorney's fee award request is based on contract, that it identify the specific contractual attorney's fee clause at issue, or that it include specific allegations addressing any particular conditions for recovery of fees under that clause." *Magpie Telecom Insiders, Inc. v. MPhase Techs., Inc.*, No. 07-cv-02369, 2008 WL 5068836, at *1 (D. Colo. Nov. 24, 2008) (denying as moot plaintiff's request to amend complaint to add contractual provision that entitled plaintiff to attorneys' fees because plaintiff expressly requested attorneys' fees in complaint, so complaint was legally sufficient without specific contractual provision). Sensing trouble, CoreLogic tries to recast Uhlig's attorneys' fees damages as indemnity cause of action. But that's not how Uhlig has chosen to structure its claim. Uhlig has requested attorneys' fees as damages and pleaded those damages as required by the Federal Rules of Civil Procedure. The court thus rejects CoreLogic's argument that the court dispose[34] of Uhlig's request for attorneys' fees.

---

[34] The verb "dispose" highlights the oddity of CoreLogic's request. In its initial summary judgment brief, CoreLogic asked the court to "summarily dispose of Uhlig's claim for contractual attorneys' fees." Doc. 289 at 66. Then, in its summary judgment reply brief, CoreLogic explained that it "seeks dismissal under FRCP 12(c) and its Objections to the Pretrial Order of Uhlig's demand for attorneys' fees pursuant to contract." Doc. 327 at 30–31 (internal citation omitted). Neither procedural vehicle—Rule 12(c) or pretrial order objections—works here.

The court next proceeds to the heart of Uhlig's case against CoreLogic: breach of contract.

### G.  Uhlig's Breach of Contract Claims[35]

Uhlig asserts four distinct breach of contract claims against CoreLogic. CoreLogic moves for summary judgment against all four, arguing: (i) the claims are untimely, (ii) the parties modified the contracts with their course of conduct, (iii) Uhlig acquiesced, and (iv) Uhlig can't prove the existence of 14,000 separate contracts. The court considers each argument, in turn, below. And it concludes by addressing Uhlig's request for summary judgment on the liability element of its own breach of contract claims.

---

Start with Rule 12(c). It governs motions for judgment on the pleadings. A court evaluates a Rule 12(c) motion under the same standard governing a Rule 12(b)(6) motion to dismiss. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). For a complaint to survive a Rule 12(b)(6) motion to dismiss, "*a complaint* must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff *pleads* factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added) (citing *Twombly*, 550 U.S. at 556). This case already has progressed far beyond the pleading stage. CoreLogic doesn't attack the pleadings; it attacks Uhlig's contractual damages claim in the *Pretrial Order*. The Pretrial Order isn't a pleading. *See* Fed. R. Civ. P. 7(a) (listing all pleadings allowed, and list doesn't include final pretrial order). "The court recognizes that the Tenth Circuit has determined that a final pretrial order supersedes the pleadings in the case, but it has never concluded that it is a 'pleading' for purposes of Rule 12(c)." *Myklatun v. Halliburton Energy Servs., Inc.*, No. CIV-09-770-F, 2011 WL 13112075, at *2 (W.D. Okla. Oct. 13, 2011) (internal citation omitted). So, Rule 12(c) is of no use to CoreLogic.

CoreLogic's objection to the Pretrial Order "asks the Court to strike the reference to contractual attorneys' fees." Doc. 279 at 41 n.14. As already explained, the court evaluates objections to the Pretrial Order under a clearly erroneous or contrary to law standard. *See above* § III.A.1. The court's summary judgment analysis concludes that Uhlig properly has requested these damages under the Federal Rules of Civil Procedure. So, the Pretrial Order naturally survives the more-generous clearly erroneous or contrary to law standard, and the court overrules CoreLogic's objection to the Pretrial Order's inclusion of a claim for contract-based attorneys' fees.

[35]     CoreLogic has objected to the Pretrial Order's statement of Uhlig's breach of contract claims. Doc. 303 at 10–12. CoreLogic argues that the Pretrial Order's statement of Uhlig's fraud claim is "far too general" and amounts to an attempt "to expand the breaches Uhlig pleaded." *Id.* at 10. But CoreLogic's reply abandons this argument, only focusing its attention on Uhlig's fraud, contractual indemnity, trade secret, and unjust enrichment claims. *See generally* Doc. 331. The court overrules CoreLogic's objection to the Pretrial Order's statement of Uhlig's breach of contract claims.

### 1. Uhlig's breach of contract claims for contracts formed after November 21, 2016, are timely.

CoreLogic asserts that Uhlig's breach of contract claims are time barred. The parties agree Kansas's statute of limitations applies to these claims and Delaware substantive law governs these claims. Doc. 279 at 2, 3 (Pretrial Order ¶¶ 1.d.iii., 1.d.vii.). And they also agree that Kansas's statute of limitations is five years. Kan. Stat. Ann. § 60-511(1). Uhlig filed this action on November 22, 2021. Doc. 1. CoreLogic argues two theories of the statute of limitations against Uhlig's breach of contract claims. One doesn't work and one does.

CoreLogic first argues that Uhlig pleads the breach of a *single* contractual provision. Doc. 289 at 48. CoreLogic acknowledges that Uhlig pleads four separate breach of contract claims for four separate contracts, but asserts that, "for each, Uhlig alleges a single breach of the exact same provision—'CoreLogic breached the [agreement] by reselling Community Information for Commercial Purposes.'" *Id.* (quoting Doc. 193 at 15–17 (2nd Am. Compl. ¶¶ 79, 85, 91, 97)). CoreLogic characterizes Uhlig's breach of contract theory as "a single breach of contract, though the same contractual prohibition is contained in four separate writings." *Id.* And CoreLogic has adduced undisputed evidence that it allegedly breached the contract by reselling Uhlig's data on November 30, 2015. *Id.* at 49. So, CoreLogic reasons, Uhlig's single breach of contract is untimely. Uhlig calls this a "misreading" of its Second Amended Complaint. The court agrees with Uhlig.

Uhlig characterizes its breach of contract theory this way: Every time CoreLogic placed an order, it breached the Terms of Use and the Order Submission Agreement. Doc. 309 at 33. So, Uhlig asserts, because "CoreLogic placed over 14,000 orders between 2015 and November 22, 2021, CoreLogic agreed to (and breached) the Terms of Use 14,000 times, and the Order Submission Agreement 14,000 times." *Id.* at 33–34. Uhlig implemented the other two

contracts—the Account Registration Agreement and the Information Upload Agreement—in 2021.  *Id.* at 34; *see also* Doc. 293-7 at 7 (CoreLogic Ex. 97).  Uhlig thus argues that its breach of contract claims are timely because "CoreLogic breached *thousands* of contracts between 2016 and November 22, 2021."  Doc. 309 at 35 (emphasis in original).  CoreLogic's argument that there's just one contract, breached in 2015, thus fails because it misapprehends Uhlig's breach of contract theory.  Indeed, on reply, CoreLogic abandons this argument.  Doc. 327 at 19.  And it does for good reason—it won't work.

But CoreLogic's other statute of limitations argument does work.  CoreLogic argues that the court "should enter partial summary judgment as to each alleged breach of contract that took place prior to November 22, 2016."  *Id.*  Uhlig doesn't dispute this assertion, explaining it "seeks damages for each breach of contract after November 21, 2016."  Doc. 309 at 34.  And Uhlig can't rely on equitable estoppel to save these claims.  *See above* § III.A.2.a.  The court thus concludes that the statute of limitations bars Uhlig from asserting any breach of contract claim based on a contract formed before November 21, 2016.

### 2. CoreLogic hasn't shouldered its burden to show that the parties modified their agreements via their course of conduct.

CoreLogic asserts that summary judgment is appropriate against Uhlig's breach of contract claims because the parties modified the relevant contracts by their course of conduct.  Doc. 289 at 52.  The court's analysis of this defense begins with a short detour.  This detour is necessary because it explains, under Delaware law, how parties can modify a contract through their course of conduct.  This explanation relies on a paradigmatic case from 1972.

In *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, two bottling companies sued defendant Pepsi for breach of contract.  297 A.2d 28, 29 (Del. 1972).  The plaintiffs had written agreements from 1945 and 1948, under which Pepsi promised to sell Pepsi syrup to plaintiffs for

$315 per concentrate unit. *Id.* at 30. Despite this written agreement, Pepsi changed the price several times over the years, and sent notices to every bottler about these changes, including plaintiffs. *Id.* at 31. And plaintiffs never objected—until 1963, when "Pepsi notified all bottlers of a proposed price increase of $80 per concentrate unit." *Id.* at 32. Plaintiffs then sued.

Plaintiffs accused Pepsi of violating the 1945 and 1948 written price agreements, arguing "that there [was] no formal bilateral written agreement between the parties modifying the price provisions[.]" *Id.* And, plaintiffs pointed out, the written agreements contained a clause "to the effect that the written appointment expresses fully the parties' understanding, and that no future changes in the terms shall be valid except when reduced to writing and executed by both sides[.]" *Id.* But the Delaware Supreme Court disagreed, explaining, "the lack of a written amendment is not necessarily conclusive." *Id.* And "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement." *Id.* at 33. Instead, the Delaware Supreme Court focused on the parties' course of conduct. *Id.* And the Delaware court concluded that the parties had amended their contract: "The effect of the course of conduct engaged in for a period in excess of 15 years by Pepsi and the plaintiffs indicates clearly to all intents and purposes the provisions of [the written agreements] were emasculated and the price-fixing policy now followed by Pepsi was agreed to by the plaintiffs." *Id.*

It's worth noting that *Pepsi-Cola* wasn't a summary judgment case. The Delaware Supreme Court explicitly relied on the chancery court's factual findings. *Id.* The chancery court found "that the acceptance by the plaintiffs of the periodic price changes made by Pepsi was evidence of acquiescence by them in such price changes and necessarily, therefore, the

substitution of an oral agreement for the written provisions" of the parties' agreement.  *Id.*  So, the operative facts in *Pepsi-Cola* were undisputed.  That's not true here.

"Delaware courts have established a 'high evidentiary burden' for parties asserting course of conduct modifications."  *ING Bank, FSB v. Am. Reporting Co.*, 843 F. Supp. 2d 491, 498–99 (D. Del. 2012) (quoting *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) ("In an effort to screen out parties' attempts to single-handedly change contracts under the guise of oral modifications, courts have established a high evidentiary burden for parties asserting such changes.")).  "The burden is on the party seeking the modification to demonstrate that a contract has been modified."  *Haft v. Dart Grp. Corp.*, No. 93-384, 1994 WL 828326, at *12 (D. Del. Aug. 17, 1994) (citing *Drake v. Hercules Powder Co.*, 55 A.2d 630, 636 (Del. Super. Ct. 1946)).  CoreLogic thus must show it has adduced evidence capable of showing "that the modification is of such specificity as to leave no doubt as to the intention of the parties."  *Id.* (citation and internal quotation marks omitted).

Here, CoreLogic argues that the parties modified Uhlig's contractual prohibition against reselling data for commercial purposes through their years-long course of dealing.  Doc. 289 at 52.  To flesh out the summary judgment facts, *i.e.*, the admissible facts viewed in the light most favorable to Uhlig, the non-movant, the court divides the facts into four categories:

    a.  CoreLogic's relationship with Uhlig as one of Uhlig's biggest customers,

    b.  CoreLogic's attempt to negotiate a licensing agreement with Uhlig for CondoCerts,

    c.  The GOAUA that CoreLogic added to its custom questionnaires, and

    d.  Uhlig's knowledge about the reselling.

The court examines each category of facts, below.

### a.        CoreLogic and Uhlig's Relationship

Uhlig asserts that it never modified its contracts with CoreLogic and, in fact, knew little about CoreLogic.  Uhlig gave the following discovery response when asked about its knowledge of CoreLogic:

> CoreLogic was one of tens of thousands of Uhlig's customers, and at least until November 20, 2020, was presumed by Uhlig to be using the Community Information for purposes consistent with Uhlig's standard Terms and Conditions. Beyond routine, low-level customer service contacts, which focused on operational issues, Uhlig had little if any awareness of CoreLogic or its activities, and was unaware of the extent of CoreLogic's misconduct, including but not limited to the production and sale of unauthorized, counterfeit documents and certifications bearing the signature of Uhlig's preparers.  Uhlig did not have reason to investigate CoreLogic's activities until it received a complaint from a community association[.]

Doc. 290-17 at 5–6 (CoreLogic Ex. 13).  CoreLogic calls Uhlig's discovery response "false." Doc. 289 at 52.  To demonstrate the falsity of this response, CoreLogic cites several summary judgment exhibits.

It's undisputed that, at the very least, Uhlig knew of CoreLogic.  In 2013, Uhlig CEO Mark Uhlig signed a "Custom Programming Quote" with CoreLogic to allow Uhlig to integrate with Jenark, CoreLogic's accounting system.[36]  Doc. 291-27 (CoreLogic Ex. 57); Doc. 309-9 at 19 (Uhlig 30(b)(6) Dep. 148:14–19).  In 2015, Uhlig noted that "CoreLogic/Jenark" was an integration partner with its New York competitors.  *See generally* Doc. 292-16 (CoreLogic Ex.

---

[36] CoreLogic asserts that, from the Custom Programming Quote, Uhlig's CEO knew or had reason to know that CoreLogic has businesses other than CondoSafe because of the Custom Programming Quote's stated purpose.  Doc. 289 at 19.  The purpose of the project was to modify "Jenark web service with Uhlig WelcomeLink product to support integration for First Service clients' requirements. Webservice intended to provide data to support the documentation required for sales of homes by owners li[ving] in common interest communities (HOA, condominiums, etc.) managed by First Service."  Doc. 291-27 at 2 (CoreLogic Ex. 57).  Viewed in the light most favorable to Uhlig, this stated project purpose doesn't provide Uhlig with much information about CoreLogic beyond Jenark.  So, the court rejects CoreLogic's view that the Custom Programming Quote shows that Uhlig knew or should've known in 2013 that CoreLogic had businesses other than CondoSafe.

76).[37]  And when Uhlig bought CondoCerts from Mutual of Omaha, Uhlig agreed never to sell

CondoCerts to CoreLogic.  Doc. 291-11 at 61 (CoreLogic Ex. 41).

Though Uhlig knew of CoreLogic, Uhlig didn't see CoreLogic as a competitor.  Uhlig's

30(b)(6) representative testified, "we've never understood CoreLogic as a . . . competitor for

customers of ours."  Doc. 290-15 at 4 (Uhlig 30(b)(6) Dep. 37:10–25).  Uhlig testified that its

> primary awareness . . . of CoreLogic was as the owner of an accounting software
> company in our space . . . which is used by one of our customers and with which
> we integrate . . . which makes them someone that we would pay attention to only
> for the purposes of, say, employee retention or . . . nonsolicitation.

*Id.* at 4–5 (Uhlig 30(b)(6) Dep. 37:21–38:8).

CoreLogic emphasizes that it was a big customer of Uhlig.  It's undisputed that

CoreLogic placed thousands of orders with Uhlig, making CoreLogic one of Uhlig's biggest

customers.  CoreLogic also asserts that Uhlig and CondoCerts treated CoreLogic differently than

other customers in a variety of ways.  For example, CondoCerts had a special inbox for

CoreLogic inquiries—something CondoCerts didn't do for other customers.  Doc. 290-7 at 4, 32

(Button Dep. 29:5–15, 118:13–15).  And CoreLogic cites numerous examples of this special

treatment.[38]  But no matter how specially Uhlig treated CoreLogic, CoreLogic never ties this

special relationship to any contract modifications.  Put differently:  CoreLogic placed thousands

of orders, and Uhlig prioritized CoreLogic.  But so what?  That special treatment doesn't mean

Uhlig knew about CoreLogic's products and services.  And it certainly doesn't establish that

---

[37]    Uhlig objects to this exhibit as hearsay.  But CoreLogic doesn't offer this list of New York market competitors for the truth of the matter asserted—to show that CoreLogic did, indeed, provide integration services for Uhlig's competitors.  Instead, CoreLogic only offers this exhibit to show Uhlig's state of mind, *i.e.*, that Uhlig knew about CoreLogic.  Because CoreLogic doesn't offer this exhibit for the truth of the matter it asserts, the court overrules Uhlig's hearsay objection.

[38]    CoreLogic's orders followed a special workflow.  Doc. 290-7 at 4 (Button Dep. 29:5–15).  And Uhlig dedicated a section of its training to CoreLogic specifically.  *See, e.g.*, Doc. 292-20 at 3 (CoreLogic Ex. 80).

Uhlig—as a matter of law—agreed CoreLogic could resell Community Information for commercial purposes.

In sum, though CoreLogic disputes "the assertion that Uhlig knew 'little if anything' about CoreLogic until November 2020" as "indisputably false," the summary judgment standard prevents the court from adopting CoreLogic's view. Doc. 289 at 52. The summary judgment evidence, viewed in the light most favorable to Uhlig, shows that Uhlig knew about CoreLogic and CoreLogic's Jenark platform generally. And it shows CoreLogic placed a lot of orders and Uhlig had special processes for those orders. But a reasonable factfinder could credit the "little" part of Uhlig's assertion that it "had little if any awareness of CoreLogic or its activities[.]" Doc. 290-17 at 5–6 (CoreLogic Ex. 13).

### b.      License Agreement

CoreLogic also relies on evidence of a License Agreement that would've allowed CoreLogic to use CondoCerts data for commercial purposes. In a nutshell, CoreLogic alleges that Mutual of Omaha—CondoCerts' previous owner—knew what CoreLogic did with the CondoCerts data. And CoreLogic had worked with Mutual of Omaha on a License Agreement for CondoCerts data. When Uhlig bought CondoCerts from Mutual of Omaha, CoreLogic and Uhlig discussed this License Agreement. But Uhlig never signed the License Agreement and told CoreLogic that it only did business according to its own terms and conditions. CoreLogic nevertheless argues that the License Agreement and surrounding discussions show that Uhlig knew CoreLogic was reselling CondoCerts data for commercial purposes. The evidence, which the court combs through below, reveals a far more complicated story.

The court previously recounted the details of the License Agreement, *see above* § I, but, for ease of reference, repeats them here. On September 21, 2017, CoreLogic sent Mr. Madigan, of Mutual of Omaha, a proposed License Agreement. Doc. 284-23 at 7–12 (Uhlig Ex. 22). Mr.

Madigan forwarded the License Agreement to Uhlig because Uhlig had purchased CondoCerts by this point in time. *Id.* at 6. For summary judgment purposes, the important part of the License Agreement is § 2.2, titled "Permitted Use." *Id.* at 9. This section provided, "During the Term of this Agreement and at all times thereafter, CoreLogic may use the HOA Information for any lawful business purpose, including, without limitation, for incorporation into instances of CoreLogic's real estate analytics products and services sold to CoreLogic customers." *Id.* The License Agreement doesn't define CoreLogic's real estate analytics products and services. *Id.*

Uhlig asked Mr. Madigan to provide some context for this agreement. *Id.* at 6. Uhlig also asked, "Has CondoCerts signed a similar agreement before?" *Id.* Mr. Madigan responded, "This is new, the bank has not signed this in the past." *Id.* A Uhlig employee forwarded the License Agreement to Uhlig's CEO. *Id.* at 2. Uhlig's CEO testified he had "no memory of seeing this agreement." Doc. 284-25 at 3 (Uhlig Dep. 95:21–25). And he testified that he "remembered that CoreLogic asked to have . . . some sort of special terms, and our answer was just, categorically, no. Because we don't do that and never have." *Id.* at 3–4 (Uhlig Dep. 95:21–96:3). Uhlig's CEO also testified that he understood the purpose of the email asked to do business contrary to Uhlig's terms and conditions. Doc. 290-14 at 23 (Uhlig Dep. 125:15–23).

In January 2018 and February 2018, CoreLogic followed up with Uhlig about the License Agreement. Doc. 284-24 at 3–4 (Uhlig Ex. 23). Uhlig responded in February. *Id.* at 2–3. Uhlig wrote, "The terms and conditions for our products and for users of our sites appear on our ordering sites. We do not offer these products and services outside those terms, so we are not able to enter into the agreement you propose." *Id.* CoreLogic wrote Uhlig back in March 2018, explaining, "we have been doing business with CondoCerts for many years, and had an agreement with them on our relationship." *Id.* at 2. CoreLogic explicitly noted that Uhlig's

terms didn't align with the way CoreLogic usually did business with CondoCerts.  *Id.*  Uhlig responded and invited CoreLogic to provide "more detail about the specific items [CoreLogic was] requesting, or identify the provisions that [CoreLogic felt] were part of a previous arrangement that [were] not reflected in [Uhlig's] current terms and conditions."  *Id.*  CoreLogic never responded to this invitation with the requested details or provisions.

Instead, CoreLogic responded by expressing its view "that CoreLogic and CondoCerts have an ongoing data purchase relationship which for whatever reason has not been comprehensively set out on paper."  Doc. 284-22 at 2 (Uhlig Ex. 21).  CoreLogic told Uhlig that, if the parties wanted to memorialize their relationship, they had "two very different sets of terms and conditions" to consider:  (1) the License Agreement or (2) Uhlig's terms and conditions from its CondoCerts website.  *Id.*  CoreLogic felt that Uhlig's terms and conditions "seem to be further away from the parties' course of dealing."  *Id.*  CoreLogic also informed Uhlig, "don't hesitate to reach out if you have questions or concerns I can address."  *Id.*  Uhlig never responded to this email.  Doc. 285-1 at 3 (Aberle Dep. 104:7–20).

CoreLogic argues that despite Uhlig's initial response—reporting Uhlig only did business according to its terms and conditions—"that was the beginning of the discussion, not the end of it."  Doc. 327 at 23.  In CoreLogic's view, CoreLogic's final email in the conversation invited Uhlig to respond.  Uhlig didn't.  And Uhlig continued to do business with CoreLogic for years.  This, CoreLogic asserts, shows course of conduct modification.  Perhaps.  But a reasonable factfinder could disagree with this finding.  That is, a reasonable factfinder could credit Uhlig's evidence and find Uhlig forcefully rejected CoreLogic's attempted License Agreement and that was the end of that.  Indeed, Uhlig's response to the proposed License Agreement weighs heavily against a summary judgment finding that the parties modified their contract via their

course of conduct.  Uhlig has adduced evidence that Uhlig rejected CoreLogic's proposed

modification.  Construing the facts in Uhlig's favor, Uhlig's rejection of the License Agreement

means the License Agreement can't suffice to sustain—at least not at summary judgment—

CoreLogic's "'high evidentiary burden' for parties asserting course of conduct modifications."

*ING Bank*, 843 F. Supp. 2d at 498–99 (quoting *Cont'l Ins. Co.*, 750 A.2d at 1230).

### c.   GOAUA

As further evidence that CoreLogic was transparent with Uhlig and Uhlig knew of its

actions, CoreLogic offers the GOAUA.  Recall that the GOAUA existed on CoreLogic's custom

form, in the Preparer Information section.  *See, e.g.*, Doc. 285-2 at 6 (Uhlig Ex. 27).  And it

"authorize[d] CoreLogic to utilize the information and provide it to mortgage lenders and other

third parties without restriction."  *Id.*  So, according to CoreLogic, the GOAUA indicated to

Uhlig that CoreLogic wasn't agreeing to conform to Uhlig's terms and conditions.  But Uhlig

avers that CoreLogic snuck the GOAUA into the custom questionnaires.

The parties cite deposition testimony from Uhlig employee Sean Brune, who handled

CoreLogic's custom questionnaires.  Mr. Brune testified that he had the Preparer Information

section visibly in front of him when he signed and checked the box.  Doc. 290-6 at 25 (Brune

Dep. 112:14–17).  But Mr. Brune couldn't recall spending time reading the statement about his

signature.  Doc. 285-4 at 3–4 (Brune Dep. 112:23–113:8).  Somewhat confusingly, when asked,

"Can you say that you never reviewed that language?"  Mr. Brune responded, "No, I can't say

that."  Doc. 290-6 at 26 (Brune Dep. 113:9–17).  Mr. Brune also testified that when he signed the

form, he didn't intend to authorize CoreLogic to use the information and provide it to mortgage

lenders and other third parties without restriction.  Doc. 309-15 at 13 (Brune Dep. 164:2–7).

When asked, "Do you have any recollection that you even were aware that that information had

been included by CoreLogic on its questionnaire?"  Mr. Brune responded, "No."  *Id.* (Brune Dep.

164:9–13).  To put it mildly, Mr. Brune's testimony doesn't paint a clear picture from which the court can determine, definitively and at summary judgment, whether Mr. Brune read and understood the GOAUA.

CoreLogic maintains it didn't sneak the GOAUA onto its custom questionnaire. CoreLogic emphasizes that it had a special meeting about the custom questionnaire with Mutual of Omaha—CondoCerts's owner before Uhlig.  Doc. 290-11 at 37 (Madigan Dep. 75:8–13). And CoreLogic adduces evidence that it sent the custom questionnaire—GOAUA included—to Mutual of Omaha employee Sean Madigan several times.  *Id.* at 36 (Madigan Dep. 72:4–11). But Mr. Madigan also testified he didn't recall, exactly, what the custom questionnaire said.  *Id.* (Madigan Dep. 72:12–21).  CoreLogic cites more review by Mutual of Omaha of the custom questionnaire and its GOAUA, specifically by Mr. Madigan.  *Id.* at 42–44 (Madigan Dep. 93:3– 95:8).  And when Uhlig acquired CondoCerts, Mr. Madigan assisted with the transition from Mutual of Omaha to Uhlig, communicating with Uhlig about CoreLogic.  *Id.* at 6–7 (Madigan Dep. 27:22–28:8).

Unfortunately for CoreLogic, the summary judgment standard prevents the court from doing much with Mr. Madigan.  He didn't work for Uhlig, so his actions or statements don't bind Uhlig.  And though he discussed CoreLogic with Uhlig during the transition, the court can't infer that this discussion means Uhlig knew about the GOAUA.  Uhlig, as nonmovant, is entitled to the benefit of all reasonable inferences.  A reasonable factfinder could conclude—especially considering Mr. Madigan's testimony that he didn't recall what the custom questionnaire said— that Mr. Madigan didn't know about the GOAUA and, as a result, didn't tell Uhlig about it.  So, Mr. Madigan's testimony doesn't get CoreLogic any closer to clear and convincing evidence of a course of conduct modification.  At least not at summary judgment.

Undeterred, CoreLogic cites additional evidence about CondoCerts's review of its custom questionnaire after Uhlig had acquired CondoCerts.  In 2018, CondoCerts agreed to review a draft of CoreLogic's custom questionnaire—a questionnaire containing the GOAUA. Doc. 292-3 at 2–3 (CoreLogic Ex. 63).  And CondoCerts did review CoreLogic's custom questionnaire.  Doc. 290-7 at 18 (Button Dep. 74:2–6).  But, according to Mr. Button, this review of custom questionnaires was a cursory review.  *Id.*  He testified he examined whether the custom form was "a workable PDF file and that it appear[ed] to be, at a glance, from the specified entity[.]"  *Id.*  So, it's still not clear whether CondoCerts—and therefore Uhlig—saw the GOAUA.[39]

In sum, CoreLogic argues that all this evidence shows Uhlig knew about the GOAUA. And, according to CoreLogic, the GOAUA shows CoreLogic dealt transparently with Uhlig, noting that CoreLogic was purchasing data and selling it to CoreLogic's lender customers.  Uhlig responds, arguing that CoreLogic sneaked this provision onto the form.  And Uhlig adduces evidence that in 2021, it created a stamp to affix to its questionnaires that explicitly made the CondoCerts signature subject to the provisions of the CondoCerts Order Submission Agreement. Doc. 285-3 at 10 (Ross Dep. 111:3–12); Doc. 285-2 at 6 (Uhlig Ex. 27).  With the stamp and the GOAUA, this is what the CoreLogic custom questionnaire looked like:

---

[39]     CoreLogic proffers the following statement of fact:  "CondoCerts never complained about the language in CoreLogic's custom questionnaires with the Grant of Authority."  Doc. 289 at 37 (CoreLogic Statement of Fact ¶ 261).  CoreLogic cites deposition testimony from Christopher Button.  *Id.*  Uhlig objects, arguing the deposition testimony doesn't support CoreLogic's statement of undisputed fact.  Doc. 309 at 20 (Uhlig Resp. Statement of Fact ¶ 261).  The court agrees with Uhlig.  In the cited deposition testimony, Mr. Button testifies that no one ever told him a problem existed "with some of the language on this form at CondoCerts[.]"  Doc. 290-7 at 26 (Button Dep. 103:1–4).  That's it.  CoreLogic has stretched this testimony far too far by asserting that CondoCerts never complained about the Grant of Authority.  The court can't even tell which form Mr. Button is talking about in his testimony.  The court thus sustains Uhlig's objection to CoreLogic's statement of fact.

Doc. 285-2 at 6 (Uhlig Ex. 27).  With CoreLogic's GOAUA and Uhlig's stamp, the custom

questionnaire contradicts itself.  That's not a good sign for those who hang their hopes—as

CoreLogic does here—on summary judgment in their favor.

The court concludes the GOAUA creates a fact issue.  And it's not even that close a call.

This fact issue is inappropriate for the court to resolve at summary judgment.  The court can't

glean any clear facts from Mr. Brune's testimony.  Maybe he read the GOAUA.  Maybe he

didn't.  Same for Mr. Madigan, who didn't even work for Uhlig.  And maybe Mr. Button saw the

GOAUA in his cursory review of CoreLogic's form.  Maybe someone at Uhlig *should* have seen

the GOAUA.  But eventually Uhlig created a stamp rejecting the GOAUA.  In short form, the

court can't conclude from the summary judgment facts that the parties' course of conduct

modified the prohibition against reselling data.

The testimony aside, Uhlig also points out that that the GOAUA is inconsistent with its

Customer Agreements.  Indeed, this isn't a battle of the forms, where the parties have *different*

versions of the same agreement.  Instead, the parties here have *conflicting* agreements, reflecting

the parties' very different views about the meaning of their course of conduct.  One of their

agreements, shown above, contradicts itself.  This evidence doesn't get CoreLogic any closer to summary judgment.

### d.  Uhlig's Knowledge

Next, CoreLogic asserts that Uhlig knew it "was purchasing data from Uhlig and selling it to CoreLogic's lender customers."  Doc. 289 at 53.  CoreLogic claims it "was transparent with Uhlig[.]"  *Id.*  CoreLogic cites the following evidence to show Uhlig's knowledge of its activities.

As already mentioned, in July 2016, CoreLogic contacted Uhlig because it wanted to split a PDF into single pages, but Uhlig's password protected PDFs prevented CoreLogic from doing so.  Doc. 291-16 at 7–9 (CoreLogic Ex. 46).  When asked why CoreLogic needed to split the PDF, CoreLogic responded with this:  "CoreLogic is ordering these documents on behalf of lenders that are underwriting active condo loans, purchases, and refinances.  Lenders contract us to gather the condo documents that they need to underwrite the project."  *Id.* at 3.  Uhlig's follow-up investigation raised a red flag, and Uhlig suspected CoreLogic had resold data and identified the contractual provision that prohibited this practice.  *Id.* at 2.  According to CoreLogic, these events mean that Uhlig knew CoreLogic was violating Uhlig's terms and conditions by reselling purchased data.  But course of conduct modifications require more than knowledge.  They require agreement.

When Delaware courts look for course of conduct modifications, they look for evidence that "indicates clearly to all intents and purposes the provisions of [the written agreements] were emasculated" and the modified contract "was agreed to by the plaintiffs."  *Pepsi-Cola Bottling Co.*, 297 A.2d at 33.  Put another way, CoreLogic must "demonstrate that the modification is of such specificity as to leave no doubt as to the intention of the parties."  *Haft*, 1994 WL 828326, at *12 (citation and internal quotation marks omitted).  And here, because CoreLogic tries to win

the issue on summary judgment, it must sustain its burden on the undisputed facts.  Viewing the

facts in the light most favorable to Uhlig, the non-movant, CoreLogic's evidence about Uhlig's

knowledge doesn't meet this standard.  "[D]oubt [about] the intention of the parties" persists.  *Id.*

Here, while Uhlig suspected CoreLogic was reselling its data in 2016, that doesn't mean

Uhlig *agreed*—as a matter of law—to let CoreLogic resell its data.[40]  To the contrary, Uhlig has

adduced evidence that it failed to follow through on its suspicion because it "lost track" and

Uhlig was "distracted."  Doc. 290-15 at 11–12, 15 (Uhlig 30(b)(6) Dep. 72:24–74:10, 87:12–21).

In the end, whether a reasonable factfinder will buy this explanation is up to that factfinder.  And

Uhlig later rejected CoreLogic's proposed License Agreement for CondoCerts.  To be sure, these

2016 emails seem like a less than desirable fact for Uhlig.  But they're not the only facts.  A

reasonable factfinder could conclude that even though Uhlig had notice of CoreLogic's behavior

in 2016, Uhlig didn't "indicate[] clearly" that it wanted to set aside its written contracts and

agree to a modified contract.  *Pepsi-Cola Bottling Co.*, 297 A.2d at 33.

Beyond the 2016 emails, CoreLogic cites evidence from Uhlig employees that, according

to CoreLogic, shows Uhlig knew about its activities and, as a result, agreed to modify the

contracts through the parties' course of conduct.  In 2018, Uhlig's Senior Customer Support

Representative Jennifer Michelson described CoreLogic this way:  "Corelogic works on behalf

---

[40]     This distinction between knowledge and suspicion is important.  The court used this same
evidence to conclude that the statute of limitations on Uhlig's misappropriation of trade secrets claim
began to run in 2016.  That statute of limitations uses an objective standard.  The statute of limitations on
a misappropriation claim begins to run "when the claimant discovers, or in the exercise of reasonable
diligence should have discovered, the existence of the acts constituting the cause of action."  *McCaffree*,
847 P.2d at 1330 (citation and internal quotation marks omitted).  In contrast, the course of conduct
inquiry—as applied here—requires the court to discern under the summary judgment standard whether
plaintiffs agreed to the modification through their course of conduct.  *See Pepsi-Cola Bottling Co.*, 297
A.2d at 33 (finding parties' course of conduct indicated written agreements "were emasculated and the
price-fixing policy now followed by Pepsi was *agreed to by the plaintiffs*" (emphasis added)).  That's a
much more complicated inquiry.  And, of course, the course of conduct burden applies a "high
evidentiary burden."  *ING Bank*, 843 F. Supp. 2d at 498–99 (quoting *Cont'l Ins. Co.*, 750 A.2d at 1230).

of lenders to provide them information.  A lender gets a loan request and Corelogic is hired to get info for them."  Doc. 291-6 at 2 (CoreLogic Ex. 36).  Ms. Michelson testified she understood that "when one business hires another business, there's usually an exchange of money[.]"  Doc. 290-12 at 34–35 (Michelson Dep. 119:23–120:22).  Ms. Michelson also testified there "was never a conversation" about CoreLogic's compensation.  Doc. 309-14 at 6–7 (Michelson Dep. 120:25–121:9).

Uhlig's Customer Support Manager, Christopher Button, learned about CondoSafe reports in 2019 and 2020.  Doc. 290-7 at 3 (Button Dep. 15:4–9); Doc. 309-12 at 3–4 (Button Dep. 34:16–35:4).  Mr. Button "assumed that CoreLogic was selling a service" and that this "service was obtaining COA information from CondoCerts and providing it to CoreLogic's customers[.]"  Doc. 290-7 at 5–6 (Button Dep. 32:16–33:3).  It "appeared" to Mr. Button that CoreLogic was taking "information from CondoCerts and recompiling it into a CondoSafe report[.]"  Doc. 309-12 at 4 (Button Dep. 35:5–11).  "Common sense" told Mr. Button that "at some point down the line CoreLogic's being compensated for the services that they are providing."  Doc. 290-7 at 10 (Button Dep. 40:16–23).  And Mr. Button "suspected" "that CoreLogic was providing the CondoSafe report to its lender customers[.]"  Doc. 309-12 at 4 (Button Dep. 35:13–21).  But Mr. Button also testified, "truthfully, I have no way of knowing that" CoreLogic was doing so.  *Id.*  And, he testified, "I don't have an understanding of what exactly they were doing with that information or with their CondoSafe report."  *Id.* at 4–5 (Button Dep. 35:23–36:6).

Back in 2018, Mr. Button understood CoreLogic had secured some documents and information on behalf of CoreLogic's clients.  Doc. 290-7 at 39–42 (Button Dep. 141:3–144:3).  At his deposition, CoreLogic labored to get Mr. Button to say that he knew CoreLogic's clients

included lenders.  *Id.*  But Mr. Button never said he possessed such knowledge, testifying that CoreLogic's clients "were never pertinent."  *Id.*  Mr. Button also acknowledged CoreLogic likely communicated that its clients were lenders, but he "could not say" that he "took it into consideration[.]"  *Id.*

Viewing this testimony in the light most favorable to Uhlig, Ms. Michelson and Mr. Button's testimony doesn't clearly establish that they knew what CoreLogic was doing.  It's undisputed that Uhlig understood CoreLogic received some kind of payment for its services. But, again, knowledge so general doesn't mean Uhlig agreed to a modified contract.

This same reasoning applies to CoreLogic's evidence of Uhlig's 2019 notice.  In September 2019, a CoreLogic customer—Nevada State Bank—emailed Uhlig about a CondoSafe Report.  Doc. 285-14 at 2 (Uhlig Ex. 40).  This customer specifically asked about the date in the Preparer Information section.  *Id.*  Recall that, at this point, CoreLogic was listing Uhlig as the preparer on the CondoSafe Report—something Uhlig now takes great issue with. And this email told Uhlig that it had been listed as the preparer.  Uhlig's employee Mr. Button forwarded Nevada State Bank's email to CoreLogic, telling CoreLogic, "I am a little unsure how to respond."  Doc. 286-1 at 10 (Uhlig Ex. 42).  Mr. Button noted that the CondoSafe Report "is not the form that was Completed" by Uhlig and, instead, the CondoSafe Report "may have been filled by [CoreLogic's] office[.]"  *Id.*  CoreLogic responded, "We will reach out to our client and explain the date on our CondoSafe Report."  *Id.* at 11.  Uhlig views this exchange as an opportunity for CoreLogic to act with transparency and explain itself.  CoreLogic didn't do so. Viewing these facts in the light most favorable to Uhlig, a reasonable factfinder could adopt Uhlig's view of this exchange's meaning.

Mr. Button then forwarded these emails to WelcomeLink employee Andrew Gross, mentioning a "recently discussed Corelogic issue." Doc. 286 at 2 (Uhlig Ex. 41). Mr. Gross investigated and prepared a summary that he sent to other Uhlig employees. *See* Doc. 286-1 (Uhlig Ex. 42). Mr. Gross explained the Nevada State Bank email and noted that CoreLogic, on the CondoSafe Report, had listed Mr. Brune of CondoCerts as the Preparer. *Id.* at 12. Mr. Gross wrote, "CoreLogic did not provide an explanation[.]" *Id.* at 13. And Mr. Gross wrote, "Since that point, no further action has been taken." *Id.* Again, the court views this exchange as a less than ideal fact for Uhlig. But Delaware law requires CoreLogic to surmount a high evidentiary burden. And it must do so on the summary judgment facts. A reasonable factfinder could conclude that this 2019 evidence shows CoreLogic didn't deal transparently with Uhlig. As a result, that factfinder could conclude that Uhlig still didn't know what, exactly, CoreLogic was doing.

Even if Uhlig had known CoreLogic received payment from its customer for Uhlig's Community Information, that doesn't mean Uhlig understood CoreLogic's business activities. Uhlig emphasizes that CoreLogic's relationship with lenders wouldn't have clued it to CoreLogic's reselling of the data. As already mentioned, Uhlig's business model imagines that the entity paying Uhlig for the data is a pass through so, ultimately, another party—*i.e.*, a bank or a homeowner—might foot the bill. Doc. 309-8 at 11–12 (Uhlig Dep. 62:4–63:18). "The purpose of Custom Questionnaires is underwriting a loan, so regardless of the category of purchaser, the purpose always, ultimately, is on behalf of or for the benefit of a lender." Doc. 309-3 at 3 (Uhlig Decl. ¶ 10). So, Uhlig avers, just because it knew that CoreLogic *ordered* data for lenders doesn't mean Uhlig knew CoreLogic had *resold* data to lenders.

CoreLogic responds, arguing multiple "Uhlig witnesses admitted they understood CoreLogic was selling Uhlig data to lenders, not merely acting on behalf of lenders." Doc. 327 at 12 (CoreLogic Resp. Statement of Fact ¶ 356). In support, CoreLogic again cites Mr. Button's testimony. But Mr. Button's testimony, recounted above, is confusing. Mr. Button testified he assumed CoreLogic provided data to lenders and, at some point, got paid for it. But he also testified that he didn't understand exactly what CoreLogic was doing.

In sum, genuine, material issues of fact inhere in Uhlig's knowledge and purported agreement to the course of the parties' conduct. And CoreLogic must clear a demanding summary judgment burden. Uhlig knew about the resales in 2016 and it didn't follow through on it. But that doesn't mean Uhlig agreed to modify the contract terms by course of dealing. To the contrary, when CoreLogic later proposed a modification via the License Agreement, Uhlig rejected it. Uhlig's employees testified they understood CoreLogic, generally, and suspected CoreLogic had used Uhlig data for money. But they also testified they didn't know what, exactly, CoreLogic did with the data. Perhaps a jury will adopt Uhlig's view of the evidence. Perhaps it won't. But, at summary judgment, the court must view all the facts in the light most favorable to Uhlig. And given the conflicting evidence over Uhlig's purported acceptance of a change to the contracts by course of conduct, CoreLogic has failed to shoulder its high evidentiary burden to show modification as a matter of law. The court thus denies this aspect of CoreLogic's summary judgment motion.

The court next takes up a related inquiry: CoreLogic's argument that Uhlig acquiesced to CoreLogic's breaches.

### 3. CoreLogic hasn't shouldered its burden to show that Uhlig acquiesced.

CoreLogic also invokes the equitable defense of acquiescence.  *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1042 (Del. 2014).  Under Delaware law, a plaintiff

> is deemed to have acquiesced in a complained-of-act where he:  has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.

*Id.* at 1047 (citation and internal quotation marks omitted).  The defense of acquiescence doesn't require "conscious intent to approve the act" or "a change of position or resulting prejudice."  *Id.* (citations omitted).  "Acquiescence centers on the *defendant* and *its* understanding that complained-of acts were acquiesced in."[41]  *Fotta v. Morgan*, No. 8230, 2016 WL 775032, at *8 (Del. Ch. Feb. 29, 2016) (emphasis in original) (quotation cleaned up).  And therein lies CoreLogic's mistake.

CoreLogic focuses all its summary judgment arguments on Uhlig's knowledge.  Doc. 289 at 57–58; Doc. 327 at 21–22.  But CoreLogic should have focused—not on Uhlig's knowledge—but on CoreLogic's own understanding.  "Instead, the Defendants largely focus on the *Plaintiffs' knowledge* after the alleged wrongdoing and merely have asserted that they were aware of the Plaintiffs' inaction."  *Fotta*, 2016 WL 775032, at *9 (emphasis in original) (denying summary judgment on defendants' argument that plaintiffs acquiesced to controversial stock dividend—by remaining silent for three years—because defendants had "made no assertions regarding their own view of the Plaintiffs' knowledge of the 2010 Stock Dividend and their inaction at the time it was declared" (emphasis omitted)).  Acquiescence "centers on the *defendant* and *its*

---

[41]  "The Delaware Supreme Court has not specifically enumerated the burden of proof in an acquiescence affirmative defense."  *Wellin v. Wellin*, 430 F. Supp. 3d 84, 95 n.7 (D.S.C. Dec. 26, 2019) (applying Delaware law).  In *Wellin*, the South Carolina federal district court concluded that, because acquiescence is an equitable defense, "the burden of proof for acquiescence is likely clear and convincing evidence."  *Id.* (internal quotation marks omitted).  The court need not determine the burden of proof here, because CoreLogic fails to meet its burden even on the preponderance standard.

understanding[.]" *Fotta*, 2016 WL 775032, at *8 (emphasis in original) (internal quotation marks and citation omitted).  To deserve summary judgment, CoreLogic had to adduce evidence that Uhlig's actions led it believe it could resell the data, making Uhlig "complicit in the very breach for which [it] seeks damages." *Id.* (citation and internal quotation marks omitted).  CoreLogic hasn't done so.

To argue acquiescence, CoreLogic relies heavily on Uhlig's internal communications.  But no evidence suggests that CoreLogic knew about those communications at the time.  The closest CoreLogic comes to adducing evidence of its own understanding are the License Agreement negotiations.  Viewing the facts in the light most favorable to Uhlig, however, those emails don't establish acquiescence.  Uhlig rejected CoreLogic's attempt to modify the parties' contracts through the License Agreement.  To be sure, Uhlig continued to do business with CoreLogic after rejecting the License Agreement, affirmatively acting in a way that might show acquiescence.  But that just presents another fact issue:  Uhlig maintains that it didn't acquiesce to CoreLogic's breach because, even after the License Agreement discussion, CoreLogic continued to sign contracts that forbade use for commercial purposes.  So, while CoreLogic frames the parties' continued business relationship as acquiescence to CoreLogic's activities, Uhlig frames it as CoreLogic's acceptance of Uhlig's terms and conditions.  Enter the jury, and this case's need for that jury to resolve another important, but disputed fact.  A reasonable factfinder might go either way.

The court thus rejects CoreLogic's acquiescence argument because it's failed to shoulder its burden to establish Uhlig's acquiescence as a matter of law.

> **4.    Uhlig has adduced sufficient evidence for a reasonable factfinder to conclude that CoreLogic executed thousands of contracts.**

CoreLogic argues it's entitled to summary judgment on Uhlig's breach of contract claims because Uhlig hasn't adduced proof of 14,000 separate contracts.  To evaluate this argument, the court revisits the evidence about Uhlig's Customer Agreements.

To purchase Community Information from Uhlig, a purchaser must execute specific actions on Uhlig's Ordering Sites, CondoCerts.com and WelcomeLink.com.  Doc. 284-2 at 3 (Uhlig Decl. ¶ 7).  When making a purchase on an Ordering Site, a purchaser must review and agree, at minimum, to (1) the Terms of Use, (2) the Registration Agreement, and (3) the Order Submission Agreement.  *Id.* (Uhlig Decl. ¶ 8).[42]  And, if the purchaser uses a custom form, the purchaser must review and agree to (4) the Information Upload Agreement.  *Id.*

Here's how these four agreements work.  *First*, every time a purchaser enters an Ordering Site, the purchaser must review and accept the Terms of Use.  *Id.* (Uhlig Decl. ¶ 9).  *Second*, to gain access to the Ordering Site's ordering functionality, a purchaser must register.  *Id.*  When the purchaser registers as a user of the Ordering Site, the purchaser must review and accept Uhlig's Account Registration Agreement.  *Id.*  *Third*, every time a purchaser places an order, the purchaser must review and accept the Order Submission Agreement.  *Id.*  And, *last*, as just mentioned, to upload a custom form, a purchaser must review and accept the Information Upload Agreement.  *Id.*  CoreLogic points out that Uhlig has used many versions of these contracts over the years.  Doc. 311 at 13.  Indeed, Uhlig has used different versions of its Customer Agreements at different times.

For example, Uhlig updated its current Terms of Use on CondoCerts in May 2021 and on WelcomeLink in August 2021.  Doc. 284-2 at 4 (Uhlig Decl. ¶ 11); Doc. 284-4 (Uhlig Ex. 3); Doc. 284-5 (Uhlig Ex. 4).  Before this current version, Uhlig had a 2018 version of the Terms of

---

[42]     CoreLogic objected, claiming that the court should disregard this part of Mr. Uhlig's declaration for lack of personal knowledge.  But the court already has overruled this objection.  *See above* n.4.

Use on CondoCerts from June 2018 until May 2021.  Doc. 284-2 at 4 (Uhlig Decl. ¶ 11); Doc. 284-6 (Uhlig Ex. 5).  And it used this 2018 Terms of Use version on WelcomeLink from June 2018 until August 2021.  Doc. 284-2 at 4 (Uhlig Decl. ¶ 12); Doc. 284-6 (Uhlig Ex. 5).  Before the 2018 version of the Terms of Use, Uhlig used another version dating back to 2007.  Doc. 284-7 (Uhlig Ex. 6).  CoreLogic asserts that these different versions of the Terms of Use contain "significant differences."  Doc. 311 at 13 (CoreLogic Resp. Statement of Fact ¶ 9).  CoreLogic even submitted a redline comparison of the 2007 and 2021 Terms of Use.  Doc. 314 (CoreLogic Ex. 36).  But, as Uhlig correctly points out, the language relevant to the current dispute remained the same—*i.e.*, each version of the Terms of Use prohibited CoreLogic from exploiting the Ordering Sites for commercial purposes.  Doc. 284-4 at 7 (Uhlig Ex. 3); Doc. 284-5 at 7 (Uhlig Ex. 4); Doc. 284-6 at 5 (Uhlig Ex. 5); Doc. 284-7 at 4 (Uhlig Ex. 6); *see also* Doc. 314 at 7 (CoreLogic Ex. 36).

Outside the Terms of Use, Uhlig first added the current form of the CondoCerts Information Upload Agreement and Account Registration Agreement to its Ordering Sites on May 26, 2021.  Doc. 309-3 at 3–4 (Uhlig Decl. ¶ 13).  Though these contracts didn't exist before May 2021, Uhlig asserts that its other contracts contained "substantially similar provisions, representations and prohibitions[.]"  *Id.*

Uhlig has submitted each version of all four agreements that existed on their Ordering Sites while CoreLogic was placing orders.  *See* Doc. 284-4 (Uhlig Ex. 3); Doc. 284-5 (Uhlig Ex. 4); Doc. 284-6 (Uhlig Ex. 5); Doc. 284-7 (Uhlig Ex. 6); Doc. 284-8 (Uhlig Ex. 7); Doc. 284-9 (Uhlig Ex. 8); Doc. 284-10 (Uhlig Ex. 9); Doc. 284-11 (Uhlig Ex. 10); Doc. 284-12 (Uhlig Ex. 11); Doc. 284-13 (Uhlig Ex. 12); Doc. 284-14 (Uhlig Ex. 13).  Uhlig also has adduced evidence that CoreLogic properly could secure data from Uhlig only if it agreed to these four contracts.

Uhlig's CEO testified, "Uhlig's website processes were automated to require assent to its contracts before the next step was taken."  Doc. 309-3 at 4 (Uhlig Decl. ¶ 16).  Because of this automation, "Uhlig did not maintain a specific record of customer contract executions."  *Id.*  This admission about a lack of specific records spills blood into the water for CoreLogic.

CoreLogic argues that Uhlig has "failed to produce evidence of (1) the existence of 14,000 separate contracts where CoreLogic purportedly agreed to Uhlig's terms; (2) CoreLogic's breach of 14,000 contracts; or (3) resulting damages for each of the 14,000 alleged breaches."  Doc. 289 at 49.  According to CoreLogic, Uhlig needs direct evidence of how, exactly, CoreLogic executed each and every agreement.  That is, in CoreLogic's view, Uhlig must explain how, exactly, its contracts function on its website.  But that's just not what the law requires.

To the contrary, Uhlig has created a triable issue of contract formation.  It's undisputed that CoreLogic placed thousands of orders through Uhlig's Ordering Sites.  Uhlig has submitted each relevant version of all four contracts.  And Uhlig has adduced evidence explaining how CoreLogic had to agree to these contracts to place an order.  That is, according to Uhlig's CEO, Uhlig's Ordering Sites forced CoreLogic to agree to these contracts.  *See* Doc. 284-2 at 3 (Uhlig Decl. ¶ 9).  Viewing the evidence in the light most favorable to Uhlig, a reasonable factfinder could conclude from Uhlig's evidence that CoreLogic assented to the contracts when it placed orders, registered accounts, and uploaded custom forms.  And the authority cited by CoreLogic fails to convince the court that no reasonable factfinder could conclude that CoreLogic entered into thousands of contracts with Uhlig.

On the contrary, CoreLogic's authority convinces the court that contract formation presents a triable issue here because each case relies heavily on the factual circumstances.  *See*

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428–30 (2d Cir. 2004) (applying New York contract law and explaining that—depending on the facts—mutual assent can arise from (i) shrinkwrap agreements, which force user exposure to terms, (ii) clickwrap agreements, which force user to manifest assent or rejection, and (iii) browsewrap agreements, where user assents to contract when visiting website); *Design With Friends, Inc. v. Target Corp.*, No. 1:21-cv-01376, 2023 WL 3434013, at *3–4 (D. Del. May 12, 2023) (applying Delaware law and denying motion to dismiss where plaintiff's website included contract via link to terms at bottom of website—a "browsewrap" agreement—and plaintiff plausibly alleged that defendant actually had accessed terms or had inquiry notice because terms were conspicuous on website); *Davitashvili v. Grubhub Inc.*, No. 20-cv-3000, 2023 WL 2537777, at *7 (S.D.N.Y. Mar. 16, 2023) (concluding defendants had failed to show that plaintiffs agreed to arbitration agreement as a matter of law because defendants had failed to adduce evidence that plaintiffs assented or that a reasonable person would've noticed the arbitration agreements); *Nager v. Tesla Motors, Inc.*, No. 19-2382, 2019 WL 4168808, at *3–4 (D. Kan. Sept. 3, 2019) (finding fact issue prevented court from determining plaintiffs had agreed to arbitrate where defendants said plaintiffs electronically accepted terms but plaintiffs maintained they never saw the electronic terms); *Netstandard Inc. v. Citrix Sys, Inc.*, No. 16-2343, 2017 WL 2666168, at *3–5 (D. Kan. June 21, 2017) (applying Kansas law and concluding defendant failed to carry its burden to show plaintiff accepted arbitration agreement as a matter of law where defendant failed to present evidence plaintiff clicked on the agreements and, even if plaintiff did so, arbitration agreement materially altered contract and plaintiff maintained it didn't know arbitration agreement was intended as part of agreement); *In re Zappos.com, Inc. Customer Data Security Breach Litig.*, 893 F. Supp. 2d 1058, 1063–66 (D. Nev. 2012) (applying Nevada law and acknowledging that, depending on facts

74

about website, browsewrap agreements on website can lead to contract, but finding no agreement because arbitration agreement was illusory and therefore unenforceable).

Beyond the contract formation issues, and viewing the evidence in the light most favorable to Uhlig, the issues of breach and damages also present triable issues. A reasonable factfinder could conclude that CoreLogic breached the agreements—depending, of course, on how that factfinder views CoreLogic's evidence about course of conduct modification. And a reasonable factfinder also could find that Uhlig suffered damages from the breach. The court thus declines to grant summary judgment against Uhlig's breach of contract claims.

That completes the court's analysis of CoreLogic's motion for summary judgment against Uhlig's breach of contract claims. Before the court leaves the breach of contract setting, however, it addresses Uhlig's motion seeking summary judgment in its own favor on its breach of contract claims.

### 5. Uhlig isn't entitled to summary judgment on its breach of contract claims.

In its Motion for Summary Judgment (Doc. 283), Uhlig asks the court to enter summary judgment on the issue of liability on Uhlig's four breach of contract claims. Uhlig argues that CoreLogic concedes it violated Uhlig's Customer Agreements, and CoreLogic's affirmative defenses fail as a matter of law. So, Uhlig reasons, it's entitled to summary judgment on the liability portion of its breach of contract claims. Anyone's who's lasted this long, however, is likely to know the fate of this argument.

Now the summary judgment standard requires the court to flip the facts and view them in the light most favorable to CoreLogic, the non-movant. So, facts that went Uhlig's way on CoreLogic's Motion for Summary Judgment read the opposite. A reasonable factfinder could conclude that Uhlig breached the implied contract, as modified by the parties' course of conduct.

The court revisits the categories of facts from CoreLogic's motion—the parties' relationship, the License Agreement, the GOAUA, and Uhlig's knowledge—to explain why a fact issue precludes summary judgment in Uhlig's favor on its breach of contract claims.

Start with the parties' relationship. Uhlig first did business with CoreLogic in 2015— specifically, with CoreLogic Solutions to integrate CoreLogic's Jenark property management software with WelcomeLink. Doc. 291-28 at 5, 16 (CoreLogic Ex. 58). Jenark is unrelated to CondoSafe, so, drawing the factual inferences in CoreLogic's favor, Uhlig knew that CoreLogic operates multiple businesses in the real estate field. And, once CoreLogic started placing orders with Uhlig, Uhlig had numerous unique processes for dealing with CoreLogic—*i.e.*, a special workflow, Doc. 290-7 at 4 (Button Dep. 29:5–15) and a section of its training dedicated to CoreLogic specifically, Doc. 292-20 at 3 (CoreLogic Ex. 80). So, construing the facts in the light most favorable to CoreLogic, Uhlig knew quite a bit about CoreLogic during the course of the parties' relationship.

Next, consider the License Agreement discussion. CoreLogic proposes a License Agreement, and Uhlig responds that it only offers its products and services according to its terms and conditions. Doc. 291-9 at 4 (CoreLogic Ex. 39). CoreLogic responds with questions, explaining that it's done "business with CondoCerts for many years, and had an agreement with them on our relationship." *Id.* at 3. Also, CoreLogic points out, "The Terms on your side . . . and the way we do business with your company, and our clients, are not aligned." *Id.* CoreLogic then asks to schedule a call. *Id.* Uhlig responds that it's happy to answer questions and requests more details before scheduling a call. *Id.* CoreLogic responds to Uhlig, asserting that the parties can consider two—"very different"—contracts to memorialize the parties' relationship: (1) the License Agreement or (2) Uhlig's Terms and Conditions from its

CondoCerts website.  *Id.* at 2.  CoreLogic notes that the CondoCerts Terms and Conditions "seem to be further away from the parties' course of dealing."  *Id.*  CoreLogic then advises that it's happy to work with Uhlig on "whatever form you prefer because in the end all we're looking to do is memorialize our existing relationship in furtherance of a continuing and mutually prosperous association[.]"  *Id.*  The summary judgment record doesn't contain evidence that Uhlig ever responded to this email.  Uhlig could have responded with a concern or terminated CoreLogic's access at any time.  It didn't.  It didn't do so despite CoreLogic's invitation to "reach out if you have questions or concerns[.]"  *Id.*  CoreLogic maintains that this silence speaks volumes, and a reasonable factfinder thus could agree, depending on how the factfinder views Uhlig's conduct.  *Corp. Serv. Co. v. Kroll Assocs., Inc.*, No. 99C-12-210, 2001 WL 755934, at *4 (Del. Super. Ct. June 15, 2001) ("As a general rule, an offeree does not need to reply to an offer, and his silence and inaction will not be construed as an assent to an offer. When the offeree through his conduct leads the offeror to conclude that he has accepted the proposal, however, the court will view silence as being tantamount to acceptance." (quotation cleaned up)).

Then consider the GOAUA.  This provision gave CoreLogic permission to provide Uhlig's data to lenders without restriction.  And Uhlig signed CoreLogic's customer forms with the GOAUA on them.  As mentioned above, this fact is less than ideal for Uhlig.  Uhlig maintains there's no evidence Uhlig knew of the GOAUA.  Doc. 284 at 37.  The summary judgment evidence precludes the court from agreeing with Uhlig.  When asked if he "never reviewed" the GOAUA, Uhlig employee Mr. Brune responded, "No, I can't say that.  But, you know, thousands would be an estimate.  I mean, it's my job to complete the forms, as many as possible."  Doc. 290-6 at 26 (Brune Dep. 113:9–17).  Given this double negative, a reasonable

factfinder could conclude that Uhlig saw the GOAUA its employee had signed.  This would amount to a reasonable conclusion because the GOAUA sits right above the signature of the Uhlig employee.  *See* Doc. 285-2 at 6 (Uhlig Ex. 27).  And a reasonable factfinder also could conclude that the signature represented an affirmative act of acceptance by Uhlig of the terms expressed in CoreLogic's GOAUA.

Uhlig also maintains that the Uhlig employees who signed the CoreLogic custom forms containing the GOAUA didn't have actual authority to bind Uhlig.  But, as CoreLogic correctly points out, a reasonable factfinder could conclude these employees had apparent authority.  *See Int'l Boiler Works Co. v. Gen. Waterworks Corp.*, 372 A.2d 176, 177 (Del. 1977) (recognizing agent with apparent authority can bind principal if "third person involved reasonably concludes that the agent is acting for the principal"); *see also Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *19 (Del. Ch. Dec. 8, 2017) ("A corporate principal may make a manifestation to a third party concerning an agent's authority by placing the agent in charge of a transaction or situation." (quotation cleaned up)).  And Mr. Button approved custom forms like CoreLogic's—an additional source of apparent authority that approved of the GOAUA.  Doc. 290-7 at 17–18 (Button Dep. 73:18–74:23).  Though Mr. Button testified to a cursory review, a reasonable factfinder could conclude that Uhlig's review either captured or should have captured attention to the GOAUA on CoreLogic's custom form.  And Uhlig ultimately approved CoreLogic's custom form with the GOAUA.  In sum, viewing the facts in the light most favorable to CoreLogic, a reasonable factfinder considering the GOAUA evidence could conclude Uhlig saw the GOAUA and understood CoreLogic was selling Uhlig's data to lenders without restriction.[43]

---

[43]     Uhlig tries to neutralize the bad fact presented by the GOAUA by emphasizing its stamp, "which affirmed that the Uhlig employees executing the Questionnaires did so only in accordance with the Order

Finally, and perhaps most importantly, consider the evidence of Uhlig's knowledge in the light most favorable to CoreLogic.  Uhlig Customer Support Manager Chris Button testified that he assumed CoreLogic was selling a service and, to the best of his understanding, that service was securing Community Information from CondoCerts and providing it to CoreLogic's customers.  *Id.* at 5–6 (Button Dep. 32:16–33:3).  Uhlig Senior Customer Support Representative Jennifer Michelson testified she understood CoreLogic was purchasing Community Information on behalf of its lender customers.  Doc. 290-12 at 15 (Michelson Dep. 75:6–24).  As examined earlier, both Mr. Button and Ms. Michelson later softened their testimony, emphasizing they didn't know exactly what was going on.  But, viewed in the light most favorable to CoreLogic, a reasonable factfinder could conclude Uhlig knew enough.

Uhlig emphasizes that its own internal emails can't show that Uhlig agreed to modify the contracts.  CoreLogic responds that it was transparent with Uhlig, Uhlig knew what CoreLogic was up to, and, when Uhlig continued to fill orders, it agreed, in effect, to new terms of business.  A reasonable factfinder could side with CoreLogic's view of the evidence.  For example, recall the now-famous July 2016 email chain, wherein Uhlig's employee—Ms. Ross—raised a red flag about CoreLogic's actions and identified the contractual provision she believed CoreLogic had violated.  Doc. 285-11 at 2 (Uhlig Ex. 37).  Critically, Ms. Ross's investigation occurred only because CoreLogic had reached out to Uhlig first.  *Id.* at 8–9.  Uhlig asked CoreLogic what it

---

Submission Agreement, which incorporated the Terms of Use, prohibited commercial use of Uhlig's data, and expressly forbade any Attempted Alteration."  Doc. 284 at 38 (internal quotation marks omitted).  But that stamp doesn't appear on every questionnaire containing the GOAUA.  And, as explained earlier when addressing CoreLogic's Motion for Summary Judgment, the stamp merely introduces more confusion because it meant CoreLogic's custom forms contradicted themselves.  *See above* § III.F.2.c. And, viewing all the evidence in the light most favorable to CoreLogic, the court must infer that Uhlig saw the GOAUA before it added the stamp.  After all, the GOAUA sits in plain sight immediately above the signature line.  The court thus declines to accredit Uhlig's evidence about its actions "after discovering" the GOAUA.  Doc. 284 at 38.

was doing with the data, and CoreLogic responded:  "CoreLogic is ordering these documents on behalf of lenders[.]"  *Id.* at 3.  A reasonable factfinder could credit this as evidence of transparency.  Add in the discussion about the 2018 License Agreement—where CoreLogic told Uhlig that its use of the data didn't align with Uhlig's terms—and a reasonable factfinder could find clear and convincing evidence of further transparency from CoreLogic.

The internal emails represent another Uhlig problem—possible acquiescence.  In these emails, CoreLogic informs Uhlig what it's doing, and Uhlig—despite investigating—ultimately did nothing.  Indeed, when Nevada State Bank asked Uhlig about a CondoSafe Report because the CondoSafe Report listed Uhlig as the preparer, Uhlig investigated and explicitly noted that it wasn't taking further action.  Doc. 286-1 at 12–13 (Uhlig Ex. 42).  Viewing these facts in the light most favorable to CoreLogic, a reasonable factfinder could find this "evidence of acquiescence" shows "the substitute of an oral agreement for the written provisions" of the parties' contract.  *Pepsi-Cola Bottling Co.*, 297 A.2d at 33.

In sum, even applying a heightened evidence standard, CoreLogic has adduced sufficient evidence from which a reasonable factfinder could find that the parties modified their contract by their course of dealing, or, alternatively, that Uhlig acquiesced to a modification.  The court thus denies Uhlig's request for summary judgment in its favor on the liability elements of its breach of contract claims.  This concludes the court's analysis of Uhlig's breach of contract claims.  The court now moves to Uhlig's Motion for Summary Judgment against CoreLogic's affirmative defenses.

### H.    CoreLogic's Affirmative Defenses

In its Motion for Summary Judgment (Doc. 283), Uhlig asks for summary judgment against 11 of CoreLogic's affirmative defenses, as directed at Uhlig's breach of contract claims.

This request requires the court to view all the facts in the light most favorable to CoreLogic.  The court begs forgiveness for the laborious[44] trek required to address these affirmative defenses.

*First*, Uhlig asks for summary judgment against CoreLogic's "failure to state a claim" affirmative defense because Uhlig has stated a claim for breach of contract.  Doc. 284 at 52.  CoreLogic responds, "Uhlig does not meet its burden on summary judgment as to CoreLogic's assent to the post-2007 'Customer Agreements' or as to CoreLogic's breach."  Doc. 311 at 65.  The court already has addressed this small squabble above, where it concluded a reasonable factfinder could conclude CoreLogic had agreed to Uhlig's Customer Agreements when it placed orders, registered accounts, etc., and breached those contracts by using Uhlig's data for commercial purposes.  The court thus concludes Uhlig has stated a claim for breach of contract.  So, the court grants Uhlig's Motion for Summary Judgment against CoreLogic's "failure to state a claim" defense.

*Second*, Uhlig seeks summary judgment against CoreLogic's statute of limitations defense to Uhlig's breach of contract claims.  Doc. 284 at 52.  As mentioned above, Uhlig's statement of its breach of contract claims in the Pretrial Order doesn't contain a time limit.  *See* Doc. 279 at 27–28 (Pretrial Order ¶ 4.a.ii.).  Only when CoreLogic raised a statute of limitations defense at summary judgment did Uhlig refine its breach of contract claims to "seeks damages for each breach of contract after November 21, 2016."  Doc. 309 at 34.  So, CoreLogic's affirmative defense succeeds in part, as this Order already makes clear, and Uhlig doesn't deserve summary judgment against it.

---

[44]        The court has complained to the parties many times about their overlitigation of this case.  Apparently, that message has fallen on deaf ears.  These affirmative defense spats are a prime example of this overlitigation.  Most of Uhlig's requests for summary judgment against affirmative defenses resemble its substantive summary judgment arguments; that is, the affirmative defenses arguments are repetitive.

*Third*, Uhlig seeks summary judgment against CoreLogic's laches defense.  Doc. 284 at 52.  Uhlig first argues that this defense is an equitable one that doesn't apply to its breach of contract claims.  Uhlig's argument has its appeal for such a simple rule would simplify the work of courts and litigants alike.  But Uhlig's argument contradicts the governing law.  *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 504 (Del. 1996) (holding breach of contract claim barred by laches).  Uhlig also argues CoreLogic can't establish the elements of laches, *i.e.*, that "(1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant."  *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).  Both elements "are questions of fact that depend upon the totality of the circumstances."  *Id.*  Viewing the facts in the light most favorable to CoreLogic, a reasonable factfinder could conclude Uhlig "waited an unreasonable length of time before bringing the suit," and in so doing, prejudiced CoreLogic because CoreLogic thought Uhlig knew of its activities, so CoreLogic invested in its CondoSafe product.  *Id.*  The court thus denies Uhlig's request for summary judgment against this affirmative defense.

*Fourth*, Uhlig seeks summary judgment against CoreLogic's unclean hands defense.  Doc. 284 at 55.  Uhlig again argues that this defense is an equitable one unavailable to CoreLogic here.  *Id.*  Not so.  *See Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 493 (Del. Ch. 2022) (explaining unclean hands can apply to breach of contract claims if plaintiff seeks equitable relief).[45]  And unclean hands "starts from the premise that courts should not be

---

[45] The court notes that Uhlig, in its reply brief, presumed that laches and unclean hands apply.  Doc. 325 at 20.  This concession likely came from CoreLogic's point that Uhlig seeks equitable remedies, so equitable doctrines apply.  Doc. 311 at 64–65.  But, when pointing out that Uhlig seeks equitable remedies, CoreLogic cites the Second Amended Complaint, not the Pretrial Order.  That is, CoreLogic doesn't identify Uhlig's equitable relief preserved in the Pretrial Order.  So, the court pauses briefly here to consider the damages asserted in the Pretrial Order for Uhlig's claims that survive summary judgment to make sure that equitable relief survives, too.

granting relief to parties who have acted improperly and at the same time recognizes that public confidence in the judicial system would decline if bad actors prevailed notwithstanding their bad acts." *Id.* at 492. Viewing the facts in the light most favorable to CoreLogic, a reasonable factfinder could conclude that Uhlig knew about CoreLogic's use of the data in 2016, 2018, or 2019. And yet, did nothing. A reasonable factfinder also could conclude the parties modified their contract through their course of dealing. So, a reasonable factfinder could conclude, Uhlig improperly repudiated the contract in 2021. A fact issue thus remains on CoreLogic's unclean hands defense, so Uhlig doesn't deserve summary judgment against it.

*Last*, the court addresses the remaining affirmative defenses together: waiver, estoppel, ratification, novation, license, acquiescence, and modification. Both parties acknowledge that these affirmative defenses depend on the court's rulings about the course of conduct modification. *See* Doc. 311 at 66–67 (citing heavily its arguments from earlier in the summary judgment brief); Doc. 325 at 21 (conceding these "affirmative defenses are premised on a finding of modification" and moving for summary judgment based on the incorrect assumption that no reasonable factfinder could find modification). As explained, perhaps ad nauseam, a fact issue remains about Uhlig's breach of contract claims. It prevents the court from granting summary judgment to either end of the caption. CoreLogic paints a picture of its full transparency and Uhlig's full knowledge of its use of Uhlig's data. Uhlig's rejoinder paints a picture of its uncertainty about CoreLogic, its rejection of CoreLogic's License Agreement, and CoreLogic's

---

For its Lanham Act claim, Uhlig seeks: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action subject to the principles of equity." Doc. 279 at 40 (Pretrial Order ¶ 5.a.i.) (citation and internal quotation marks omitted). Uhlig's breach of contract claims seek monetary damages, plus fees and costs. *Id.* at 41 (Pretrial Order ¶ 5.a.ii.). The parties—understandably—haven't addressed whether these specific remedies for the surviving claims are legal or equitable. Uhlig's Lanham Act damages invoke "the principle of equity" so the court assumes that laches and unclean hands apply. If the court's assumption is incorrect, it's certain the parties will correct it.

sneakiness. The factfinder reasonably could find either picture compelling. And, with Uhlig moving for summary judgment, the court must view the facts (and the inferences) in the light most favorable to CoreLogic. This obligation means the court must adopt CoreLogic's picture of the facts. So, Uhlig isn't entitled to summary judgment against these affirmative defenses.

This discussion completes the court's discussion of Uhlig's claims, as at issue on summary judgment. Next, the court turns its attention to CoreLogic's counterclaims.

## I.      CoreLogic's Counterclaims

CoreLogic asserts three counterclaims against Uhlig: (i) breach of contract, (ii) breach of the duty of good faith and fair dealing, and (iii) tortious interference with contractual relations. Doc. 279 at 37 (Pretrial Order ¶ 4.c.). CoreLogic bases its claims on Uhlig "abruptly and permanently terminating CoreLogic's access to WelcomeLink and CondoCerts on November 9, 2021 without advanced notice and without CoreLogic having the opportunity to recoup its investment in CondoSafe." *Id.* (Pretrial Order ¶ 4.c.i.). Uhlig has filed a Motion for Summary Judgment (Doc. 283) against these counterclaims. Uhlig makes many arguments, but to decide the issue the court need consider just one: Uhlig's argument that the one-year statute of limitations in the Terms of Use bars CoreLogic's counterclaims.

First, the court begins by deciding whether this one-year statute of limitations applies. Let's imagine that the court buys CoreLogic's theory: that is, the parties modified Uhlig's Terms of Use[46] and voilà—a new, implied contract emerged. This new contract, CoreLogic contends, allows CoreLogic to use Uhlig's Community Data for commercial purposes. And so, CoreLogic

---

[46]      As Uhlig points out, CoreLogic alleges that the parties modified Uhlig's Terms of Use contract specifically—but not any of the other Customer Agreements. CoreLogic never says this explicitly, but its brief implicitly adopts this view because it only references Uhlig's Terms of Use. *See* Doc. 311 at 55–56 (describing Terms of Use as contract of indefinite duration that required Uhlig to give reasonable notice before terminating); *id.* at 57 (describing modification of Terms of Use).

reasons it thus has satisfied its burden to demonstrate a contract modification with "such specificity and directness . . . to leave no doubt of the intention of the parties[.]" *Reeder v. Sanford Sch.*, 397 A.2d 139, 141 (Del. Super. Ct. 1979).  What, exactly, does this new, implied contract look like?

Some terms from the old contract survive.  After a modification by course of conduct, the "resulting contract is not just the modification, but rather the modification plus the terms of the former contract not inconsistent therewith."  *Haft*, 1994 WL 828326, at *12 (applying Delaware law).  So, some provisions from the old Terms of Use survive because a "a new contract does not destroy the obligation of the former agreement, except as inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely."  *Id.* (quotation cleaned up).

Uhlig argues that an important provision in the Terms of Use survived the parties' modification, assuming one occurred:  the one-year statute of limitations.  The CondoCerts Terms of Use provides, "any claim against CondoCerts must relate to a specific order submitted to CondoCerts and must be commenced by filing an individual action within one year of the date of the submission of the order to which the claim relates[.]"  Doc. 284-4 at 12 (emphasis omitted) (Uhlig Ex. 3).  WelcomeLink's Terms of Use contains a nearly identical provision. Doc. 284-5 at 12 (Uhlig Ex. 4).  No evidence suggests the parties' course of conduct modified this statute of limitations provision.  And it's not inconsistent with the parties' course of conduct modification.  So, the statute of limitation provision survives in the new, implied contract, assuming there is one.

Uhlig asserts that this one-year contractual statute of limitations bars CoreLogic's counterclaims because CoreLogic's claim began to accrue in November 2021, when Uhlig

terminated its access to the Ordering Sites, "yet, CoreLogic did not assert a viable claim against

Uhlig until February 7, 2023[.]"  Doc. 284 at 44.  February 7, 2023, is the date when CoreLogic

filed its Second Amended Counterclaims.  *See* Doc. 100.  The court agrees.  The one year

limitation renders CoreLogic's counterclaims untimely.  No reasonable factfinder could conclude

otherwise.  Trying to avoid this fate, CoreLogic makes three arguments.  All fail.

   *First*, CoreLogic argues that its Second Amended Counterclaims relate back to its First

Amended Counterclaims (Doc. 29), which CoreLogic filed on January 10, 2022.  Doc. 29.  "An

amendment to a pleading relates back to the date of the original pleading when . . . the

amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set

out—or attempted to be set out—in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1).  Sound

legal principle, but nothing permits its application here.

   CoreLogic's first Counterclaims included a breach of contract action, alleging Uhlig had

breached the "2015 Agreement."  Doc. 67 at 27 (Countercl. ¶ 66).  CoreLogic alleged this 2015

Agreement arose from CoreLogic's negotiations with Mutual of Omaha.  *Id.* at 16 (Countercl.

¶ 24).  The 2015 Agreement governed CoreLogic's use of CondoCerts—which, in 2015, Mutual

of Omaha owned.  *Id.*  CoreLogic alleged that, after Uhlig bought CondoCerts, CoreLogic

contacted CondoCerts about the 2015 Agreement, and a discussion—the License Agreement

discussion described above—ensued.  *Id.* at 17–18 (Countercl. ¶¶ 28–33).  CoreLogic alleged

Uhlig breached the 2015 Agreement by repudiating the agreement in November 2021.  *Id.* at 27

(Countercl. ¶ 66).  In September 2022, the court dismissed this breach of contract counterclaim.

Doc. 81.  The court concluded CoreLogic's counterclaim alleged "no facts capable of plausibly

supporting a finding that Uhlig ratified" the purported 2015 Agreement because the counterclaim

described "communications between the parties where Uhlig seemed to have no knowledge of

the [2015] Agreement and then declined CoreLogic's offers to memorialize an agreement outside the Terms of Use Agreement[.]" *Id.* at 36 n.10.

CoreLogic's Second Amended Counterclaim, in contrast, asserts three claims, all based on "an agreement of indefinite term pursuant to Uhlig's Terms of Use as modified by the parties' years-long course of dealing and evidenced by the over 9,000 signed Questionnaires that included the" GOAUA.  Doc. 100 at 17 (Second Am. Countercl. ¶ 28).  CoreLogic argues that the Second Amended Counterclaims relate back to the first Counterclaims "because they relate to the same transaction or occurrence."  Doc. 311 at 61.  But they don't.

The first Counterclaims relied on the 2015 Agreement (called the License Agreement in this Order), whereas the Second Amended Counterclaims relied on an *implied* contract, based on the parties' course of dealing and the GOAUA.  Those are different transactions.  To be sure, the 2015 Agreement/License Agreement is part of the parties' course of dealing.  But it's just one small part.  CoreLogic went from alleging an explicit contract based on one transaction to alleging an implied contract based on thousands of transactions.  Because CoreLogic so expanded the factual universe in its Second Amended Counterclaims, these two counterclaims do not share a "common core of operative facts[.]"  *Mayle v. Felix*, 545 U.S. 644, 664 (2005).  Indeed, the court already has determined the Second Amended Counterclaims asserted a "new breach of contract theory . . . premised on an entirely different set of factual allegations[.]"  Doc. 156 at 14–15.  CoreLogic's Second Amended Counterclaims thus were "based on factual allegations that were new and discrete from the facts [it] originally pled."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 962 (10th Cir. 2012) (affirming district court ruling that amended complaint did not relate back "because the retaliation claim raised new and discrete

allegations that were not pled in [plaintiff's] original complaint").  So, the court concludes that CoreLogic's Second Amended Counterclaims do not relate back.

*Second*, CoreLogic tries to avoid the limitations provision by arguing it's unenforceable. CoreLogic bases this argument on the accrual provision.  The accrual provision contained in the Terms of Use requires a party to bring its claims "within one year of the date of the submission of the order to which the claim relates."  *See* Doc. 284-4 at 12 (emphasis omitted) (Uhlig Ex. 3). CoreLogic argues this provision "is unreasonable as inconsistent with both Kansas and Delaware law pursuant to which a claim for breach of contract accrues upon breach."  Doc. 311 at 60. According to CoreLogic, "enforcing this provision would force parties to bring an action against Uhlig *before* a breach even occurred."  *Id.* at 61 (emphasis in original).  But CoreLogic cites no case where a court has struck down a contractual statute of limitations because its accrual provision conflicts with Delaware law.  And Delaware law applies a "fundamental principle that parties should have the freedom to contract and that their contracts should not easily be invalidated."  *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 172 (Del. Ch. 2005).

Under Delaware law, the court's "goal is to ascertain the intent of the contracting parties based on the contract terms."  *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 489–90 (Del. 2001). Here, the contract manifests a clear intent to resolve all claims about orders from Uhlig's Ordering Sites within one year.  The contract imagines that a user—given the way Uhlig's Ordering Sites work—will have an issue when the user places an order.  And Uhlig's handling of the order is the breach.  That's not inconsistent with Delaware law, which provides that a breach of contract action accrues upon breach.  *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 185–86 (Del. 2021).  This case is slightly unusual because CoreLogic takes issue with Uhlig's *inaction—i.e.*, refusing to allow CoreLogic to place orders.  Nonetheless, the contract explicitly

expresses the parties' mutual intent to resolve any issues within one year.  So, under the provision that the parties elected to adopt as part of their overall bargain, the claim began to accrue when Uhlig refused to handle the order.  The court thus declines to find this bargained-for contract provision unenforceable.

     *Last*, CoreLogic argues that Uhlig has failed to show mutual assent to the post-2007 Terms of Use.  CoreLogic reasons that Uhlig updated its Terms of Use in 2021 to add the statute of limitations provision and Uhlig can't show that CoreLogic ever agreed to those Terms of Use.  But CoreLogic's view of the undisputed facts is a naïve one.  Uhlig has adduced undisputed evidence explaining how the Terms of Use work:  a purchaser must review and accept the Terms of Use every time the purchaser enters an Ordering Site.  Doc. 284-2 at 3 (Uhlig Decl. ¶ 9).  It's undisputed that CoreLogic placed orders after Uhlig updated its Terms of Use in 2021.  *See, e.g.*, Doc. 292-1 (CoreLogic Ex. 61).  Also, Uhlig has submitted the following screenshot of how the Terms of Use appeared on the CondoCerts site in June 2021:



Doc. 325-10 at 2 (Uhlig Ex. 61).  This image shows that CondoCerts users—by clicking "Sign

In"—must confirm that they've understood and read the Terms of Use.  *Id.*  And, critically,

CoreLogic admitted in its Second Amended Counterclaims that it accepted Uhlig's Terms of

Use.  Doc. 100 at 14 (Countercl. ¶ 17).  So, though CoreLogic contends that Uhlig has failed to

show assent to the Terms of Use, no reasonable factfinder could find facts to support that

argument.  Uhlig has adduced sufficient uncontroverted summary judgment evidence that

CoreLogic agreed to the Terms of Use with the statute of limitations provision.

     CoreLogic also argues that Uhlig never notified CoreLogic of its change of terms.  But

Uhlig has adduced evidence that CoreLogic agreed to the Terms of Use *every time* CoreLogic

accessed an Ordering Site.  So, by clicking "Sign In" to access an Ordering Site, CoreLogic

represented that it had read the Terms of Use—including the updated Terms of Use.  As Uhlig

correctly points out, CoreLogic has adduced no evidence suggesting that it didn't read the Terms of Use when it signed in to an Ordering Site.  The court thus rejects CoreLogic's argument that it failed to receive notice of the 2021 Terms of Use that contained the statute of limitations.

So, even in CoreLogic's world of a Terms of Use contract modified by the parties' course of dealing to allow for CoreLogic to use Uhlig's data for commercial purposes, the statute of limitations provision in the Terms of Use survives.  CoreLogic agreed to these Terms of Use— indeed, these are the Terms of Use which CoreLogic has advocated for all along.  And that one-year statute of limitations is enforceable.  Given that Uhlig blocked CoreLogic from placing orders in November 2021, CoreLogic was required to bring its claims by November 2022.  But CoreLogic didn't assert its Second Amended Counterclaims until February 2023.  And those Second Amended Counterclaims don't relate back to CoreLogic's original Counterclaims.  So, CoreLogic's Second Amended Counterclaims are time barred, entitling Uhlig to summary judgment against them.

## IV.        Conclusion

The court grants in part and denies in part CoreLogic's Motion for Summary Judgment (Doc. 288).  The court grants CoreLogic's request for summary judgment against Uhlig's claims for fraud, misappropriation of trade secrets, unjust enrichment, tortious interference, and violating the DDTPA.  Uhlig's breach of contract claims survive.  The court also declines to conclude that Uhlig failed to assert its claim for contractual attorneys' fees properly.

The court also sustains in part and overrules in part CoreLogic's Motion to Review (Doc. 302).  The court sustains CoreLogic's objection to the Pretrial Order's statement of Uhlig's fraud claim.  The court overrules all other objections.

The court grants in part and denies in part Uhlig's Motion for Summary Judgment (Doc. 283).  The court denies Uhlig's request for summary judgment on its own breach of contract

claims.  The court grants Uhlig summary judgment on CoreLogic's failure to state a claim affirmative defense but denies summary judgment against the other affirmative defenses Uhlig targets.  And the court grants Uhlig summary judgment against CoreLogic's counterclaims.

      **IT IS THEREFORE ORDERED BY THE COURT THAT** CoreLogic's Motion to Review (Doc. 302) is sustained in part and granted in part.

      **IT IS FURTHER ORDERED THAT** CoreLogic's Motion for Summary Judgment (Doc. 288) is granted in part and denied in part.

      **IT IS FURTHER ORDERED THAT** Uhlig's Motion for Summary Judgment (Doc. 283) is granted in part and denied in part.

      **IT IS SO ORDERED.**

      **Dated this 6th day of June, 2024, at Kansas City, Kansas.**

                                    **s/ Daniel D. Crabtree**
                                    **Daniel D. Crabtree**
                                    **United States District Judge**